Nicholas Fortuna (NF -9191)
Paula Lopez (PL- 2657)
Allyn & Fortuna LLP
400 Madison Avenue, Suite 10D
New York, NY 10017
Telephone: (212) 213-8844
Facsimile: (212) 213-3318

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____X

NETWORK DATA ROOMS, LLC,

                                           Civil Case No.: 22-CV-2299

                      Plaintiff,          **VERIFIED**
                                              **COMPLAINT**
      -v-

SAULREALISM LLC and RYAN SAUL, in her individual
and professional capacities,

                      Defendants.
_____X

        Plaintiff NETWORK DATA ROOMS, LLC ("NDR" or "Plaintiff"), by its attorneys

Allyn & Fortuna LLP, alleges as follows:

**NATURE OF THE ACTION**

        1.      Plaintiff NDR is the owner of certain software and its underlying source code being

developed for establishing a virtual data room platform identified as "DealTable" for use in the

financial industry in transacting business deals such as mergers and acquisitions, in a highly secure

virtual environment capable of handling complex and high-volume transactions (hereinafter

"DealTable VDR Platform"). The software's codebase and built out source code constitutes a trade

secret belonging to NDR. In bringing this Action against defendants Saulrealism LLC and Ryan

Saul (collectively referred to as "Saul" and/or "Defendants"), NDR seeks to protect and recover

its trade secrets, and confidential and proprietary information, consisting of the original codebase

1

for the DealTable VDR Platform and the source code for DealTable VDR Platform written by Saul between September 26, 2021 and January 18, 2022, which Defendants have misappropriated, and NDR fears is at risk of being destroyed.

2.      Beginning in 2019 NDR has devoted significant time and labor and made a substantial financial investment in upgrading and building out the original codebase for the DealTable VDR Platform for the purpose of creating a Stable Release Version of the DealTable VDR Platform that can be marketed to the financial industry. In furtherance of its goals of completing the development of the DealTable VDR Platform, in December 2020, NDR retained the services of Saul to serve as Lead Project Developer and write the source code needed to complete the development and launch of the DealTable VDR Platform.

3.      Plaintiff's claims against Defendants arise from their breach of their obligations under the consulting and non-disclosure agreement entered into with Plaintiff, when, after NDR terminated the parties' relationship, Saul deleted the DealTable marketing website, the DealTable application, the DealTable database and database connection, the DealTable website certificates, and the current permissions and user data[1] and it was discovered that Saul stole the entire codebase for the DealTable VDR Platform and is unlawfully withholding from NDR the original source code[2] written by Saul between September 26, 2021 and January 18, 2022, as a work for hire, which is owned by NDR and is a trade secret of NDR's, and which Saul is refusing to return to NDR.

4.      NDR brings this action against Defendants for, inter alia, misappropriation of trade secrets under the 2016 Defense of Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* ("DTSA") and New York common law, as well as for conversion, and breach of contract, and seeks to recover

---

[1] Many of the deleted items were recovered except the DealTable application which was only partially recovered and the database connection which has not been recovered.
[2] The original source code is what a developer creates and when compiled becomes the performance based code read by a computer that is encompassed and viewable on a website or webapplication.

injunctive relief, actual and consequential damages, exemplary damages, attorney's fees, pre-judgment and post-judgment interest, costs, and such other and further relief deemed just and proper by this Court.

5.      NDR will also be seeking the Court's assistance in maintaining the *status quo* by preventing defendants Saul from disclosing or destroying NDR's misappropriated trade secrets and proprietary and confidential information and, due to NDR's undeniable ownership rights to the source code stolen by Saul, will also seek mandatory preliminary injunctive relief in the form of an order directing Saul to immediately return the source code to NDR pending the litigation.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337 and 18 U.S.C. § 1836 (3)(c) and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

7.      In addition, the Court has jurisdiction over this action pursuant to 28 U.S. Code § 1331.

8.      The amount in controversy in this matter, exclusive of costs and interest, is in excess of the jurisdiction requirement of 28 U.S. Code § 1332.

9.      Plaintiff NDR is a limited liability company formed under the laws of the state of New York, whose members consist of Christopher Concannon, Thomas Concannon and Jack Concannon (collectively referred to as "NDR Members").

10.     All NDR members reside and are citizens of the state of New York.

11.     Upon information and belief, defendant Saulrealism LLC is a limited liability company formed under the laws of the state of Missouri, whose sole member is Saul Ryan.

12.     Upon information and belief, defendant Ryan Saul resides and is a citizen of the state of Missouri, having an address of 828 N. Grant Avenue, Springfield, Missouri 65802.

13.     Venue is proper in this district under 28 U.S.C. § 1391(b)(3) because defendants have consented to the personal jurisdiction of this court pursuant to a forum selection clause contained in the consulting agreement entered into between Plaintiff and Defendants which provides that "the venue for any dispute arising hereunder shall the state and federal courts located in New York County, State of New York, and each Party hereby consents to the jurisdiction of such court."

## THE PARTIES

14.     Plaintiff NDR is a limited liability company organized under the laws of the State of New York, with its principal place of business located at 257 West 38th Street, 2nd Flr, New York, New York 10018. NDR was formed for the purpose of developing and maintaining a virtual data room platform for use in the financial industry in transacting business deals such as mergers and acquisitions.

15.     Upon information and belief, defendant Ryan Saul is an individual, residing in Springfield, Missouri, and is the sole member of defendant Saulrealism LLC.

16.     Upon information and belief, defendant Saulrealism LLC is a limited liability company organized under the laws of the State of Missouri, with its principal place of business located at 828 N. Grant Avenue, Springfield, Missouri 65802.

17.     Upon information and belief, Defendant Ryan Saul is a full stack developer, providing web and software development services to individuals and businesses across the U.S. on a consulting basis through defendant Saulrealism LLC.

## FACTS RELEVANT TO ALL CLAIMS

18.     Since 2019, NDR has devoted significant time and labor and made a substantial financial investment in upgrading and building out the source codebase for the DealTable software for the purpose of creating a Stable Release Version of the DealTable VDR Platform that can be marketed to the financial industry.

19.     NDR's members own non-party Network Financial Printing, Inc. ("NFP"), a well-established financial printing company, with valuable long-time financial clients seeking to streamline their business deals by making their confidential company documents available for review through a virtual data room.

20.     It was contemplated by NDR and non-party NFP that upon the completion and launch of the DealTable VDR Platform, NFP would facilitate the transition of its financial clients, who are moving away from traditional printing towards paperless and virtual document retention services, to NDR.

21.     In furtherance of this valuable business transition, NFP had told its clients that the launch of the DealTable VDR Platform was forthcoming.

22.     In December 2020, NDR retained the services of defendant Saul to serve as Lead Project Developer and edit the existing codebase and new source code needed to complete the development of the DealTable VDR Platform.

23.     Plaintiff has at all times taken extensive measures to protect its trade secrets and confidential and proprietary information including but not limited to the original codebase and source code for the DealTable VDR Platform.

24.     As part of these protective measures, NDR required defendant Ryan Saul to enter into a Nondisclosure Agreement prior to disclosing information about the DealTable VDR

Platform during discussions between the parties about the possibility of Saul working as a software development consultant for NDR to oversee and write the source code needed to complete the DealTable VDR Platform.

25.     A Nondisclosure Agreement dated December 12, 2020 was entered into between NDR and defendant Ryan Saul ("NDA").

26.     Pursuant to the terms of the NDA, Saul acknowledges that NDR's confidential information includes the "design and coding of NDR's Software and NDR's future business and marketing plans for the use of the Software, as well as plans for further development and enhancement of the Software for other business purposes."

27.     Pursuant to the terms of the NDA, Saul further acknowledges that NDR's confidential information includes "***technical data, trade secrets*** or know-how, including, but not limited to, research, business plans or models, marketing plans, product plans, product strategies, products, services, ***computer software and code***, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, customer lists, prospective investor lists and strategies, pricing policies, operational methods, marketing, finances or other business information disclosed by NDR."

28.     Pursuant to the terms of the NDA, Saul agreed that "all NDR Confidential Information is and shall remain the sole property of NDR [and] [u]pon NDR's request, [Saul] es shall promptly return to NDR all such tangible Confidential Information.

29.     Additionally, Saul agreed to "use NDR Confidential Information solely to fulfill his/her obligations under this Agreement, during the contemplated negotiations, and throughout the term of any contract or agreement that results therefrom."

30.     The NDA also includes a remedy provision for breaches thereof, which entitles NDR to injunctive relief and monetary damages.

31.     On or about December 20, 2020, NDR entered into a Consulting Agreement with defendant Saulrealism LLC and defendant Ryan Saul as an officer of Saulrealism LLC and in her individual capacity with regard to specific provisions of the Consulting Agreement ("Consulting Agreement").

32.     Pursuant to the Consulting Agreement, Saulrealism LLC agreed to provide NDR with software developments services and that Ryan Saul would serve as the Lead Developer.

33.     As Lead Developer, Saul was responsible for the back end development of the DealTable VDR Platform and was responsible for completing the project tasks assigned to her by David Delorge, the DealTable Azure Chief Cloud Architect and Cloud Security Engineer ("Delorge") and NDR's members, Chris Concannon and Thomas Concannon (collectively, "Concannons"), editing the existing codebase for the DealTable VDR Platform, writing source code that builds on the existing codebase for the continued development of the DealTable VDR Platform, ensuring that the edited and new code is checked into the Azure DevOps repository and from there deploy changes in the source code so that they can be incorporated into the DealTable servers, databases and web applications.

34.     Pursuant to the Consulting Agreement, the backend development services that Saul was retained to provide also included, *inter alia*,

- Reviewing each line of code currently written in the software and fixing any underlying issues found within;
- Leading the backend development of the software project creating timelines and setting project milestones for each phase of work to ensure project is progressing in a timely manner for the Stable Release Version Launch;
- Providing regular detailed reports to Company as to the progress of the work and keeping Company informed of any changes to the scope of work, cost of completion, and timeline; and

- Providing such other services needed for completing the project within the time-frame set forth herein.

35.     Defendant Saul was providing services to NDR as an independent contractor and was being paid a consultant fee for the work provided.

36.     In an effort to protect its trade secrets and its confidential and proprietary information, NDR included in the Consulting Agreement a Non-Competition provision which states as follows:

> Consultant and Saul acknowledge and agree that during the term of the Agreement they will not render Consultant, managerial, market research, advise or consulting services, either directly or indirectly, to any business engaged in or about to be engaged in developing, producing, marketing, distributing or selling virtual data room services, related products, which would otherwise conflict with his (*sic*) obligations to the Company.

37.     Additionally, the Consulting Agreement expressly provides that NDR is the owner of all work performed by Saul relating to the DealTable VDR Platform software development project. Specifically, the Consulting Agreement states the following with regard to ownership:

Ownership

(a)    Consultant agrees that all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets, as well as all derivatives and modifications thereof and thereto (collectively, "Inventions"), conceived, made or discovered by Consultant, solely or in collaboration with others, which relate in any manner to the Software development project that the Consultant is overseeing, are the sole property of the Company. In addition, any Inventions which constitute copyrightable subject matter shall be considered "works made for hire" as that term is defined in the United States Copyright Act. Consultant further agrees to assign (or cause to be assigned) and does hereby assign fully to the Company all such Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.

(b)    Upon the termination of this Agreement, Consultant agrees to deliver promptly to Company all printed, electronic, audio-visual, and other tangible manifestations of the Software, including all originals and copies thereof.

(c) Consultant further agrees to provide all assistance reasonably requested by Company, both during and subsequent to the Term of this Agreement, in the establishment, preservation and enforcement of Company's rights in the Software.

38.     NDR also sought to protect its confidential information by including a provision in the Consulting Agreement which expressly prohibits Saul from "directly or indirectly disclos[ing] to any other person or entity, or use for Consultant's own benefit or for the benefit of others besides Company, any Company Confidential Information."

39.     The confidentiality provision in the Consulting Agreement also requires Saul to "promptly return all Company Confidential Information" following the termination of the agreement.

40.     Pursuant to the Consulting Agreement, Saul agreed and acknowledged the substantial harm that NDR would suffer as a result of a breach of the Agreement by them and agreed to the following remedy provision:

> Consultant understands and acknowledges that Company's remedies at law for any material breach of this Agreement by Consultant are inadequate and that any such breach will cause the Company substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, including the return of consideration paid for this Agreement, Consultant agrees that the Company shall have the right to seek specific performance and injunctive relief. It is also expressly agreed that, in the event of such a breach, Company shall also be entitled to recover all of its costs and expenses (including attorneys' fees) incurred in enforcing its rights hereunder.

41.     The Consulting Agreement also recognized the continued enforceability of the NDA and Defendants' continued obligations thereunder.

42.      In addition to the provisions in the Consulting Agreement and NDA, which expressly provide for the confidentiality and protection of NDR's trade secrets and confidential information including, but not limited to, the DealTable software codebase and source code for the DealTable VDR Platform, which Saul was being paid to edit, review and write, NDR had specific security protocols in place which Saul was required to follow.

43.     NDR set up the DealTable VDR Platform that was being developed with Microsoft Azure DevOps and Azure DevOps Source Code Repositories.

44.     As part of the process, NDR created a secure, restricted access repository for its source code and required all developers working on the DealTable VDR Platform software development project to "check in" a/k/a save all source code in NDR's Azure DevOps Source Code Repository.

45.     NDR used every available security precaution and platform, including full backups, secure accessibility, Privileged Identity Management, Data Loss Prevention and Virtual Desktops, to ensure the security of the codebase and source code of the DealTable VDR platform and its development project.

46.     Specifically, pursuant to NDR's established security protocols, Saul was required to always use the Azure Active Directory User account in order to access the DealTable VDR Platform codebase and source code and as a second level of security to prevent unauthorized access to the data and applications an Azure Multi-Factor Authentication process was deployed.

47.     Saul was provided with a secure internet connection through the Azure Virtual Desktop assigned to her and from which she was required to perform all work on the codebase and source code for DealTable VDR Platform.

48.     NDR provided Saul access to the codebase for the DealTable VDR Platform solely for the purpose of carrying out her duties as Lead Developer and directed Saul to check in all code work she performed into NDR's secure Azure DevOps Source Code Repository.

49.     Until August 2021, there were multiple code developers working on the project and all work and tasks related to the source code were being tracked on the Azure DevOps Repository Boards and Task program.

50.     This allowed NDR, through Delorge, to monitor and track the various code changes being made by the different developers.

51.     Beginning in September 2021, Saul became the only developer working on the project and she requested to work through Microsoft Teams for maintaining a shared list of tasks with Delorge and Concannons.

52.     Despite the alteration in how coding changes were being tracked, Saul was at all times required to perform all coding work on her assigned Azure Virtual Desktop and save all source code on NDR's secure Azure DevOps Source Code Repository.

53.      Upon information and belief, beginning in or around September 26, 2021, Saul intentionally sought to deceive NDR and steal its source code by failing to check in the source code she was paid to edit and write into NDR's secure Azure DevOps Source Code Repository.

54.     Upon information and belief, beginning in or around September 26, 2021, Saul intentionally sought to deceive NDR and steal its source code by unlawfully downloading NDR's codebase for the DealTable VDR Platform and making changes to the source code and creating new code to build out the DealTable VDR Platform on a hidden, self-owned GitHub Repository.

55.     That the aforementioned conduct by Saul was neither known by NDR, nor consented to by NDR.

56.     That, upon information and belief, Saul went to great lengths to conceal her unlawful conduct in downloading the codebase for the DealTable VDR Platform and not working from her assigned Azure Virtual Desktop by logging in to the Virtual Desktop each day but actually coding on a different machine.

57.     That, upon information and belief, Saul went to great lengths to conceal her unlawful conduct of not checking in all source code into NDR's Azure DevOps Source Code

Repository by creating a new "branch" on the repository called "Ryan Development" and uploading old code to the repository so that NDR and Delorge would believe that she was uploading the new source code.

58.     Saul provided consulting services to NDR beginning in December 2020 through January 18, 2022, for which she was paid approximately $153,660.00.

**Events of January 18, 2022**

59.     In preparation for a check-in meeting scheduled for the morning of January 18, Thomas Concannon sent Saul an extensive list of open and new code edits that needed to be made to the DealTable VDR Platform codebase in order to complete the software development project.

60.     Upon information and belief, defendant Saul was unhappy with the task list sent by Thomas Concannon and, on the morning of January 18, 2022, sent Delorge a text message telling him that she "had" to talk to him "ASAP."

61.     Upon information and belief, after receiving the task list, Saul and Delorge spoke on the phone and during the call, Saul threatened to delete the DealTable VDR Platform [Dev Code] in order to upset the Concannons and force them to do what she wants.

62.     That, upon information and belief, Delorge told Saul that she could not delete the codebase and that doing so is a felony and a breach of the Consulting Agreement and NDA she is bound by. However, Delorge did not notify NDR's members of Saul's threats.

63.     That, upon information and belief, after Saul spoke with Delorge, she and Chris Concannon had a disagreement via teams regarding Saul's performance and negative and volatile attitude and Saul was terminated from the project.

64.     Chris Concannon then directed Delorge to immediately block Saul's access to NDR's Microsoft Azure DevOps and NDR's Azure DevOps Source Code Repository, which Delorge proceeded to do.

65.     A few hours later, Delorge, Concannons and Saul had a virtual meeting, during which Saul apologized for her behavior and it was agreed that Saul would continue working on the project as the Lead Developer.

66.     As a result, Delorge was directed to reinstate Saul's access to NDR's Microsoft Azure DevOps and NDR's Azure DevOps Source Code Repository.

67.     During a conference call held later that same day between Delorge, Concannons and Saul, Saul became belligerent and Chris Concannon, again, fired Saul from the project. After Ryan hung up, NDR directed Delorge to again block her access to NDR's Microsoft Azure DevOps and NDR's Azure DevOps Source Code Repository.

68.     That, upon information and belief, it takes less than one minute to complete the process to block Saul's access to NDR's Microsoft Azure DevOps and NDR's Azure DevOps Source Code Repository.

69.     Upon information and belief, during the one minute it took to block Saul's access, she launched a small bat file that deleted the DealTable website and marketing site, the DealTable application, the DealTable database and database connection, the DealTable website certificates, and the current permissions and user data, and attempted to create a back door into the Network Security.

70.     After discovering what Saul had done, Delorge was able to restore the deleted databases and websites by retrieving the Disaster Recovery back-ups and manually restoring the

connections and re-installing the certifications, Microsoft Office apps and PDF apps and partially restore the DealTable application, but was not able to restore the database connection.

71.     In reviewing the Disaster Recovery back-ups, Delorge discovered that Saul had embedded re-write code in the database at 9:50 a.m. on January 18, 2022 and had removed all administrative privileges to the Webapp in order to prevent NDR and Delorge from accessing the Webapp.

72.     That, upon information and belief, at approximately 4:00 p.m. MST, Saul called Delorge and during the call, Saul admitted to Delorge that she deleted the services and told him that "they deserved it."

73.     That, upon information and belief, before hanging up, Saul asked Delorge to tell the Concannons that she "could fix it" if they wanted her to continue with the project.

74.      NDR immediately blocked, removed and added Saul's IP and location to NDR's security blocks.

75.     In monitoring the security of the system it was discovered by Delorge that after Saul's access was blocked she made several attempts to unlawfully regain access to NDR's system.

76.     That NDR filed a criminal complaint against Saul for cybercrimes with the New York District Attorney's Office and the Federal Bureau of Investigations related to the deletion of the DealTable database and Webapplications, and an investigation is ongoing.

77.     That in the weeks following Saul's termination from the project and in reviewing the code currently stored in NDR's Azure DevOps Source Code Repository, it was discovered that the last time Saul checked in source code to the repository was on September 26, 2021 and none of the code written by Saul between September 26, 2022 and January 18, 2022 was checked into NDR's repository and has unlawfully been retained by Saul.

78.   That the NDR Azure DevOps Source Code Repository is where Saul was required to store all the source code she created to build out the DealTable VDR Platform. That only the original source code can be edited and updated.

79.   The source code in the repository represents 80% of the codebase needed to finish the development of the DealTable VDR Platform. The missing source code from September 26, 2021 through January 18, 2022 is necessary in order for NDR to make the edits and updates needed to complete the remaining 20% of the source code to complete the DealTable VDR Platform.

80.   After discovering that Saul not only tried to sabotage NDR's DealTable VDR Platform development project by deleting the DealTable website and marketing site, the DealTable application, the DealTable database and database connection, the DealTable website certificates, and the current permissions and user data, but has also misappropriated NDR's valuable trade secrets and confidential and proprietary information by downloading the original code base for the DealTable VDR Platform to her personal repository and by failing to check-in the source code created between September 26, 2021 and January 18, 2022, NDR notified the authorities of Saul's additional crimes.

81.   In addition, NDR has taken numerous steps to recover the stolen source code including, having Delorge call Saul on numerous occasions to ask that she return the source code and having its attorney both call and email Saul to demand the immediate return of the source code.

82.   NDR's efforts have been unsuccessful, as Saul has failed to return the stolen source code to NDR and is believed to remain in wrongful possession of NDR's trade secrets, confidential and proprietary information.

83.     That Saul acted willfully, maliciously, and in bad faith in deleting the DealTable website and marketing site, the DealTable application, the DealTable database and database connection, the DealTable website certificates, and the current permissions and user data and in misappropriating NDR's trade secrets, confidential and proprietary information, which she has refused to return.

## FIRST CAUSE OF ACTION

### Misappropriation of Trade Secrets Under the Defend Trade Secrets Act

(18 U.S.C. § 1836, *et seq.*)

84.     NDR repeats, realleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

85.     NDR owns and possesses confidential, proprietary, and trade secret information, including, but not limited to, the (i) DealTable VDR Platform software, (ii)  the software implementation of algorithms, models, and methodologies, whether in compiled or decompiled source code or object code, (iii) hosting environments; (iii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iv) technical data, work products, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, customer lists, prospective investor lists and strategies, pricing policies, operational methods, marketing, finances or other business information disclosed by NDR ("Trade Secrets").

86.     NDR's Trade Secrets relate primarily to the DealTable VDR Platform and the software development project to build out the source code and launch a stable release version of the platform, which NDR has been developing since 2019 and has sought to keep secure and confidential.

87.     NDR has taken reasonable steps to keep its Trade Secrets confidential and secret, including, but not limited to, (i) requiring that all persons to execute nondisclosure agreements before even revealing the nature of the software and its business plans; (2) requiring any consultants who will work with the software and source code to sign consulting agreements that contain strong confidentiality provisions and limitations on the use and disclosure of NDR's Trade Secrets; (iii) creating a secure, restricted access repository for its source code and requiring all developers working on the software development project to "check in" a/k/a save all source code in NDR's Azure DevOps Source Code Repository; (iv) implementing full backups, (v) secure accessibility, (vi) Privileged Identity Management, (vii) Data Loss Prevention and (viii)  Virtual Desktops, to ensure the security of the DealTable Software and its development project.

88.     NDR's Trade Secrets derive independent economic value from not being readily known to or readily ascertainable, through proper means, by other persons who could obtain economic value from its disclosure or use.

89.     Since 2019 NDR has expended significant resources, both financially, and through its member's and consultant's time and labor, to securely develop the DealTable VDR Platform with high-end features not found in existing virtual data room platforms.

90      That NDR has spent the last three years and in excess of one million dollars   in developing its Trade Secrets, which Defendants have misappropriated.

91.      That, upon information and belief, in violation of NDR's rights, Defendants Saul have intentionally, fraudulently, maliciously, and oppressively misappropriated, used, and continue to use, NDR's Trade Secrets, and have deprived NDR of access to its Trade Secrets, intentionally interfering and preventing NDR from completing the software development project and launching the DealTable VDR Platform.

92.     That, upon information and belief, the aforesaid acts by Defendants Saul were malicious and unlawful and were intended to cause and did cause severe and irreparable harm and damage to NDR and its members, as evident by the admissions made by Saul to Delorge that she stole the source code created between September 26, 2021 and January 18, 2022 and deleted the DealTable website and marketing site, the DealTable application, the DealTable database and database connection, the DealTable website certificates, and the current permissions and user data.

93.     That, upon information and belief, if Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, use and disclose, or potentially destroy NDR's Trade Secrets to NDR's detriment.

94.     As a direct and proximate result of Defendants' unlawful conduct, and until Defendants' conduct is enjoined, NDR has suffered and will continue to suffer, irreparable injury and significant damages in an amount to be proved at trial.

95.     Because NDR's remedy at law is inadequate, NDR seeks temporary, preliminary, and permanent injunctive relief, which includes a mandatory injunction directing Saul to return its source code and to prevent the disclosure and potential destruction of its Trade Secrets.

96.     Defendants' conduct, as alleged herein, caused and continues to cause damages to NDR, has threatened and continues to threaten NDR's ability to finish the development of the stable release version and launch of the DealTable VDR Platform.

97.     That by misappropriating NDR's Trade Secrets and preventing NDR's ability to complete the DealTable VDR Platform, NDR risks losing valuable business opportunities which include having a London private equity firm test out the DealTable VDR platform and provide valuable feedback on its features and functionality in the banking industry prior to mass marketing the product, the risk that clients of NFP will turn to a different virtual data room platform for its

financial deals, and the lost opportunity to launch the platform at the Venture Summit conference and secure potential investors, negatively impacting NDR's business reputation and its ability to maintain and grow a customer base in a highly competitive market.

98.     Due to Defendants Saul's willful, malicious and bad faith misappropriation of NDR's Trade Secrets, NDR is entitled to all available remedies including but not limited to, temporary, preliminary, and permanent injunctive relief, against the continued misappropriation by defendants Saul of its Trade Secrets, a mandatory injunction directing Saul to return its DealTable code base and source code written by Saul between September 26, 2021 and January 18, 2022, an award of compensatory and consequential damages caused by the defendant Saul's misappropriation of NDR's Trade Secrets in the sum of not less than $1,000,000.00, exemplary damages under 18 USC 1836 (3) (C), attorney's fees, pre-judgment interest, post judgment interest, expert fees, costs, and litigation expenses incurred in this action.

## SECOND CAUSE OF ACTION

### Misappropriation of Trade Secrets Under New York Law

99.     NDR repeats, realleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

100.     NDR owns and possesses confidential, proprietary, and trade secret information, including, but not limited to, the (i) DealTable VDR Platform software, (ii)  the software implementation of algorithms, models, and methodologies, whether in compiled or decompiled source code or object code, (iii) hosting environments; (iii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iv) technical data, work products, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, customer lists, prospective investor

lists and strategies, pricing policies, operational methods, marketing, finances or other business information disclosed by NDR.

101.    NDR has taken reasonable steps to keep its Trade Secrets confidential and secret, including, but not limited to, (i) requiring that all persons to execute nondisclosure agreements before even revealing the nature of the software and its business plans; (2) requiring any consultants who will work with the software and source code to sign consulting agreements that contain strong confidentiality provisions and limitations on the use and disclosure of NDR's Trade Secrets; (iii) creating a secure, restricted access repository for its source code and requiring all developers working on the software development project to "check in" a/k/a save all source code in NDR's Azure DevOps Source Code Repository; (iv) implementing full backups, (v) secure accessibility, (vi) Privileged Identity Management, (vii) Data Loss Prevention and (viii)  Virtual Desktops, to ensure the security of the DealTable Software and its development project.

102.    Since 2019 NDR has expended significant resources, both financially, and through its member's and consultant's time and labor, to securely develop the DealTable Software and be in a position to launch a stable release version of the software as part of a virtual data room platform.

103.    That NDR has spent the last three years and approximately one million dollars in developing its Trade Secrets, which Defendant has misappropriated.

104.    That, upon information and belief, in violation of NDR's rights, and in breach of the express provisions of the Consulting Agreement and NDA by and between Defendants and NDR, Defendants Saul have intentionally, fraudulently, maliciously, and oppressively misappropriated, used, and continue to use, NDR's Trade Secrets, and have deprived NDR of access to its Trade Secrets, intentionally interfering and preventing NDR from completing the

software development project.

105.   That, upon information and belief, the aforesaid acts by Defendants Saul were malicious and unlawful and were intended to cause and did cause severe and irreparable harm and damage to NDR and its members, as evident by the admissions made by Saul to Delorge that she stole the source code and deleted the DealTable website and marketing site, the DealTable application, the DealTable database and database connection, the DealTable website certificates, and the current permissions and user data.

106.   That, upon information and belief, if Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, use and disclose, or potentially destroy NDR's Trade Secrets to NDR's detriment.

107.   As a direct and proximate result of Defendants' unlawful conduct, and until Defendants' conduct is enjoined, NDR has suffered and will continue to suffer,  irreparable injury and significant damages in an amount to be proved at trial.

108.   Because NDR's remedy at law is inadequate, NDR seeks temporary, preliminary, and permanent injunctive relief, which includes a mandatory injunction directing Saul to return its source code and to prevent the disclosure and potential destruction of its Trade Secrets.

109.    Defendants' conduct as alleged herein caused and continues to cause damages to NDR, has threatened and continues to threaten NDR's ability to finish the development and launch of the DealTable VDR Platform.

110.   That by misappropriating NDR's Trade Secrets and preventing NDR's ability to complete the DealTable Software, NDR risks losing valuable business opportunities.

111.   Due to Defendants Saul's willful, malicious and bad faith misappropriation of NDR's Trade Secrets, NDR is entitled to all available remedies including but not limited to,

temporary, preliminary, and permanent injunctive relief, against the continued misappropriation by defendants Saul of its Trade Secrets, a mandatory injunction directing Saul to return its DealTable code base and the source code written by Saul between September 26, 2021 and January 18, 2022, an award of compensatory and consequential damages caused by the defendant Saul's misappropriation of NDR's Trade Secrets in the sum of not less than $1,000,000.00, punitive damages,  attorney's fees, pre-judgment interest, post judgment interest, expert fees, costs, and litigation expenses incurred in this action

## THIRD CAUSE OF ACTION

### Conversion

112.    NDR repeats, realleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

113.    NDR owns and has a possessory right to the confidential, proprietary, and trade secret information, including, but not limited to, the (i) DealTable VDR Platform software, (ii) the software implementation of algorithms, models, and methodologies, whether in compiled or decompiled source code or object code, (iii) hosting environments; (iii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iv) technical data, work products, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, customer lists, prospective investor lists and strategies, pricing policies, operational methods, marketing, finances or other business information disclosed by NDR.

114.    NDR has taken reasonable steps to keep its Trade Secrets confidential and secret, including, but not limited to, (i) requiring that all persons to execute nondisclosure agreements before even revealing the nature of the software and its business plans; (2) requiring any

consultants who will work with the software and source code to sign consulting agreements that contain strong confidentiality provisions and limitations on the use and disclosure of NDR's Trade Secrets; (iii) creating a secure, restricted access repository for its source code and requiring all developers working on the software development project to "check in" a/k/a save all source code in NDR's Azure DevOps Source Code Repository; (iv) implementing full backups, (v) secure accessibility, (vi) Privileged Identity Management, (vii) Data Loss Prevention and (viii) Virtual Desktops, to ensure the security of the DealTable Software and its development project.

115.    NDR provided Defendants Saul access to its Trade Secrets and confidential and proprietary information for the limited purpose of performing the consulting services as Lead Developer of software.

116.    That at all times NDR's Trade Secrets and confidential and proprietary information including but not limited to the codebase of the DealTable VDR Platform software and source code were to be maintained on NDR's Azure DevOps Source Code Repository and worked on by Defendants Saul through the Virtual Desktop provided by NDR.

117.    That defendants Saul, without NDR's knowledge, permission or consent, stole the DealTable NDR Platform software codebase and is, upon information and belief, storing it in her personal Github repository.

118.    That defendants Saul, without NDR's knowledge, permission or consent, stole the DealTable NDR Platform source code written by Saul between September 26, 2021 and January 18, 2022, and is, upon information and belief, storing it exclusively in her personal Github repository, and no portion of it can be found in NDR's Azure DevOps Source Code Repository.

119.    That defendants Saul are in unlawful possession of NDR's property.

120.   That the return of NDR's property has been demanded of defendants Saul through telephone calls and a letter from NDR's counsel.

121.   That defendants Saul have refused to return to NDR its valuable property.

122.   That defendants Saul's conduct constitutes conversion.

123.   Due to Defendants Saul's willful, malicious and bad faith conversion of NDR's valuable property, Trade Secrets, and confidential information, NDR is entitled to all available remedies including but not limited to, temporary, preliminary, and permanent injunctive relief, against the continued conversion by defendants Saul, a mandatory injunction directing Saul to return its DealTable VDR Platform codebase and the source code written by Saul between September 26, 2021 and January 18, 2022, an award of compensatory and consequential damages caused by the defendant Saul's conversion of NDR's property in the sum of not less than $1,000,000.00, punitive damages,  attorney's fees, pre-judgment interest, post judgment interest, expert fees, costs, and litigation expenses incurred in this action.

## FOURTH CAUSE OF ACTION

### Breach of Nondisclosure Agreement

124.   NDR repeats, realleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

125.   Pursuant to the NDA by and between NDR and defendant Ryan Saul dated December 12, 2020, Saul acknowledges that NDR's confidential information includes the "design and coding of NDR's DealTable VDR Platform software and NDR's future business and marketing plans for the use of the Software, as well as plans for further development and enhancement of the Software for other business purposes."

126.    Pursuant to the terms of the NDA, Saul further acknowledges that NDR's confidential information includes "*technical data, trade secrets* or know-how, including, but not limited to, research, business plans or models, marketing plans, product plans, product strategies, products, services, *computer software and code*, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, customer lists, prospective investor lists and strategies, pricing policies, operational methods, marketing, finances or other business information disclosed by NDR."

127.    Pursuant to the terms of the NDA, Saul agreed to that "all NDR Confidential Information is and shall remain the sole property of NDR [and] [u]pon NDR's request, [Saul] es shall promptly return to NDR all such tangible Confidential Information.

128.    Additionally, Saul agreed to "use NDR Confidential Information solely to fulfill his/her obligations under this Agreement, during the contemplated negotiations, and throughout the term of any contract or agreement that results therefrom."

129.    The NDA was in effect at all relevant times herein, and defendants Saul has breached her obligations under the NDA by intentionally and maliciously deleting DealTable website and marketing site, the DealTable application, the DealTable database and database connection, the DealTable website certificates, and the current permissions and user data, misappropriating NDR's valuable trade secrets and confidential and proprietary information by downloading the source code base to her personal repository and failing to check-in the source code created between September 26, 2021 and January 18, 2022, and by refusing to return the stolen source code.

130.    The NDA also includes a remedy provision for breaches thereof, which entitles NDR to injunctive relief and monetary damages, for a breach thereof.

131.    As a result of defendant Saul's breach of the NDA, NDR has suffered and continues to suffer great, immediate and irreparable harm and is entitled to temporary, preliminary, and permanent injunctive relief, including a mandatory injunction directing Saul to return to NDR the DealTable VDR Platform code base and the source code written by Saul between September 26, 2021 and January 18, 2022. In addition, or in the alternative, NDR has suffered damages in an amount to be determined at trial but believed to exceed $1,000,000.00.

## FIFTH CAUSE OF ACTION

### Breach of Consulting Agreement

132.    NDR repeats, realleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

133.    Pursuant to the Consulting Agreement by and between NDR and defendant Ryan Saul dated December 20, 2020, under which Saul was providing independent contractor services as Lead Developer on the software project, Saul was responsible for, *inter alia*, leading the backend development of the software project, creating timelines and setting project milestones for each phase of work to ensure project is progressing in a timely manner for the Stable Release Version Launch; reviewing each line of code in the software and fixing any underlying issues found within; providing regular detailed reports to Company as to the progress of the work and keeping Company informed of  any changes to the scope of work, cost of completion, and timeline; completing the project tasks assigned to her by Delorge and Concannons, editing the existing codebase for the DealTable VDR Platform software, writing source code that builds on the existing code base for the continued development of the DealTable VDR Platform, ensuring that the edited and new code is checked into the Azure DevOps repository and from there deploy changes in the code so that they can be incorporated into the DealTable servers, databases and web applications.

134.    The Consulting Agreement expressly provides that NDR is the owner of all work performed by Saul relating to the DealTable VDR Platform software development project. Specifically, the Consulting Agreement states the following with regard to ownership:

Ownership

(a)    Consultant agrees that all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets, as well as all derivatives and modifications thereof and thereto (collectively, "Inventions"), conceived, made or discovered by Consultant, solely or in collaboration with others, which relate in any manner to the Software development project that the Consultant is overseeing, are the sole property of the Company. In addition, any Inventions which constitute copyrightable subject matter shall be considered "works made for hire" as that term is defined in the United States Copyright Act. Consultant further agrees to assign (or cause to be assigned) and does hereby assign fully to the Company all such Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.

(b)    Upon the termination of this Agreement, Consultant agrees to deliver promptly to Company all printed, electronic, audio-visual, and other tangible manifestations of the Software, including all originals and copies thereof.

(c) Consultant further agrees to provide all assistance reasonably requested by Company, both during and subsequent to the Term of this Agreement, in the establishment, preservation and enforcement of Company's rights in the Software.

135.    The Consulting Agreement expressly prohibits Saul from "directly or indirectly disclos[ing] to any other person or entity, or use for Consultant's own benefit or for the benefit of others besides Company, any Company Confidential Information."

136.    The confidentiality provision in the Consulting Agreement also requires Saul to "promptly return all Company Confidential Information" following the termination of the agreement.

137.    The Consulting Agreement was in effect at all relevant times herein, and defendants Saul have breached their obligations under the Consulting Agreement by intentionally and maliciously deleting the DealTable website and marketing site, the DealTable application, the DealTable database and database connection, the DealTable website certificates, and the current

27

permissions and user data, misappropriating NDR's valuable trade secrets and confidential and proprietary information by downloading the DealTable software codebase to Saul's personal repository and failing to check-in the source code created between September 26, 2021 and January 18, 2022, and by refusing to return the stolen source code.

138.    Pursuant to the Consulting Agreement, Saul agreed and acknowledged the substantial harm that NDR would suffer as a result of a breach of the Agreement by them and agreed to the following remedy provision:

> Consultant understands and acknowledges that Company's remedies at law for any material breach of this Agreement by Consultant are inadequate and that any such breach will cause the Company substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, including the return of consideration paid for this Agreement, Consultant agrees that the Company shall have the right to seek specific performance and injunctive relief. It is also expressly agreed that, in the event of such a breach, Company shall also be entitled to recover all of its costs and expenses (including attorneys' fees) incurred in enforcing its rights hereunder.

139.    That while defendant Saulrealism LLC is the "consultant" under the Agreement, defendant Ryan Saul agreed to be bound, individually, by the confidentiality provision of the Consulting Agreement.

140.    That as a result of Defendants' breach of the Consulting Agreement, NDR has suffered and continues to suffer great, immediate and irreparable harm and is entitled to temporary, preliminary, and permanent injunctive relief, including a mandatory injunction directing Saul to return to NDR the DealTable code base and the decompiled source code written by Saul between September 26, 2021 and January 18, 2022. In addition, or in the alternative, NDR has suffered damages in an amount to be determined at trial but believed to exceed $1,000,000.00.

141.    That as a result of Defendants' breach of the Consulting Agreement, NDR is entitled to recover all of its costs and expenses, including attorneys' fees in enforcing its rights under the agreement.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Network Data Rooms LLC seeks judgment in their favor and an

Order against Defendants Ryan Saul and Saulrealism LLC that grants the following relief:

A. Preliminarily and permanently enjoins Defendants, and all parties in active concert or participation with them, from using, disclosing, or destroying any of NDR's confidential, proprietary and/or trade secret information for any purpose;

B. Orders Defendants and all parties in active concert or participation with them to return to NDR all originals and copies of NDR's confidential, proprietary and/or trade secret information including the DealTable VDR Platform codebase unlawfully downloaded by Defendants and the source code from September 26, 2021 and January 18, 2022;

C. Awards NDR actual, incidental, compensatory, and consequential damages to be proven at trial, but believed to exceed the sum of $1,000,000.00;

D. Awards NDR exemplary and damages due to Defendants' willful and malicious activities;

E. Awards NDR punitive damages due to Defendants' willful and malicious activities;

F. Awards NDR its costs and expenses incurred herein, including reasonable attorneys' fees and pre-judgment and post-judgement interest;

G. Awards NDR such further relief as the Court deems necessary and just.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable by jury.

Dated: New York, New York
       March 21, 2022

Respectfully submitted,
**ALLYN & FORTUNA, LLP**

By:   /s/
      Nicholas Fortuna (NF-9191)
      Paula Lopez (PL- 2657)
      *Attorneys for the Plaintiff*
      400 Madison Avenue, Suite 10D
      New York, NY 10017
      Tel: 212.213.8844  Fax: 212.213.2218

## VERIFICATION

STATE OF NEW YORK    )

                            )ss.:

COUNTY OF NEW YORK   )

CHRISTOPHER CONCANNON, being duly sworn, deposes and says:

I am a Member and Manager of the named Plaintiff, Network Data Rooms, LLC, the limited liability company described in the within action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true based upon my personal knowledge, unless stated upon information and belief, and as to those matters, I believe them to be true. I make this verification because Plaintiff is a New York Limited Liability Company and I am a Member and Manager of the company.

_____

CHRISTOPHER CONCANNON

Sworn to before me this
21 day of March, 2022

_____

Notary Public

This remote notarial act involved the use of communication technology.