**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
―――――――――――――――――――――――――――――X
NETWORK DATA ROOMS, LLC,                                    Civil Case No.: 22-CV-2299-LSG
                         Plaintiff,
    -v-

SAULREALISM LLC and RYAN SAUL, in her individual
and professional capacities,
                         Defendants.
―――――――――――――――――――――――――――――X

**DECLARATION OF CHRISTOPHER CONCANNON IN SUPPORT OF PLAINTIFF NETWORK DATA ROOMS, LLC'S MOTION FOR A PRELIMINARY INJUNCTION**

CHRISTOPHER CONCANNON, pursuant to 28 U.S.C § 1746, hereby declares as follows:

1. I, along with my two sons, Thomas Concannon and Jack Concannon, am a member of Network Data Rooms, LLC ("NDR"). I am fully familiar with the facts and circumstances set forth herein.

2. NDR is the owner of certain software and its underlying source code being developed for establishing a virtual data room platform identified as "DealTable" for use in the financial industry in transacting business deals such as mergers and acquisitions, in a highly secure virtual environment capable of handling complex and high-volume transactions (hereinafter "DealTable VDR Platform").

3. I am also shareholder and officer of Network Financial Printing, Inc. ("NFP"), a well-established financial printing company with valuable long-time financial clients seeking to streamline their business deals by making their confidential company documents available for review through a virtual data room.

4. At the time of forming NDR to develop the DealTable VDR Platform, it was my intention to transition NFP's financial clients, who are moving away from traditional printing

1

towards paperless and virtual document retention services, to NDR as soon as the DealTable VDR Platform became operational.

5. As will be shown herein, NDR has devoted significant time and labor and made a substantial financial investment in upgrading and building out the software for the DealTable VDR Platform for the purpose of creating a Stable Release Version of the platform that can be marketed to the financial industry. In furtherance of its goals of completing the development of the DealTable VDR Platform, in December 2020, NDR retained the services of defendants Ryan Saul and Saulrealism LLC (hereinafter "Defendants" and/or "Saul") to serve as Lead Project Developer and write the source code needed to complete the development project.

6. NDR's claims against Defendants arise from their breach of their obligations under the consulting and non-disclosure agreement entered into with NDR, when, after NDR terminated the parties' relationship, Saul deleted several critical DealTable services and it was discovered that Saul stole the entire code base for the DealTable Software and is unlawfully withholding from NDR the decompiled source code written by Saul between September 26, 2021 and January 18, 2022, as a work for hire.

7. As shown herein, Defendants' conduct in refusing to return NDR's source code prevents NDR from making the necessary edits and updates needed to complete the DealTable VDR Platform, which it was on the precipice of completing, causing it irreparable harm and entitling it to injunctive relief including but not limited to an order directing Saul to return the stolen source code.

**Background**

8. NDR acquired the DealTable software in 2019 and soon thereafter began the development project for the DealTable VDR Platform. As part of the development, NDR created

a Board of Advisors consisting of NDR's members and two experts in the development of software for industries requiring heightened security measures as well as in information security management systems. The Board of Advisors developed the framework for the buildout of the DealTable software, identifying the features and functions that would need to be created and incorporated into the existing software for the DealTable VDR Platform to enter the market already superior to existing VDR platforms by offering greater features, functionality, security, and with a better user interface and user experience.

9. In November 2020, NDR retained the services of David Delorge ("Delorge") to work as a consultant in the role of DealTable Azure Chief Cloud Architect and Cloud Security Engineer for the DealTable VDR Platform development project. As per NDR's usual policy, Delorge was required to sign a nondisclosure agreement and the consulting agreement entered into with him also contains confidentiality provisions.

10. In December 2020, NDR entered into discussion with defendant Ryan Saul to serve as Lead Project Developer and edit the existing codebase and new source code needed to complete the development of the DealTable VDR Platform.

11. NDR required defendant Ryan Saul to enter into a Nondisclosure Agreement prior to disclosing information about the DealTable VDR Platform during discussions between the parties about the possibility of Saul working as a software development consultant for NDR to oversee and write the source code needed to complete the DealTable VDR Platform. A copy of the Nondisclosure Agreement dated December 12, 2020 signed by Ryan Saul and NDR ("NDA") is annexed hereto as Exhibit "A."

12. Pursuant to the terms of the NDA, Saul acknowledges that NDR's confidential information includes the "design and coding of NDR's Software and NDR's future business and

marketing plans for the use of the Software, as well as plans for further development and enhancement of the Software for other business purposes." *See* Ex. "A" at Whereas Clause 4.

13. Pursuant to the terms of the NDA, Saul further acknowledges that NDR's confidential information includes "***technical data, trade secrets*** or know-how, including, but not limited to, research, business plans or models, marketing plans, product plans, product strategies, products, services, ***computer software and code***, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, customer lists, prospective investor lists and strategies, pricing policies, operational methods, marketing, finances or other business information disclosed by NDR." *See* Ex. "A" at ¶1.

14. Additionally, pursuant to the NDA, Saul agreed that "all NDR Confidential Information is and shall remain the sole property of NDR [and] [u]pon NDR's request, [Saul] es shall promptly return to NDR all such tangible Confidential Information. *See* Ex. "A" at ¶1.

15. Moreover, Saul agreed to "use NDR Confidential Information solely to fulfill his/her obligations under this Agreement, during the contemplated negotiations, and throughout the term of any contract or agreement that results therefrom."

16. The NDA also includes a remedy provision for breaches thereof, which entitles NDR to injunctive relief and monetary damages.

17. On or about December 20, 2020, NDR entered into a Consulting Agreement with defendant Saulrealism LLC and defendant Ryan Saul as an officer of Saulrealism LLC and in her individual capacity with regard to specific provisions of the Consulting Agreement ("Consulting Agreement"). A copy of the Consulting Agreement is annexed hereto as Exhibit "B."

18. Pursuant to the Consulting Agreement, Saulrealism LLC agreed to provide NDR with software development services and that Ryan Saul would serve as the Lead Developer.

19. As Lead Developer, Saul was responsible for the back end development of the DealTable VDR Platform and was responsible for completing the project tasks assigned to her by Delorge and NDR's members, including myself and my son, Thomas Concannon, editing the existing codebase for the DealTable VDR Platform, writing source code that builds on the existing codebase for the continued development of the DealTable VDR Platform, ensuring that the edited and new code is checked into the Azure DevOps repository and from there deploy changes in the source code so that they can be incorporated into the DealTable servers, databases and web applications.

20. Defendant Saul was providing services to NDR as an independent contractor and was being paid a consultant fee for the work provided.

21. In an effort to protect its trade secrets and its confidential and proprietary information, NDR included in the Consulting Agreement a Non-Competition provision which states as follows:

> Consultant and Saul acknowledge and agree that during the term of the Agreement they will not render Consultant, managerial, market research, advise or consulting services, either directly or indirectly, to any business engaged in or about to be engaged in developing, producing, marketing, distributing or selling virtual data room services, related products, which would otherwise conflict with his (*sic*) obligations to the Company. *See* Ex. "B" at ¶5.

22. Additionally, the Consulting Agreement expressly provides that NDR is the owner of all work performed by Saul relating to the DealTable VDR Platform software development project. Specifically, the Consulting Agreement states the following with regard to ownership:

<u>Ownership</u>

(a) Consultant agrees that all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets, as well as all derivatives and modifications thereof and thereto (collectively, "Inventions"), conceived, made or discovered by Consultant, solely or in collaboration with others, which relate in any manner to the Software development project that the Consultant is overseeing, are the

sole property of the Company. In addition, any Inventions which constitute copyrightable subject matter shall be considered "works made for hire" as that term is defined in the United States Copyright Act. Consultant further agrees to assign (or cause to be assigned) and does hereby assign fully to the Company all such Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.

(b) Upon the termination of this Agreement, Consultant agrees to deliver promptly to Company all printed, electronic, audio-visual, and other tangible manifestations of the Software, including all originals and copies thereof.

(c) Consultant further agrees to provide all assistance reasonably requested by Company, both during and subsequent to the Term of this Agreement, in the establishment, preservation and enforcement of Company's rights in the Software. *See* Ex. "B" at ¶6.

23. NDR also sought to protect its confidential information by including a provision in the Consulting Agreement which expressly prohibits Saul from "directly or indirectly disclos[ing] to any other person or entity, or use for Consultant's own benefit or for the benefit of others besides Company, any Company Confidential Information." See Ex. "B" at ¶11.

24. The confidentiality provision in the Consulting Agreement also requires Saul to "promptly return all Company Confidential Information" following the termination of the agreement. See Ex. "B" at ¶11.

25. Pursuant to the Consulting Agreement, Saul agreed and acknowledged the substantial harm that NDR would suffer as a result of a breach of the Agreement by them and agreed to the following remedy provision:

> Consultant understands and acknowledges that Company's remedies at law for any material breach of this Agreement by Consultant are inadequate and that any such breach will cause the Company substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, including the return of consideration paid for this Agreement, Consultant agrees that the Company shall have the right to seek specific performance and injunctive relief. It is also expressly agreed that, in the event of such a breach, Company shall also be entitled to recover all of its costs and expenses (including attorneys' fees) incurred in enforcing its rights hereunder.

*See* Ex. "B" at ¶12 and recognized the continued enforceability of the NDA and Saul's obligations thereunder

26. Additionally, pursuant to NDR's established security protocols, Saul was required to always use the Azure Active Directory User account in order to access the DealTable VDR Platform codebase and source code and as a second level of security to prevent unauthorized access to the data and applications an Azure Multi-Factor Authentication process was deployed.

27. In addition, Saul was provided with a secure internet connection through the Azure Virtual Desktop assigned to her and from which she was required to perform all work on the codebase and source code for DealTable VDR Platform.

28. Moreover, there is no question that Saul was provided access to the codebase for the DealTable VDR Platform solely for the purpose of carrying out her duties as Lead Developer and was required to save all code work she performed into NDR's secure Azure DevOps Source Code Repository, and for which she was paid approximately $154,000.00 in consulting fees.

**Events of January 18, 2022**

29. In preparation for a check-in meeting scheduled for the morning of January 18, Thomas Concannon sent Saul an extensive list of open and new code edits that needed to be made to the DealTable VDR Platform codebase in order to complete the software development project.

30. Apparently Saul was very upset with the list of tasks Thomas sent her and became very hostile and aggressive during a Teams meeting. Because of this and numerous other incidents, I terminated her from the project and directed Delorge to block Saul's access to NDR's Microsoft Azure DevOps and NDR's Azure DevOps Source Code Repository.

31. A few hours later, I, Delorge, Thomas, and Saul had a virtual meeting, during which Saul apologized for her behavior and asked to be permitted to continue working on the project as the Lead Developer.

32. Given the significant progress being made in completing the DealTable VDR Platform, I agreed to let Saul continue on the project and told Delorge to reinstate her access to NDR's Microsoft Azure DevOps and NDR's Azure DevOps Source Code Repository. I was not aware of the threats Saul had made to Delorge about deleting the DealTable Dev Code at this time.

33. During a conference call held later that same day, Saul became extremely belligerent and hostile, and I fired her from the project. As soon as the call ended, I directed Delorge to block her access to NDR's Microsoft Azure DevOps and NDR's Azure DevOps Source Code Repository.

34. Shortly thereafter, I was informed by Delorge that Saul had deleted the DealTable website and marketing site, the DealTable application, the DealTable database and database connection, the DealTable website certificates, and the current permissions and user data, and that she was attempting to create a back door into the Network Security.

35. Concerned about the security of the source code for the DealTable VDR Platform, I asked Delorge to confirm that all the code was properly saved on NDR's Azure DevOps Source Code Repository, which he assured me it was.

36. The following day, I filed a complaint against Saul for cybercrimes with the New York District Attorney's Office and the Federal Bureau of Investigations related to the deletion of the DealTable database and Webapplications. It is my understanding that the investigation is ongoing.

37. Believing that Delorge had substantially recovered the DealTable database and webapplication, and related documentation that Saul had deleted on January 18, 2022, with the exception of part of the application and the database connection, NDR was planning to hire a new developer.

38. However, in or around February 17, 2022, Delorge discovered that the last time Saul checked in source code to NDR's Azure DevOps Source Code Repository was on September 26, 2021 and none of the code written by Saul between September 26, 2022 and January 18, 2022 is saved on NDR's repository. I immediately reported the stolen source code the NY District Attorney's Office, who is investigating this matter.

39. Furthermore, NDR, through Delorge and its attorneys, has attempted to recover the source code from Saul but she has refused to respond to their requests or to return its property.

40. NDR has been advised by Delorge that Saul's unlawful retention of the decompiled source code prevents NDR from adding additional features, editing existing features or from making any future updates to the DealTable VDR Platform. In fact, prior to commencing this litigation, NDR retained the services of a Full Stack developer to try to rebuild the missing decompiled source code but he was unable to do so and NDR had to terminate his services.

41. NDR needs the court's assistance in protecting its stolen decompiled source code because it is the basis for the additional features that make the DealTable VDR platform superior to its competitors and will provide NDR with a competitive advantage over existing virtual data room providers.

42. Saul's actions have paralyzed NDR's ability to complete the project and launch the DealTable VDR Platform, which it has been working towards for the last three years, and on January 18, 2022, was only a month or two from completing.

43. Not only were NFP's financial clients expecting the DealTable VDR Platform to launch and prepared to use its services but NDR had also secured a London private equity firm to agree to test out the DealTable VDR platform and provide valuable feedback on its features and functionality in the banking industry prior to mass marketing the product.

44. As a result of Saul's theft of the decompiled source code, NDR has been unable to finish the buildout of the DealTable VDR platform in order to have it tested and the equity firm is now in the process of being sold, putting NDR at risk of losing a valuable testing opportunity.

45. In addition, NDR was planning to launch the DealTable VDR platform at the Venture Summit Digital Connect conference scheduled for March 29, 2022 through March 31, 2022, for which it had registered for on February 4, 2022, prior to discovering that Saul had stolen the decompiled source code written between September 26, 2021 and January 18, 2022 ("Venture Summit").

46. The Venture Summit would have afforded NDR a valuable opportunity to meet tech investors and secure future funding for its business. Unable to complete the DealTable VDR Platform without the decompiled source code, NDR will no longer be able to launch it at the Venture Summit and will be forced to forgo the opportunity to secure potential investors and the opportunities that could be derived from its participation in the program including publicity and exposure to potential customers in the financial industry.

47. The more time that Saul is allowed to maintain possession and control of NDR's source code, the greater the possibility that she may destroy it or disclose it to NDR's competitors, creating a grave risk to NDR because without NDR's source code, it would likely take NDR's competitors years to replicate and install the features of the DealTable VDR platform into their existing virtual data room platforms. However, if Saul discloses the source code to NDR's competitors, NDR will lose its competitive advantage from the superior features and functionality is has spent years and over one million dollars in developing.

48. I declare under the penalty of perjury that the foregoing is true and correct.

Dated: March 22, 2022

_____
CHRISTOPHER CONCANNON