EXHIBIT B

**CONSULTING AGREEMENT**

This Agreement is made this 20th day of December, 2020 (the "Effective Date") by and between Network Data Rooms, LLC with its principal place of business at 257 West 38th Street, 2nd Floor, New York, NY 10018 ("NDR"), and/or any of its wholly owned subsidiaries (collectively called "the Company") and SAULREALISM LLC ("Saul" or "Consultant").

WHEREAS, Company is the owner of certain software it seeks to upgrade and build out for the purpose of launching a new platform, offering virtual data room and deal making capabilities for complex and high-volume transactions ("Software").

WHEREAS, Consultant possesses the technical experience necessary for providing full stack software development services with a focus on backend development in connection with the upgrade and build out of Company's Software.

WHEREAS, Company desires to retain Consultant to perform consulting services for the Company and Consultant is willing to perform such services, on terms set forth more fully below; and

WHEREAS, Consultant recognizes that it has been provided adequate consideration for entering into this Consulting Agreement.

NOW THEREFORE, in consideration of the mutual promises set forth herein, Consultant and Company hereby agree as follows:

1. Consulting Services

Consultant, through Ryan Saul ("Saul") will provide Company with Software Development services in overseeing the design and development of the Software. Consultant is responsible for developing and leading the backend development services for delivering to Company a Stable Release Version of the Software to market ("Consulting Services"). In performing the Consulting Services, Consultant will be responsible for, *inter alia*,

1. Reviewing each line of code currently written in the software and fixing any underlying issues found within;

2. Notifying Company of any concerns found within the current code;

3. Leading the backend development of the software project in creating timelines and setting project milestones for each phase of the work to ensure project is progressing in a timely manner for the Stable Release Version launch;

4. Providing regular detailed reports to Company as to the progress of the work and keeping Company informed of any changes to the scope of the work, cost of completion, and timeline;

5. Occasional traveling to New York for in-person meetings with Company; and

6. Providing such other services needed for completing the project within the time-frame set forth herein.

Consultant shall use Consultant's best efforts to perform the Consulting Services such that the results are satisfactory to the Company.

2.   Term and Termination

Consultant agrees to serve as a consultant to the Company for a period of six-months commencing on December 21, 2020 and shall terminate upon the earlier of (i) six-months from the Effective Date; (ii) upon delivery of a Stable Release Version of the Software, acceptable to the NDR Board of Directors, if Company does not exercise its exclusive option to extend the Agreement for an additional six month period from the delivery of the Stable Release Version upon ten (10) days' written notice; or (iii) termination by Company, at any time for cause, or without cause upon giving seven (7) days' prior written notice to Consultant.

If, at the end of the six-month term, the Agreement has not been terminated, Company, at its sole option, with Consultant's consent, may elect to extend the Agreement for successive periods of one month each, under the same terms set forth herein, by giving Consultant fourteen (14) days' prior written notice of its election.

3.   Compensation

Company agrees to pay Consultant a consulting fee in the sum of $60/hour on a biweekly basis, payable by check, or electronic bank transfer, made out to SAULREALISM, LLC, and addressed to SAULREALISM, LLC, 828 N GRANT AVE SPRINGFIELD MO 65802.
For any day that Consultant does not render a full day's worth of consulting services, the biweekly consulting fee due and payable to Consultant will be based on a pro rata basis. The hours rendered by Consultant will be determined by the work hours logged on Company's Virtual Machine through Microsoft Azure.

4.   Expenses

Consultant will be reimbursed by the Company for all pre-approved expenses necessarily incurred in the performance of this Agreement.

5.   Non-Competition

Consultant and Saul acknowledge and agree that during the term of the Agreement they will not render Consultant, managerial, market research, advise or consulting services, either directly or indirectly, to any business engaged in or about to be engaged in developing, producing, marketing, distributing or selling virtual data room services, related products, which would otherwise conflict with his obligations to the Company.

6.   Ownership

 (a)   Consultant agrees that all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets, as well as all derivatives and modifications thereof and thereto (collectively, "Inventions"), conceived, made or discovered by Consultant, solely or in collaboration with others, which relate in any manner to the Software development project that the Consultant is overseeing, are the sole property of

2

the Company. In addition, any Inventions which constitute copyrightable subject matter shall be considered "works made for hire" as that term is defined in the United States Copyright Act. Consultant further agrees to assign (or cause to be assigned) and does hereby assign fully to the Company all such Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.

 (b)   Upon the termination of this Agreement, Consultant agrees to deliver promptly to Company all printed, electronic, audio-visual, and other tangible manifestations of the Software, including all originals and copies thereof.

(c) Consultant further agrees to provide all assistance reasonably requested by Company, both during and subsequent to the Term of this Agreement, in the establishment, preservation and enforcement of Company's rights in the Software.

7.    Independent Contractor Status

For all purposes, Consultant shall be deemed to be an independent contractor, and not an employee or agent of the Company. Nothing in this Agreement shall in any way be construed to constitute Consultant as an agent, employee or representative of the Company, but Consultant shall perform the Services hereunder as an independent contractor. Consultant acknowledges and agrees that Consultant is obligated to report as income all compensation received by Consultant pursuant to this Agreement, and Consultant agrees to indemnify the Company and hold it harmless to the extent of any obligation imposed on Company (i) to pay in withholding taxes or similar items or (ii) resulting from Consultant's being determined not to be an independent contractor. The Company and Consultant agree that substantially all of the Services shall be performed at a location or locations other than the Company's business premises.

8.    No Authority to Bind Company

Consultant acknowledges and agrees that Consultant has no authority to enter into contracts that bind the Company or create obligations on the part of the Company without the prior written authorization of the Company.

9.    Consulting or Other Services for Competitors

Consultant and Saul represent and warrant that Consultant does not presently perform or intend to perform, during the term of the Agreement, consulting or other services for, or engage in or intend to engage in an employment relationship with, companies who businesses or proposed businesses in any way involve products or services which would be competitive with the Company's products or services, or those products or services proposed or in development by the Company during the term of the Agreement. If, however, Consultant decides to do so, Consultant agrees that, in advance of accepting such work, Consultant will promptly notify the Company in writing, specifying the organization with which Consultant proposes to consult, provide services, or become employed by and to provide information sufficient to allow the Company to determine if such work would conflict with the terms of this Agreement, including the terms of the Non-Disclosure Agreement, the interests of the Company or further services which the Company might request of Consultant. If the Company determines that such work

conflicts with the terms of this Agreement, the Company reserves the right to terminate this Agreement immediately.

10.    Conflicts with this Agreement

(a)   Consultant certifies that Consultant has no outstanding agreement or obligation that is in conflict with any of the provisions of this Agreement, or that would adversely affect Consultant's performance hereunder, and Consultant agrees not to enter into any such conflicting Agreement during the term of this Agreement.

(b)   In view of Consultant's access to the Company's trade secrets and proprietary know-how, Consultant further agrees that Consultant shall not, without Company's prior written consent, design identical or substantially similar designs as those developed under this Agreement for any third party during the Term of this Agreement and for a period of five years after the termination of this Agreement. If, in any judicial proceeding, this provision is deemed to exceed the time, geographic or scope limitations permitted by applicable law, then the parties consent to have the reviewing court reform any such provisions to the maximum time, geographic or scope limitations, as the case may be, in order to render such provision enforceable under applicable laws.

(c)  Consultant represents and warrants that neither Consultant nor Saul or any of their assistants are under any pre-existing obligation in conflict or in any way inconsistent with the provisions of this Agreement. Consultant and Saul represent and warrant that Consultant's performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by Consultant in confidence or in trust prior to commencement of this Agreement. Consultant warrants that Consultant has the right to disclose and/or use all ideas, processes, techniques and other information, if any, which Consultant has gained from third parties, and which Consultant discloses to the Company or uses in the course of performance of this Agreement, without liability to such third parties. Notwithstanding the foregoing, Consultant agrees that Consultant shall not bundle with or incorporate into any deliveries provided to the Company herewith any third-party products, ideas, processes, or other techniques, without the express, written prior approval of the Company. Consultant will not knowingly infringe upon any copyright, patent, trade secret or other property right of any former client, employer or third party in the performance of the Consulting Services.

11.    Confidential Information or Materials

During the Term of Agreement, Consultant and  Saul will have access to the Company's confidential, proprietary and trade secret information including but not limited to information and strategy relating to the Company's products and services including customer lists and files, product description and pricing, information and strategy regarding profits, costs, marketing, purchasing, sales, customers, suppliers, contract terms, employees, salaries; product development plans; business, acquisition and financial plans and forecasts and marketing and sales plans and forecasts (collectively called "Company Confidential Information"). Consultant and Saul will not, during the Term of Agreement or thereafter, directly or indirectly disclose to any other person or entity, or use for Consultant's own benefit or for the benefit of others

4

besides Company, any Company Confidential Information. Upon termination of this Agreement, Consultant agrees to promptly return all Company Confidential Information.

12.    Remedies

Consultant understands and acknowledges that Company's remedies at law for any material breach of this Agreement by Consultant are inadequate and that any such breach will cause the Company substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, including the return of consideration paid for this Agreement, Consultant agrees that the Company shall have the right to seek specific performance and injunctive relief. It is also expressly agreed that, in the event of such a breach, Company shall also be entitled to recover all of its costs and expenses (including attorneys' fees) incurred in enforcing its rights hereunder.

13.    Assignment

This is a personal services agreement and Consultant may not assign this Agreement, or any interest herein, without the prior written consent of the Company.

14.    Governing Law and Jurisdiction.

This Agreement shall be governed by and construed in accordance with the laws of New York, without regard to its conflict of law principles that would result in application of any other law. The venue for any dispute arising hereunder shall be the state and federal courts located in New York County, State of New York, and each Party hereby consents to the jurisdiction of such court.

15.    Entire Agreement

This Agreement constitutes the entire understanding of the parties on the subjects covered. It cannot be modified or waived except in a writing signed by Consultant and an Officer of the Company. Notwithstanding the foregoing, the Parties shall continue to be bound by the terms of the Non-Disclosure Agreement between the Parties, dated December 12, 2020 and attached to this Agreement as **Exhibit "A".**

16.    Agreement Enforceable to Full Extent Possible

If, for any reason, a court of competent jurisdiction finds any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

Company:        NETWORK DATA ROOMS, LLC

Name: Jack Concannon
Title: CEO
Signature:
Date: 12/21/2020

Consultant:     SAULREALISM LLC

Name: Ryan Saul
Title: Owner
Signature:
Date: 12-21-2020

RYAN SAUL, Individually and as Officer of SAULREALISM, LLC with respect to paragraphs (5), (9), (10[c]), (11), (14), and (16) of this Agreement.

Name: Ryan Saul
Signature:
Date: 12-21-2020

# Exhibit A

**NONDISCLOSURE AGREEMENT**

This NONDISCLOSURE AGREEMENT (this "Agreement") is entered into as of this 12th day of December, 2020, by and between Network Data Rooms, LLC with its principal place of business at 257 West 38th Street, 2nd Floor, New York, NY 10018 ("NDR") and Ryan Saul, having an address at _____828 N GRANT AVE SPRINGFIELD MO 65802_____ (the "Receiving Party") (each a "Party" and collectively the "Parties").

WHEREAS, NDR is the owner of certain software it seeks to upgrade and build out for the purpose of launching a new platform, offering virtual data room and deal making capabilities for complex and high-volume transactions (the "Software");

WHEREAS, the Receiving Party is an individual that provides full stack software development services with a focus on backend development (the "Service");

WHEREAS, the Parties are negotiating and contemplating entering into an agreement whereby the Receiving Party will provide the Services to NDR in connection with its upgrade and build out of NDR's Software.

WHEREAS, as part of the negotiation, the Receiving Party will have access to NDR's confidential information related to, *inter alia*, design and coding of NDR's Software and NDR's future business and marketing plans for the use of the Software, as well as plans for further development and enhancement of the Software for other business purposes, which NDR has deemed to be proprietary and confidential information that it seeks to protect;

NOW THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    Confidential Information. For purposes of this Agreement, "Confidential Information" means any proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, business plans or models, marketing plans, product plans, product strategies, products, services, computer software and code, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, customer lists, prospective investor lists and strategies, pricing policies, operational methods, marketing, finances or other business information disclosed by NDR (the "NDR Confidential Information") either directly or indirectly in writing, orally or by drawings or inspection of parts or equipment or owned by NDR even though not delivered by the Parties. It is understood that all of the NDR Confidential Information is and shall remain the sole property of NDR. Upon NDR's request, the Receiving Party shall promptly return to NDR all such tangible Confidential Information.

2.    Confidentiality Obligation. It is understood that unauthorized disclosure or use, whether intentional or unintentional, of any of the Confidential Information would be detrimental to NDR. Therefore, the Receiving Party agrees to the following:

1

a. The Receiving Party agrees to use NDR Confidential Information solely to fulfill his/her obligations under this Agreement, during the contemplated negotiations, and throughout the term of any contract or agreement that results therefrom.

b. The Receiving Party shall treat as confidential and not disclose to any third party any NDR Confidential Information and shall not use such Confidential Information for its own benefit. Without limiting the foregoing, the Receiving Party shall use at least the same degree of care which it uses to prevent the disclosure of its own Confidential Information of like importance, but in no event with less than reasonable care, to prevent the disclosure of NDR's Confidential Information. The Receiving Party further agrees to take all reasonable precautions to prevent any unauthorized disclosure or use of any NDR Confidential Information.

c. Unless required by law, the Receiving Party shall not make NDR's Confidential Information available in any form to any third party or to use NDR's Confidential Information for any purpose other than the implementation of this Agreement and any subsequent agreement for the provision of the Service.

d. Any dissemination of NDR's Confidential Information shall be only in connection with the Authorized Purpose, and shall only be disclosed by the Receiving Party to his/her advisors, agents or affiliates who have a need to know said Confidential Information in order for the Receiving Party to carry out proper purposes and responsibilities related to the negotiation of the any subsequent agreement for the provision of the Service and related business transactions, and who have been advised of the confidential nature of such information. Further, the Receiving Party shall cause such advisors, agents and affiliates to which it has given access to the Confidential Information to comply with the terms and provisions of this Agreement in the same manner as each Party is bound hereby, and accept responsibility for the actions and unauthorized disclosures of such representatives.

e. The Parties agree that existence of this Agreement, the negotiations contemplated herein, and any contract or agreement that results, as well as the terms and conditions thereof, shall be treated as Confidential Information and that no reference to its existence or the terms and conditions of this Agreement may be made by the Receiving Party.

f. In the event the transactions contemplated hereby are not consummated, upon termination of the discussions between the Parties, or upon either Party's written request, each Party hereto will, and will cause its respective Representatives to, promptly (and in no event later than five [5] business days after such request) redeliver or cause to be redelivered all copies of documents and information furnished by the other party in connection with this Agreement or the transactions contemplated hereby and destroy or cause to be destroyed all notes, memoranda, summaries, analyses, compilations and other writings related thereto or based thereon prepared by the party furnished such documents and information or its Representatives. Each Party will certify that the provisions of this paragraph have been complied with.

2

3.      Exclusions.  Notwithstanding the provisions of Section 1, Confidential Information shall exclude information that any the Receiving Party can demonstrate: (a) is or becomes a part of the public domain through no act or omission of the Receiving Party; (b) was in the Receiving Party's lawful possession prior to the disclosure and had not been obtained by the Receiving Party either directly or indirectly from NDR; (c) is lawfully disclosed to the Receiving Party by a third party without restriction on disclosure; (d) is independently developed by the Receiving Party; or (e) is required to be disclosed by any judicial or governmental requirement or order (provided that the Receiving Party timely advises NDR of the governmental demand for disclosure).

4.      Remedies.  The Receiving Party's unauthorized use of Confidential Information will diminish the value of such information. Therefore, the Receiving Party agrees and acknowledges that any breach of the Receiving Party's obligations with respect to confidentiality or use of Confidential Information hereunder shall entitle NDR to equitable relief to protect its interest therein, including injunctive relief, as well as money damages.

5.      Required Disclosure.  In the event the Receiving Party believes that his/her will be compelled, or is compelled, by a court, administrative agency, or other governmental body to disclose Confidential Information received under this Agreement, his/her shall: (i) provide prompt notice thereof to NDR so that the Receiving Party can  take steps to oppose such disclosure, and (ii) cooperate with NDR's reasonable attempts to oppose such disclosure, and (iii) use reasonable efforts to obtain a protective order or otherwise prevent unrestricted or public disclosure of such information.

6.      Waiver.  It is further understood and agreed that no failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder. The execution of any contract or agreement contemplated herein or the termination of the discussions or relationship between the Parties shall not relieve any Party or its advisors, agents or affiliates of the obligations of non-use or nondisclosure hereunder or the obligation to return or destroy certain materials.

7.      Choice of Laws; Severability; Modification. This Agreement shall be governed by and construed and interpreted in accordance with the substantive laws of the State of New York. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision hereof shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. All obligations and rights of the Parties expressed herein shall be in addition to, and not in limitation of, those provided by applicable law. This Agreement may be modified or waived only by a separate writing by the Parties expressly so modifying or waiving such. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. References to the Parties shall be deemed to include each of their affiliates, if any. Any disputes arising out of this Agreement shall be venued in federal or state court in the State of New York, and each Party hereby consents to the jurisdiction

3

of such court. This Agreement shall be binding upon the Parties hereto and their successors and assigns.

[Signatures on the following page]

4

IN WITNESS WHEREOF, the Parties acknowledge their agreement to the foregoing as of the date first set forth above by execution of the Agreement by their respective authorized representatives.

**NETWORK DATA ROOMS, LLC**

Name:  Jack Concannon
Title:  CEO
Signature:
Date:  12/14/2020

**RYAN SAUL**

Name:  Ryan Saul
Signature:
Date:  12-14-2020

5