**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————————X
NETWORK DATA ROOMS, LLC,

Civil Case No.: 22-CV-2299-LGS

Plaintiff,

-v-

SAULREALISM LLC and RYAN SAUL, in her individual
and professional capacities,

Defendants.

————————————————————————————X

---

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A
PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER
UNDER F.R.C.P 65 (a) and (b)

---

ALLYN & FORTUNA LLP
Nicholas Fortuna, Esq.
Paula Lopez, Esq.
Attorneys for Plaintiff
Network Data Rooms LLC
400 Madison Avenue, Suite 10D
New York, New York 10017
(212) 213 – 8844

<u>TABLE OF CONTENTS</u>

Preliminary Statement ……………………………………………………………….………1

Statement of Facts………………………………………………………. …………..…3

Argument ………………………………………………………………………..............3

Point I. Plaintiff Meets All Requirements for Obtaining a Preliminary Injunction……….3

A.   NDR is Likely to Prevail on the Merits of its Claims………………...…....6

1.   NDR Will Likely Prevail on its Misappropriation of a Trade Secret Claim under the DTSA …………………………………...……….……….6

a)   NDR's DealTable Software Code Base and Decompiled Source Code are Trade Secrets………………………………………7

b)   Defendants Have Misappropriated DealTable's Trade Secrets….10

2.   NDR is Likely to Prevail on its State Law Claim for Misappropriation of Trade Secrets.…………………………………………………… 11

3.   NDR is Likely to Prevail on its Claim for Conversion of DealTable Software and Decompiled Source Code Written between September 26, 2021, and January 18, 2022...………………………...………….............13

4.   NDR is Likely to Prevail on its Claims for Breach of Contract………..14

i.   The Existence of a Valid Contract…………………….……...…14

ii.   Defendants Saul's Breach and Performance by NDR…………...15

iii.   Resulting Damages…………………………………………17

B.   NDR Has and Will Continue to Suffer Irreparable Harm……………………18

C.   The Balance of the Equities and Public Interest Favors Plaintiff Obtaining A Preliminary Injunction…………………………………………………….21

Point II. A Temporary Restraining Order Should be Granted….......................................23

Conclusion ………………………………………………………………………....25

TABLE OF AUTHORITIES

Cases                                                                                                    Page

*Abdul Wali v. Coughlin,*
   754 F2d 1015 (2d Cir. 1985)…………………………………………………………………4

*Aurora Commercial Corp. v Approved Funding Corp.,*
   13 CIV. 230 RPP, 2014 WL 1386633 *1 (S.D.N.Y. Apr. 9, 2014)………………….........14

*AVGraphics, Inc. v. NYSE Group, Inc.,*
   22 Misc. 3d 1139(A) *1 (Sup. Ct. 2006)……………………………………………………14

*Barbes Rest. Inc. v ASRR Suzer 218, LLC,*
   140 AD3d 430 (1st Dept 2016) ............................................................................... 21

*Business Intelligence Servs., Inc. v. Hudson,*
   580 F. Supp. 1068 (S.D.N.Y. 1984)……………………………………………………...19

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,*
   598 F.3d 30 (2d. Cir. 2010) ....................................................................... 3, 4

*Colavito v. New York Organ Donor Network, Inc.,*
   8 N.Y.3d 43 (2006)…………………………………………………………………………13

*Computer Associates International, Inc. v. Bryan,*
   784 F. Supp. 982 (E.D.N.Y. 1992)…………………………………………………………11

*Employers' Fire Ins. Co. v. Cotten,*
   245 N.Y. 102, 105 (1927)……………………………………………………………………...13

*Estee Lauder Companies, Inc. v. Batra,*
   430 F.Supp.2d 158 (S.D.N.Y. 2006)………………………………………………………19

*DoubleClick Inc. v. Henderson,*
   1997 WL 731413, *1 (Sup. Co. N.Y. Co. 1997)……………………………………...19, 22

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.,*
   730 F.2d 61 (2d Cir.1984)…………………………………………………………………19

*Golden Crust Patties v. Bullock,*
   957 F.Supp.2d 186 (E.D.N.Y. 2013) ....................................................................... 18

*Green Party of New York State v. New York State Bd. Of Elections,*
   389 F3d 411 (2d Cir 2004)………………………………………………………………...3

*Iacovacci v. Brevet Holdings, LLC*,
   437 F.Supp.3d 367 (S.D.N.Y. 2020)……………………………………………………………………7

*Imperial Chem. Indus. Ltd. v. National Distillers and Chem. Corp.*,
   342 F.2d 737 (2d Cir.1965)..................................................................................... 10

*L-3 Communications Corp. v. Kelly*,
   10 Misc. 3d 1055(A) *1 (Sup. Ct. 2005)……………………………………………………………19

*Lumex, Inc. v. Highsmith*,
   919 F. Supp. 624 (E.D.N.Y. 1996)……………………………………………………………………19

*J.A. Preston Corp. v. Fabrication Enterprises, Inc.*,
   68 N.Y.2d 397 (1986) .......................................................................................... 4

*Jacobson & Co. v. Armstrong Cork Co.*,
   548 F.2d 438 (2d Cir.1977)................................................................................... 20

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
   596 F.2d 70 (2d Cir. 1979) …..…………………………………………………...........3

*Levinson v. Cello Music & Film Sys., Inc.*,
   199 F.3d 1322 (2d Cir. 1999)……………………………………………………………………..21

*Mtivity Inc. v. Office Depot, Inc.*,
   525 F.Supp.3d 433 (E.D.N.Y. 2021)……………………………………………………………9

*N. Am. Soccer League v. Nat'l Football League*,
   465 F. Supp. 665 (S.D.N.Y. 1979)……………………………………………………………21

*N. Am. Soccer League, LLC v. United States Soccer Fedn., Inc.*,
   296 F. Supp.3d 442 (E.D.N.Y. 2017)……………………………………………………………21

*Onieda Group Inc. v. Steelite International U.S.A., Inc.*,
   2017 WL 1954805, Slip Copy (E.D.N.Y. 2017)...................................................... 18

*Pan American World Airways, Inc. v. Flight Engineers' Int'l Ass'n*,
   306 F.2d 840 (2d Cir.1962)……………………………………………………………………24

*SEC v. Citigroup Global Mkts. Inc.*,
   673 F.3d 158 (2d Cir.2012)................................................................................. 23

*SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*,
   642 F. Supp. 2d 167 (S.D.N.Y. 2009)………………………………………………………..8

*Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.,*
   118 F.3d 955 (2d Cir. 1997)……………………………………………………………..7

*Somoza v New York City Dept. of Educ.,*
   06 CIV. 5025 (VM), 2006 WL 1981758, *1 (S.D.N.Y. July 10, 2006)……………………..24

*State v. Seventh Regiment Fund, Inc.,*
   98 N.Y.2d 249 (2002)……………………………………………………………………13

*Sylmark Holdings Ltd. v. Silicone Zone In'l, Ltd.,*
   5 Misc.3d 285 (Sup. Ct. 2004)……………………………………………………..12, 22

*Syntel Sterling Best Shores Mauritius Limited v. Trizetto Group, Inc.,*
   No. 15-CV-211, 2016 WL 5338550, *1 (S.D.N.Y. Sept. 23, 2016)…………………………...11

*Terrell v. Terrell,*
   279 A.D.2d 301 (1st Dep't 2001)………………………………………………............6

*Ticor Title Insurance Co. v. Cohen,*
   173 F3d 63 (S.D.N.Y. 1999)………………………………………………………………5

*Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.,*
   60 F.3d 27 (2d Cir. 1995)............................................................................... 4, 6, 20

*Volt Delta Resources LLC v. Soleo Communications Inc.,*
   11 Misc. 3d 1071(A) *1 (Sup. Ct. 2006)………………………………………............13

Federal Statutes and Rules                Page

18 U.S.C. § 1836, *et seq.* ………………………………………………………..*passim*
F.R.CP. 65…………………………………………………………………….*passim*

State Statutes and Rules                Page

C.P.L.R. § 6301 …………………………………………….…………………..1,17

## PRELIMINARY STATEMENT

Plaintiff NETWORK DATA ROOMS, LLC ("NDR" or "Plaintiff"), by its attorneys Allyn & Fortuna LLP, submits this Memorandum of Law in support of its Application for a Temporary Restraining Order and Preliminary Injunction, pursuant to pursuant to F.R.C.P. 65, enjoining and restraining, defendants SAULREALISM LLC and RYAN SAUL (collectively referred to as "Saul" and/or "Defendants") from destroying, disclosing, transferring, or in any way using any of Plaintiff's confidential, proprietary, and trade secret information including but not limited to, the codebase of the DealTable Virtual Data Room Platform software, and the decompiled source code written by Defendants between September 26, 2021 and January 18, 2022. In addition, Plaintiff seeks a mandatory preliminary injunction directing Defendants to turn over to Plaintiff the original and all copies of the codebase of the DealTable Virtual Data Room Platform software and the decompiled source code written by Defendants between September 26, 2021 and January 18, 2022, in their possession, custody, or control.

NDR brings this action against Defendants for, inter alia, misappropriation of trade secrets under the 2016 Defense of Trade Secrets Act, 18 U.S.C. § 1836, et seq. ("DTSA") and New York common law, as well as for conversion, and breach of contract, and seeks to protect and recover its trade secrets, confidential and proprietary information, consisting of the original codebase for the DealTable Virtual Data Room Platform ("DealTable VDR Platform") and the source code for DealTable VDR Platform written by Saul between September 26, 2021 and January 18, 2022, which Defendants have misappropriated in violation of the terms of binding and enforceable agreements. In making this application for injunctive relief, NDR seeks the Court's assistance in maintaining the status quo by preventing defendants Saul from disclosing or destroying NDR's misappropriated trade secrets and proprietary and confidential information and, due to NDR's

undeniable ownership rights to the source code stolen by Saul, a mandatory injunction in the form of an order directing Saul to immediately return to NDR the DealTable codebase unlawfully downloaded by Saul and the decompiled source code created between September 26, 2021 and January 18, 2022 pending the litigation.

As will be shown herein, NDR is the owner of certain software designed for establishing a virtual data room platform identified as "DealTable," for use in the financial industry in transacting business deals such as mergers and acquisitions, in a highly secure virtual environment capable of handling complex and high-volume transactions. Since 2019, NDR has devoted significant time and labor and made a substantial financial investment in upgrading and building out the DealTable software for the purpose of creating a stable release version of the DealTable VDR Platform that can be marketed to the financial industry. In furtherance of its goals of completing the development of the DealTable VDR Platform, in December 2020, NDR retained the services of Saul to serve as Lead Project Developer and write the source code needed to complete the development of, and launch, the DealTable VDR Platform. NDR's claims against Defendants arise from their breach of their obligations under the consulting and nondisclosure agreement entered into with NDR, when, after NDR terminated the parties' relationship, Saul deleted the DealTable marketing website, the DealTable application, the DealTable database and database connection, the DealTable website certificates, and the current permissions and user data[1] and it was discovered that Saul stole the entire codebase for the DealTable VDR Platform and is unlawfully withholding from NDR the original source code written by Saul between September 26, 2021 and January 18, 2022, which is owned by NDR and is a trade secret of NDR's, and which Saul is refusing to return to NDR.

---

[1] Many of the deleted items were recovered except the DealTable application which was only partially recovered and the database connection which has not been recovered.

Defendants' conduct in refusing to return NDR's source code prevents NDR from making the necessary edits and updates needed to complete the DealTable VDR Platform it was on the precipice of finishing and had planned on launching at Venture Summit Digital Connect scheduled for March 29, 2022 through March 31, 2022, for which it had registered prior to discovering that Saul had stolen the decompiled source code written between September 26, 2021 and January 18, 2022, and will result in the loss of prospective investors and cause  irreparable harm to NDR absent an injunction. Moreover, the balance of the equities weighs in NDR's favor, as it is merely seeking to recover property that belongs to it and which Defendants' acquired through wrongful and deceptive conduct in violation of their express contractual obligations.

## STATEMENT OF FACTS

The Court is respectfully referred to accompanying Verified Complaint dated March 21, 2022, the Declaration of Christopher Concannon executed March 22, 2022, with exhibits thereto, and the Declaration of David Delorge, executed on March 22, 2022 with exhibits thereto, for a full a full recitation of the facts as if fully set forth herein.

## ARGUMENT

## I.    PLAINTIFF MEETS ALL REQUIREMENTS FOR OBTAINING A PRELIMINARY INJUNCTION

Plaintiffs request a preliminary injunction pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 65.  Generally, a party seeking a preliminary injunction pursuant to F.R.C.P. 65 must show "first, irreparable injury, and, second, either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor. *See Green Party of New York State v New York State Bd. of Elections*, 389 F3d 411, 418 (2d Cir 2004) *citing Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979); *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598

3

F.3d 30, 35 (2d. Cir. 2010); *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d. Cir. 1995).

Irreparable harm is an injury that is not remote or speculative but actual and imminent, and "for which a monetary award cannot be adequate compensation." *See Tom Doherty Assoc.,* 60 F.3d at 37 *citing Jackson Dairy,* 596 F.2d at 72. Irreparable harm can be found to exist where the availability of a product is essential to the life of the business" because "[w]here the loss of a product will cause the destruction of a business itself or indeterminate losses in other business, the availability of money damages may be a hollow promise and a preliminary injunction appropriate. *Id.* at 38.

The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits. *See Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985). Where the preliminary injunction sought is mandatory in nature—"alter[s] the status quo by commanding some positive act," a movant is required to meet the higher standard of 'substantial' likelihood of success on the merits." *See Tom Doherty Assoc.*, 60 F.3d 27 at 34-35. As will be shown herein, NDR can meet the heightened standard for obtaining a preliminary injunction that is both prohibitory and mandatory, as there is no question about NDR's ownership rights to the codebase and source code that Defendants have unlawfully misappropriated and which NDR seeks to recover. Additionally, it is noted that under both the Consulting Agreement and Nondisclosure Agreement ("NDA") that Defendants have breached as a result of the conduct NDR seeks to enjoin, Defendants acknowledge NDR's entitlement to injunctive relief and the "substantial and irrevocable damage" that would result from Defendants' breach. *See* Ex. "A" to Concannon Decl. at ¶ 4 and Ex. "B" to Concannon Decl. at ¶ 12. Courts have recognized that such language could be viewed as "an admission …that the plaintiff will suffer irreparable harm" as a

4

result the defendant's breach. *See Estee Lauder Companies*, 430 F.Supp.2d at 174 (quoting *Ticor Title Insurance Co. v. Cohen*, 173 F.3d 63, 69 (S.D.N.Y.1999)).

NDR seeks this preliminary injunction because it is the sole means to protect the disclosure and destruction of its Trade Secrets and proprietary and confidential information and ensure the continued viability of its business. NDR needs the immediate recovery of the source code created between September 26, 2021 and January 18, 2022, which Defendants have misappropriated, in order to complete the development of the DealTable VDR Platform and be able to launch it in time to meet the demands of its intended customers. As will be shown herein, Defendants have stolen the source code created between September 26, 2021 and January 18, 2022, and have refused to return it knowing full well that without it, it would be virtually impossible for NDR to complete the DealTable VDR Platform. Defendants' actions were taken in bad faith and with the purpose of sabotaging Plaintiff's ability to complete the development project, as evident by the deletion of the DealTable marketing website, the DealTable application, the DealTable database and database connection, the DealTable website certificates, and the current permissions and user data, and refusal to return the source code despite repeated requests by NDR and its agents.  Further, if Defendants are permitted to retain possession and control of the source code as well as the codebase for the DealTable VDR Platform, all of which constitutes NDR's confidential, proprietary, and trade secret information, NDR will continue to be harmed. To the extent that any such information has been disclosed or could be disclosed to third-parties or potential competitors, NDR has no remedy and will have no remedy except for an order from this Court that enjoins Defendants from utilizing the information and returning all copies to NDR.

**A.  NDR is Likely to Prevail on the Merits of its Claims**

A moving party establishes a likelihood of success on the merits by making a prima facie showing of its right to relief. *Terrell v. Terrell,* 279 A.D.2d 301, 303 (1st Dep't 2001); *see also, Tom Doherty Assoc., Inc.*, 60 F.3d at 35. The allegations contained in the Verified Complaint, together with the Declarations of Christopher Concannon and David Delorge and exhibits thereto, evidencing the Defendants' unlawful misappropriation and conversion of the codebase and source code written between September 26, 2021 and January 18, 2022 of the DealTable VDR Platform, constituting NDR's Trade Secrets and proprietary and confidential information, fully demonstrate that NDR is likely to prevail on its claims for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") and New York law, conversion, and breach of contract claims.

**1.  <u>NDR Will Likely Prevail on its Misappropriation of a Trade Secret Claim under the DTSA</u>**

The DTSA provides a federal cause of action to the owner of a trade secret for the misappropriation of a trade secret that is "related to a product or service used in, or intended for use in, interstate or foreign commerce." *See* 18 U.S.C. § 1836(b). "Owner" is defined within the DTSA as "the person or entity in whom or in which rightful legal or equitable title to, or license in the trade secret is reposed[.]" *See* 18 U.S.C. 1839 (4). "Misappropriation" is defined within DTSA as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *See* 18 U.S.C. 1839 (5)(A). The DTSA defines "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy[.]" *See* 18 U.S.C. 1839 (6)(A).

A "trade secret" is defined under the DTSA as all forms and types of, *inter alia*, financial, business, or technical information, including "processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically,

electronically," if "(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]" *See* 18 U.S.C. 1839 (3).

**a.** **NDR's DealTable Software Code Base and Decompiled Source Code are Trade Secrets**

New York courts rely on the definition of trade secret contained in the Restatement of Torts, which provides that a trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.' *See Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.,* 118 F.3d 955, 968 (2d Cir. 1997). In assessing the existence of a trade secret, federal courts will often apply the factors used by New York state courts in determining whether information constitutes a trade secret. In doing so, courts consider the following non-exclusive list of factors to identify the existence of a trade secret:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*See Iacovacci v. Brevet Holdings, LLC*, 437 F.Supp.3d 367, 380 (S.D.N.Y. 2020). The DealTable code base and the decompiled source code written by Saul between September 26, 2021 and January 18, 2022, as a work for hire and subject to the protections of an NDA and robust confidential provisions contained in a consulting agreement, are unquestionably protectable trade secrets under the unambiguous statutory language. Firstly, the DealTable code base and

7

decompiled source code satisfy the a "formula, pattern, device or compilation" prong of the Restatement definition. *See, e.g., SimplexGrinnell LP v. Integrated Sys. & Power, Inc.,* 642 F. Supp. 2d 167, 198 (S.D.N.Y. 2009) (recognizing that source code, like software, may constitute a trade secret).

In applying the Restatement factors to the DealTable codebase and decompiled source code written between September 26, 2021 and January 18, 2022, it is clear that they meet the definition of a "Trade Secret."  Firstly, (1) the DealTable software codebase and decompiled source code, when deployed, result in the creation of particular features and functionality specific to NDR's VDR Platform, which are not available in existing virtual data room platforms, and therefore not likely known by NDR's competitors; (2) the DealTable software codebase and decompiled source code, as well as NDR's business plans relating to the use of the software technology in the DealTable VDR Platform is known only to NDR's members and consultants who are required to sign agreements acknowledging the confidentiality and trade secret status of the information; (3) NDR implemented comprehensive security protocols to safeguard the codebase and decompiled source code that comprises the DealTable VDR Platform including, the creation of a secure, restricted access repository for its source code and requiring all developers working on the software development project to "check in" a/k/a save all source code in NDR's Azure DevOps Source Code Repository, requiring full backups, secure accessibility, Privileged Identity Management, Data Loss Prevention and Virtual Desktop, requiring Defendants to always use the Azure Active Directory User account to access the DealTable Software and code base and deploying an Azure Multi-Factor Authentication process in order to gain access to the code base; (4) NDR's DealTable software code base and decompiled source code is extremely valuable to it in that it represents critical features and functionality unique to the DealTable VDR Platform, making it superior to its

competitors, more technologically advanced, and easier to use, and would provide NDR with a competitive advantage over existing virtual data room providers; (5) NDR has expended considerable time, money, and effort to have the necessary codebase and source code created to build out the DealTable VDR Platform to have specific features and functionality (not otherwise available on the market) including but not limited to three years of working with software consultants to develop the virtual data room platform and over $1,000,000.00; and (6) it would be virtually impossible for third-parties to replicate NDR's source code without having direct access to it and the disclosure of NDR's source code to its competitors would severely impair NDR's competitive edge by giving its competitor's the ability to quickly replicate and install the features of the DealTable VDR platform into their existing virtual data room platforms; which, otherwise, would have taken them years to do.

Moreover, the information contained in the DealTable code base and decompiled source code, which Defendants have misappropriated, afford NDR a substantial advantage over existing virtual data rooms, because when integrated they will provide unique and marketable attributes to the DealTable VDR Platform, which do not exist in the current virtual data room market. For instance, the DealTable VDR Platform includes (i) Chat embedded functionality, (ii) redaction restrictions, (iii)increased security through multi-factor authenticated logins, (iv) ability to edit and save documents directly on the platform, (v) ability to draft documents and to upload documents singularly or in bulk, and (vi) accessible user interface. *See Mtivity Inc. v. Office Depot, Inc.*, 525 F.Supp.3d 433, 446 (E.D.N.Y. 2021) (finding that the plaintiff sufficiently established that its software is a "trade secret" based on allegations of the expenditure of significant sums and years spent in the research and development of the trade secret, the submission of agreements containing robust confidentiality provisions, evidencing the measures taken to preserve the secrecy of the

software.) *Computer Assoc. Intern., Inc. v Bryan*, 784 F. Supp 982, 1010 (E.D.N.Y 1992) ("'[A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.') (quoting *Imperial Chem. Indus. Ltd. v. National Distillers and Chem. Corp.,* 342 F.2d 737, 742 (2d Cir.1965).

**b.      Defendants Have Misappropriated DealTable's Trade Secrets**

Having shown that the codebase and decompiled source code for the DealTable VDR Platform constitutes trade secrets, the secrecy of which NDR took great efforts to preserve, there is no question that Defendants acquired possession of NDR's trade secret through improper means. For instance, although Saul was obligated to perform all coding work on her assigned Azure Virtual Desktop and save all source code on NDR's secure Azure DevOps Source Code Repository, beginning in or around September 26, 2021, Saul unlawfully downloaded NDR's codebase for the DealTable VDR Platform, made all changes to the codebase and created the new source code for critical features and functionality of the platform on a hidden, self-owned GitHub Repository instead of using the assigned Azure Virtual Desktop. In addition, Saul intentionally failed to save into NDR's secure Azure DevOps Source Code Repository, the DealTable source code she was being paid to edit and write. Knowing full well that she was required to comply with NDR's security protocols for working with the codebase for the DealTable VDR Platform, Saul tried to hide the fact that she was not working from her assigned Azure Virtual Desktop by logging in to the Virtual Desktop each day but actually coding on a different machine. Additionally, in an effort to hide the fact that she was not saving the edited and new source code into NDR's Azure DevOps Source Code Repository, Saul created a new "branch" on the repository called "Ryan Development" and would periodically upload old code to the repository to make Delorge and NDR

think that she was uploading the new source code. The foregoing conduct by Defendants Saul was taken not only in violation of the security measures implemented by NDR to secure its trade secrets but also in clear breach of Defendants' contractual obligations under the NDA and Consulting Agreement. *See* Exs. "A" and "B" to Concannon Decl. *See*, *Syntel Sterling Best Shores Mauritius Limited v. Trizetto Group, Inc.*, No. 15-CV-211, 2016 WL 5338550, *6 (S.D.N.Y. Sept. 23, 2016) (finding that defendants adequately pled elements for relief under DTSA where the allegations show that defendants took reasonable measures to maintain the secrecy of their confidential information, that plaintiffs, without consent, downloaded intellectual property from defendant's Customer Exchange and other repositories and used it for their own use and financial gain, unrelated to its service of defendant's clients, and in breach of a confidentiality provision).

Based on the foregoing, NDR has shown that it is likely to prevail on its claim for misappropriation of trade secrets under the DTSA. The DTSA expressly authorizes injunctive relief in the event of actual or threatened misappropriation of trade secrets. *See* 18 U.S.C. § 1836 (b)(3)(A); *see also, Computer Associates International, Inc. v. Bryan,* 784 F. Supp. 982 (E.D.N.Y. 1992) (finding that computer programs, or components thereof, qualify for trade secret protection and preliminarily enjoining former employees from continuing to use such programs or components.) Accordingly, this Court should grant NDR's motion for a preliminary injunction that not only prohibits Defendants from disclosing or destroying the DealTable VDR Platform codebase and decompiled source code but that also requires Defendants to return to NDR the decompiled source code from September 26, 2021 through January 18, 2022, which Saul failed to save into NDR's repository and is wrongfully within Saul's exclusive possession.

**2. NDR is Likely to Prevail on its State Law Claim for Misappropriation of Trade Secrets**

A plaintiff claiming misappropriation of trade secrets under New York must show: (1) that it has a possessory interest in a trade secret, and (2) that defendant is using that trade secret in

breach of an agreement, confidence, or duty, or as a result of discovery by improper means. *See, e.g., Sylmark Holdings Ltd. v. Silicone Zone In'l, Ltd.,* 5 Misc.3d 285, 297 (Sup. Ct. 2004). For the same reasons discussed above that NDR is likely to prevail on its claim under the DTSA, it will also prevail on its state law claim. First, there is no question that the code base and decompiled source code for the DealTable VDR Platform is owned by NDR, as Defendants' edits and contributions to the source code were made as a work for hire and are the sole property of NDR. The Consulting Agreement between the parties expressly states that:

<u>Ownership</u>

(a)    Consultant agrees that all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets, as well as all derivatives and modifications thereof and thereto (collectively, "Inventions"), conceived, made or discovered by Consultant, solely or in collaboration with others, which relate in any manner to the Software development project that the Consultant is overseeing, are the sole property of the Company. In addition, any Inventions which constitute copyrightable subject matter shall be considered "works made for hire" as that term is defined in the United States Copyright Act.

Moreover, Defendants' access to NDR's DealTable VDR Platform code base was solely as a result of the consulting work NDR hired them to perform and which was covered by an NDA and Consulting Agreement. Defendants were never authorized to download the codebase for the DealTable VDR Platform or to edit or build on the source code on any device other than her assigned Virtual Machine or to save the changes made by Defendants to the source code on any device other than NDR's repository. In retaining possession of the decompiled source code written between September 26, 2021 and January 18, 2022 and refusing to return it to NDR, knowing full well that it is the only copy of the decompiled source code, Defendants are in breach of their contractual obligations. Specifically, the Consulting Agreements states that:

(b)    Upon the termination of this Agreement, Consultant agrees to deliver promptly to Company all printed, electronic, audio-visual, and other tangible manifestations of the Software, including all originals and copies thereof.

Defendants are fully aware that their conduct is in breach of their contractual obligations and the harm its conduct is causing NDR.

### 3. NDR is Likely to Prevail on its Claim for Conversion of DealTable Software and Decompiled Source Code Written between September 26, 2021 and January 18, 2022

Conversion is defined as "an unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *See Employers' Fire Ins. Co. v Cotten*, 245 NY 102, 105 (1927); *State v. Seventh Regiment Fund, Inc.,* 98 N.Y.2d 249, 259, 746 N.Y.S.2d 637 (2002). NDR is likely to prevail on its claim that Defendants Saul converted the decompiled source code for the DealTable VDR Platform. To prevail on a claim for conversion, a plaintiff must prove: "(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Colavito v. New York Organ Donor Network, Inc.,* 8 N.Y.3d 43, 50 (2006) (internal citations omitted). As discussed above and as alleged in the Verified Complaint, there is no question that NDR is the owner and holder of a possessory interest in the decompiled source code created by Saul between September 26, 2021 and January 18, 2022 for the DealTable VDR Platform. Moreover, it is beyond dispute that defendants Saul, in failing to save the decompiled source code on NDR's Azure DevOps Source Code Repository as required, and their refusal to return the source code to NDR following termination as consultant, they are exercising control over NDR's property and interfering with NDR's dominion over the decompiled source code in derogation of NDR's valuable rights and despite NDR's repeated demands for its return. Defendants Saul have intentionally placed NDR's property beyond its control and there is no question that NDR is likely to succeed on its conversion claim. *See, e.g., Volt Delta Resources LLC v. Soleo Communications Inc.,* 11 Misc. 3d 1071(A) *1, *3-4 (Sup. Ct. 2006) (holding that cause of action alleging defendant "improperly retained software... over which plaintiff has

exclusive rights" stated a cause of action for conversion independent of the claim for breach of contract.); see also, *AVGraphics, Inc. v. NYSE Group, Inc.,* 22 Misc. 3d 1139(A) *1, *5 (Sup. Ct. 2006) (recognizing that the alleged conversion of computer software and hardware gives rise to a viable claim for conversion).

**4. NDR is Likely To Prevail on its Claims for Breach of Contract**

Under New York law, a plaintiff claiming breach of contract must show: "(1) the existence of a valid contract, (2) performance by the plaintiff, (3) the defendant's failure to perform, and (4) resulting damage." *See Aurora Commercial Corp. v Approved Funding Corp.*, 13 CIV. 230 RPP, 2014 WL 1386633 *1, *3 (S.D.N.Y. Apr. 9, 2014).

i.      The existence of a valid contract.

a. *Nondisclosure Agreement*

NDR required defendant Ryan Saul to enter into a NDA prior to disclosing information about the DealTable VDR Platform during discussions between the parties about the possibility of Saul working as a software development consultant for NDR to oversee and write the source code needed to complete the DealTable VDR Platform. *See* Ex. "A" to Concannon Decl. Pursuant to the terms of the NDA, Saul acknowledges that NDR's confidential information includes the "design and coding of NDR's Software and NDR's future business and marketing plans for the use of the Software, as well as plans for further development and enhancement of the Software for other business purposes." *See Id*. at Whereas Clause 4. Saul further acknowledges in the NDA that NDR's confidential information includes "***technical data, trade secrets*** or know-how, including, but not limited to, research, business plans or models, marketing plans, product plans, product strategies, products, services, ***computer software and code***, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information,

customer lists, prospective investor lists and strategies, pricing policies, operational methods, marketing, finances or other business information disclosed by NDR." *See Id.* at ¶1. In signing the NDA, Saul agreed that (i) "all NDR Confidential Information is and shall remain the sole property of NDR [and] [u]pon NDR's request, [Saul] es shall promptly return to NDR all such tangible Confidential Information" and to "use NDR Confidential Information solely to fulfill his/her obligations under this Agreement, during the contemplated negotiations, and throughout the term of any contract or agreement that results therefrom." *See Id.* at ¶2 (a).

  *b. Consulting Agreement*

  On or about December 20, 2020, NDR entered into a Consulting Agreement with defendant Saulrealism LLC and defendant Ryan Saul as an officer of Saulrealism LLC and in her individual capacity with regard to specific provisions of the Consulting Agreement. *See* Ex. "B" to Concannon Decl.  Pursuant to the Consulting Agreement, Saulrealism LLC agreed to provide NDR with software development services and that Ryan Saul would serve as the Lead Developer. As Lead Developer, Defendant Saul was providing services to NDR as an independent contractor and was being paid a consultant fee for the work provided. In an effort to protect its trade secrets and its confidential and proprietary information, NDR included in the Consulting Agreement a Non-Competition provision which states as follows:

> Consultant and Saul acknowledge and agree that during the term of the Agreement they will not render Consultant, managerial, market research, advise or consulting services, either directly or indirectly, to any business engaged in or about to be engaged in developing, producing, marketing, distributing or selling virtual data room services, related products, which would otherwise conflict with his (*sic*) obligations to the Company.

*See Id.* at ¶5.  Additionally, the Consulting Agreement expressly provides that NDR is the owner of all work performed by Saul relating to the DealTable VDR Platform software development project. Specifically, the Consulting Agreement states the following with regard to ownership:

<u>Ownership</u>

(a)     Consultant agrees that all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets, as well as all derivatives and modifications thereof and thereto (collectively, "Inventions"), conceived, made or discovered by Consultant, solely or in collaboration with others, which relate in any manner to the Software development project that the Consultant is overseeing, are the sole property of the Company. In addition, any Inventions which constitute copyrightable subject matter shall be considered "works made for hire" as that term is defined in the United States Copyright Act. Consultant further agrees to assign (or cause to be assigned) and does hereby assign fully to the Company all such Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.

(b)     Upon the termination of this Agreement, Consultant agrees to deliver promptly to Company all printed, electronic, audio-visual, and other tangible manifestations of the Software, including all originals and copies thereof.

(c) Consultant further agrees to provide all assistance reasonably requested by Company, both during and subsequent to the Term of this Agreement, in the establishment, preservation and enforcement of Company's rights in the Software.

*See Id*. at ¶6.

NDR also sought to protect its confidential information by including a provision in the Consulting Agreement which expressly prohibits Saul from "directly or indirectly disclos[ing] to any other person or entity, or use for Consultant's own benefit or for the benefit of others besides Company, any Company Confidential Information" and which requires Saul to "promptly return all Company Confidential Information" following the termination of the agreement. *See Id*. at ¶11. Pursuant to the Consulting Agreement, Saul agreed and acknowledged the substantial harm that NDR would suffer as a result of a breach of the Agreement by them and agreed to the following remedy provision:

Consultant understands and acknowledges that Company's remedies at law for any material breach of this Agreement by Consultant are inadequate and that any such breach will cause the Company substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, including the return of consideration paid for this Agreement, Consultant agrees that the Company shall have the right to seek specific performance and injunctive relief. It is also expressly agreed that, in the event of such a breach, Company shall also be entitled to recover all of its costs

and expenses (including attorneys' fees) incurred in enforcing its rights hereunder.

*See Id*. at ¶12 and recognized the continued enforceability of the NDA and Saul's obligations thereunder. Additionally, pursuant to NDR's established security protocols, Saul was required to always use the Azure Active Directory User account in order to access the DealTable VDR Platform codebase and source code and as a second level of security to prevent unauthorized access to the data and applications an Azure Multi-Factor Authentication process was deployed. In addition, Saul was provided with a secure internet connection through the Azure Virtual Desktop assigned to her and from which she was required to perform all work on the codebase and source code for DealTable VDR Platform. And, there is no question that Saul was provided access to the codebase for the DealTable VDR Platform solely for the purpose of carrying out her duties as Lead Developer and was required to save all code work she performed into NDR's secure Azure DevOps Source Code Repository.

ii.  Defendants Saul's Breach and Performance by NDR.

NDR performed under the terms of the agreements by paying Defendants the agreed upon consulting fee in the sum of approximately $154,000.00 in consulting fees. Despite NDR's performance and the clear and unambiguous terms of the NDA and Consulting Agreement, there is no question that defendants Saul have breached their obligations thereunder by intentionally and maliciously deleting DealTable website and marketing site, the DealTable application, the DealTable database and database connection, the DealTable website certificates, and the current permissions and user data, misappropriating NDR's valuable trade secrets and confidential and proprietary information by downloading the source code base to her personal repository and failing to check-in the source code created between September 26, 2021 and January 18, 2022, and by refusing to return the stolen source code.

iii.    <u>Resulting Damages</u>.

NDR can further show that it has been damaged by Defendants in being prevented from completing the development project and launching the DealTable VDR Platform. Saul's actions have paralyzed NDR's ability to complete the project and launch the DealTable VDR Platform, which it has been working towards for the last three years, and on January 18, 2022, was only a month or two from completing. Moreover, if Saul destroys or discloses the source code to NDR's competitors, NDR will lose its competitive advantage from the superior features and functionality it has spent years and over one million dollars in developing. Consequently, NDR has suffered and continues to suffer great, immediate and irreparable harm and is entitled to temporary, preliminary, and permanent injunctive relief, including a mandatory injunction directing Saul to return to NDR the DealTable VDR Platform code base and the source code written by Saul between September 26, 2021 and January 18, 2022. In addition, or in the alternative, NDR has suffered damages in an amount to be determined at trial but believed to exceed $1,000,000.00.

**B.    NDR Has and Will Continue To Suffer Irreparable Harm**

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction." *Onieda Group Inc. v. Steelite International U.S.A., Inc.¸* 2017 WL 1954805, Slip Copy (E.D.N.Y. 2017); *Golden Crust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 194 (E.D.N.Y. 2013). As discussed above, there is no question that the information contained in the DealTable code base and decompiled source code, which Defendants have misappropriated and continue to withhold from NDR, constitute a trade secret and afford NDR a substantial advantage over existing virtual data rooms, because when integrated they will provide unique and marketable attributes to the DealTable VDR Platform, which do not exist in the current virtual data room market.  In cases involving the misappropriation of trade secrets, irreparable

harm has often been presumed, although the presumption is capable of being rebutted. *See, e.g.,* *Estee Lauder Companies, Inc. v. Batra*, 430 F.Supp.2d 158, 174 (S.D.N.Y. 2006) ("Irreparable harm is presumed where a trade secret has been misappropriated because, as the Court of Appeals for the Second Circuit has explained, '[a] trade secret once lost is, of course, lost forever' and therefore, such a loss 'cannot be measured in money damages'") (quoting *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir.1984); *DoubleClick Inc. v. Henderson,* 1997 WL 731413, *1, *7 (Sup. Co. N.Y. Co. 1997) ("Irreparable harm is presumed, where, as here, trade secrets have been misappropriated.") (quoting *Lumex, Inc. v. Highsmith,* 919 F. Supp. 624, 628 (E.D.N.Y. 1996) ("It is clear that irreparable harm is presumed where a trade secret has been misappropriated.")); *L-3 Communications Corp. v. Kelly,* 10 Misc. 3d 1055(A) *1, *6 (Sup. Ct. 2005) (citing cases) ("New York law recognizes that irreparable harm is presumed when trade secrets have been misappropriated").

Even absent the presumption of irreparable harm, NDR's allegations establish that the issuance of a preliminary injunction is necessary to prevent it from suffering further irreparable harm. *Business Intelligence Servs., Inc. v. Hudson,* 580 F. Supp. 1068, 1072 (S.D.N.Y. 1984) (finding irreparable harm where disclosure of software system to competitor "would allow [competitor] to develop or improve its computing system with little or no effort"). Defendant Saul's actions have paralyzed NDR's ability to complete the project and launch the DealTable VDR Platform, which it has been working towards for the last three years, and on January 18, 2022, was only a month or two from completing. Defendants' unlawful retention of the decompiled source code prevents NDR from adding additional features, editing existing features or from making any future updates. The delay in completing the development and launching the DealTable VDR Platform is likely to cause the loss of potential business opportunities and goodwill. For

instance, NDR had secured a London private equity firm to agree to test out the DealTable VDR platform and provide valuable feedback on its features and functionality in the banking industry prior to mass marketing the product.  As a result of Saul's theft of the decompiled source code, NDR has been unable to finish the buildout of the DealTable VDR platform in order to have it tested and the equity firm is now in the process of being sold, putting NDR at risk of losing a valuable testing opportunity.  In addition, NDR's members were in the process of transitioning their financial clients from their printing company to NDR's VDR Platform, after repeated assurances that the DealTable VDR Platform was about to launch. Courts have found that a movant has shown sufficient risk of irreparable harm by showing that absent a preliminary injunction it is threatened with the loss of goodwill and/or business relationships.  *See Tom Doherty*, 60 F.3d at 37–38 ("found irreparable harm where a party is threatened with the loss of a business," particularly when the "very viability" of the business is at risk.) In *Tom Doherty Assoc., Inc.,* the court recognized that "a loss of prospective goodwill that is both imminent and non-quantifiable can constitute irreparable injury" and granted the plaintiff the injunctive relief requested holding that absent the preliminary relief, TOR "will lose an opportunity to become a sufficiently well-known publisher of children's books to attract additional authors and owners of characters." *Id.*; *see also Jacobson & Co. v. Armstrong Cork Co.,* 548 F.2d 438, 445 (2d Cir.1977) (affirming finding of irreparable harm because plaintiff "presented ample evidence to show a threatened loss of goodwill and customers, both present and potential, neither of which could be rectified by monetary damages").

In addition, NDR was planning to launch the DealTable VDR platform at the Venture Summit Digital Connect scheduled for March 29, 2022 through March 31, 2022, for which it had registered for on February 4, 2022, prior to discovering that Saul had stolen the decompiled source

code written between September 26, 2021 and January 18, 2022 ("Venture Summit"). The Venture Summit would have afforded NDR a valuable opportunity to meet tech investors and secure future funding for its business. Unable to complete the DealTable VDR platform without the decompiled source code, NDR will no longer be able to launch it at the Venture Summit and will be forced to forgo the opportunity to secure potential investors and the opportunities that could be derived from its participation in the program including publicity and exposure to potential customers in the financial industry. Such a lost opportunity to secure "potential investors" has been recognized by the courts as evidence of irreparable harm. *See N. Am. Soccer League, LLC v. United States Soccer Fedn., Inc.,* 296 F. Supp. 3d 442, 459 (E.D.N.Y. 2017) ("Plaintiff has demonstrated irreparable harm on the basis of potential loss of investors.") (citing cases) *Levinson v. Cello Music & Film Sys., Inc.*, 199 F.3d 1322 (2d Cir. 1999) (discussing possibility of irreparable harm if "potential investors" had been deterred by the uncertainty caused by the issue in dispute); *N. Am. Soccer League v. Nat'l Football League*, 465 F. Supp. 665, 672 (S.D.N.Y. 1979) (finding irreparable harm in part due to "chilling effect ... upon potential new investors").

## C.  THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVORS PLAINTIFFS OBTAINING A PRELIMINARY INJUNCTION

The balancing of the equities requires the court to determine the relative prejudice to each party accruing from a grant or denial of the requested relief. *See Barbes Rest. Inc. v ASRR Suzer 218, LLC*, 140 AD3d 430, 432 (1st Dept 2016). In analyzing the public interest prong, a court must ensure that the proposed injunction will not harm the public interest. *SEC v. Citigroup Global Mkts. Inc.,* 673 F.3d 158, 163 n.1 (2d Cir.2012). Herein, a balancing of the equities entails weighing NDR's protection and preservation of its trade secrets, and confidential and proprietary information, against that of the Defendants Saul to remain in possession and control of NDR's source code, which they only had access to in furtherance of development projects Defendants

were retained (and compensated) to perform, and which they possess in violation of their contractual duties of including a stringent confidentiality provision. Here, the equities for enjoining Defendants Saul from destroying and/or disclosing NDR's code based for DealTable VDR Platform unlawfully downloaded by Defendants and decompiled source code for the DealTable VDR Platform created between September 26, 2021 and January 18, 2022, and for an order directing the immediate return to NDR of the decompiled source code balance in NDR's favor because Defendants Saul have no right to continue in possession of, or to use NDR's trade secret, and proprietary and confidential information.

Absent the requested prohibitory and madatory injunction, NDR stands to lose and never recover its valuable, confidential information. Defendants only stand to lose access to that which they never owned, only created as a work for hire on behalf of NDR, and covenanted to protect. *See DoubleClick Inc.,* 1997 WL 731413, at *7 ("equity does not favor the employee who seeks to breach his fiduciary duties to his former employer"); *see also*, *Sylmark Holdings Ltd.*, 5 Misc.3d 285 at 300 ("equity does not favor an agent which breaches the duty of confidentiality owed to its principal.") Moreover, the granting of a preliminary injunction herein preventing the destruction and disclosure of the codebase and decompiled source code and directing the return of the decompiled source code to NDR, merely prevents Defendants from engaging in conduct and retaining possession of something, which they have no right to engage in or to possess. Such an injunction imposes a minimal burden on Defendants.

However, the more time that Defendants Saul are allowed to maintain possession and control of NDR's source code, the greater the possibility that it may be destroyed or disclosed to NDR's competitors and that NDR loses the opportunity to launch the DealTable VDR Platform. This would be extremely harmful to NDR because without its code, it would likely take NDR's

competitors years to replicate and install the features of the DealTable VDR platform into their existing virtual data room platforms.  Moreover, if NDR does not recover the decompiled source code, it is prevented from completing and launching the DealTable VDR Platform, delaying its highly anticipated entry into the marketplace.  Furthermore, it would be very difficult to have a new developer replicate the stolen source code because each coder has a unique way of coding and the existing codebase saved on the development site was written by Saul, who did not comment on her code, making it very difficult for a new code developer to understand its functionality in order to write new code that can be pieced together with the saved codebase. Undertaking such an endeavor could cause NDR its development project, and to lose the traction it has gained in marketing the DealTable VDR platform, which it believed would be marketable by end of February 2022.

On the other hand, granting the requested injunction does nothing more than maintain the status quo and reinforce each parties rights in and to the subject property, Moreover, to the extent that some of the injunctive relief affords NDR with the return of its stolen source code, such an award will not inflict any prejudice to Defendants Saul, given their total lack of legal rights in and to DealTable VDR Platform code base and decompiled source code.  Furthermore, granting Plaintiffs' motion for an injunction serves the public interest because absent an injunction the public will be deprived of access to a superior, cost-effective virtual data room platform, otherwise not available.  Accordingly, there is no question that the balance of the equities, and the public interest, favor an injunction.

## II.    A TEMPORARY RESTRAINING ORDER SHOULD BE GRANTED

Pursuant to Rule 65 (b) of the Federal Rules of Civil Procedure, federal courts have the discretion to issue "a temporary restraining order without written or oral notice to the adverse party

or its attorney" *when "*(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Under the law of this Circuit, "the standard for an entry of a TRO is the same as for a preliminary injunction." *See, Somoza v New York City Dept. of Educ.,* 06 CIV. 5025 (VM), 2006 WL 1981758, at *3 (S.D.N.Y. July 10, 2006). The purpose of a temporary restraining order is to preserve an existing situation in statu quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Pan American World Airways, Inc. v. Flight Engineers' Int'l Ass'n,* 306 F.2d 840, 842–43 (2d Cir.1962).

For the reasons discussed above, NDR is entitled to entry of an *ex parte* temporary restraining order, preventing Defendants Saul from destroying and/or disclosing the DealTable VDR codebase and source code from September 26, 2021 through January 18, 2022. NDR has demonstrated that it meets the requirements for obtaining a preliminary injunction under F.R.C.P. 65 against Defendants. NDR has met the higher standard of showing a likelihood of success on its claims for misappropriation of a trade secret under DTSA and New York law, conversion by Defendants, and breach of a binding and enforceable NDA and Consulting Agreement by Defendants. Moreover, NDR has shown that it will suffer irreparable harm absent the issuance of an injunction not only because Defendants are in wrongful possession of its trade secrets but also based on, *inter alia*, the indeterminate delay caused by Defendants' actions in withholding its decompiled source code, on NDR's ability to complete the development and launch of the DealTable VDR Platform which, in turn, threatens  the loss of a valuable beta testing opportunity with a London private equity firm that would have provided NDR with valuable feedback, and the

24

loss of potential business opportunities and goodwill, and potential investment opportunities.

Moreover, Defendants Saul's past actions of (i) intentionally and maliciously deleting the DealTable website and marketing site, the DealTable application, the DealTable database and database connection, the DealTable website certificates, and current permissions and user data, and (ii) in misappropriating NDR's valuable trade secrets and confidential and proprietary information by downloading the codebase to the DealTable VDR Platform to her personal repository, failing to save the source code created between September 26, 2021 and January 18, 2022 in NDR's repository, and by refusing to return the stolen source code to NDR, further emphasizes that immediate threat that NDR's source code will be destroyed or disclosed before a preliminary injunction hearing can be held, if a TRO is not granted.

## **CONCLUSION**

For all of the foregoing reasons, the Court should grant NDR's application in its entirety, together with such other and further relief as the Court deems just, equitable and proper.

Dated: New York, New York
March 22, 2022

Respectfully submitted,
ALLYN & FORTUNA, LLP

By: _____
Nicholas Fortuna, Esq.
Paula Lopez, Esq.
Attorneys for Plaintiff
400 Madison Avenue, Suite 10D
New York, New York 10017
(212) 213-8844

25