UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NETWORK DATA ROOMS, LLC,

                      **Plaintiff,**                Civil Case No.: 22-cv-02299-LGS

    -v-

SAULREALISM LLC and RYAN SAUL, in
Her individual and professional capacities,

                      **Defendants.**

---

**DECLARATION OF RYAN SAUL IN OPPOSITION TO PLAINTIFF NETWORK DATA ROOMS, LLC'S MOTION FOR A PRELIMINARY INJUNCTION**

1. I, Ryan Saul, am the named individual Defendant in the above-captioned matter. As such I am fully familiar with the facts and circumstances set forth herein.

2. I am also the sole member of the entity Defendant, SaulRealism LLC (hereinafter "SaulRealism").

3. SaulRealism is a limited liability company organized under the State of Missouri.

4. I have worked in the information technology (IT) field for ten years.

5. On or about December 2020, I began discussions with Plaintiff Network Data Rooms, LLC (hereinafter "NDR"), to serve as Lead Project Developer for the DealTable VDR Platform.

6. On December 12, 2020, I entered into a Nondisclosure Agreement with the Plaintiff.

7. On or about December 20, 2020, SaulRealism entered into a Consulting Agreement with the Plaintiff.

8. On the same date, I entered into the agreement in my individual capacity for certain paragraphs of the Consulting Agreement, specifically paragraphs (5), (9), (10[c]), 11, (14), and (16).

9. I reported directly to NDR's ownership Christopher Concannon, Jack Concannon, and Thomas Concannon.

10. Throughout the project, my communications with management would rotate between all three individuals.
11. At times all three would ask for different things in the development in the DealTable VDR Platform Development, or would even create a completely separate "side project."
12. I also reported to David Delorge, who was hired as a consultant for NDR's DealTable Azure Chief Cloud Architect and Cloud Security Engineer.
13. Based upon my conversations with the Plaintiff, I was told that there had been a significant investment of time and work product already existing in the DealTable VDR Platform.
14. Pursuant to my conversations, I had been informed that prior developers had created existing code for the project for about two years.
15. Our Consulting Agreement had a term of six months, so I had some expectations that this would be a reasonable time to complete the project.
16. Upon first review of the code, it appeared based upon my professional opinion that the existing codebase was very bare and could have been written in the span of a few weeks, and certainly not two years.
17. Upon information and belief, much of the code (but not all) written by the prior developers had been deleted before I began working on the project.
18. Upon information and belief, this "missing code" from the earlier developers had been the subject of a prior litigation, or a threatened litigation.
19. Upon information belief the Plaintiff (or their predecessor or agents) had settled with the prior developer regarding the "missing code."
20. While I was working with the Plaintiff, from January 2021 through August 2021, there had been two other developers that worked on the project intermittently.
21. One developer was terminated on or about March 2021.
22. The second developer was hired in June 2021 and was terminated in August 2021.

23. Pursuant to NDR's established security protocols, I was required to always use the Azure Active Directory User account to access the DealTable VDR Platform codebase and source code.

24. I always followed that directive, and only used the Azure Active Directory User account to access the DealTable VDR Platform codebase and source code.

25. I was required to always use a secure internet connection through the Azure Virtual Desktop assigned to me to access the codebase and source code the for the DealTable VDR Platform.

26. I always followed that directive, and only used the Azure Virtual Desktop to access the codebase and source code for the DealTable VDR Platform.

27. I never performed any work on the codebase on the DealTable VDR Platform from a personal computer outside of the Virtual Network.

28. All work I completed for NDR was checked-in on the NDR secure Azure DevOps Source Code Repository.

29. I continued to deposit code to NDR's repository from my initial hiring until about January 16, 2022.

30. The only time I used any other repository, was in the first two months of 2021, reviewing the existing code from the prior developers. This was only completed at the request of management.

31. I did not download NDR's codebase on September 26, 2021.

32. I have never downloaded NDR's codebase, as that would be a flagrant violation of the Confidentiality Agreement.

33. I do not have a GitHub Repository, because I do not use GitHub as a repository.

34. On or about October 2021, I created a new "branch" called "Ryan Development."

35. One of the prior developers on the team had made over twenty branches in the code, and it is a common practice in code development.

36. New code was deposited into the branch.

37. The purpose of creating the new branch was to easily go back in time.

38. This was necessary because Thomas Concannon requested a special side project, and the best way to organize it was to create a new branch.

39. Thomas Concannon did not want Chris Concannon to know that I was coding this side project, which I started in about October 2021 and worked on for about two months.

40. Thomas Concannon also acknowledged that he may abandon this side project, so the branch was created to easily go back in time.

41. All work for this project was deposited into the secure NDR repository.

42. Paragraph 19 of the Delorge Declaration names many features that I coded and deposited the code to the secure NDR repository after September 26, 2021.

43. I do not possess any decompiled source code for the DealTable VDR Platform.

44. I do not have the original code, nor do I have a copy of the code.

45. We used Microsoft Teams to communicate, and to work through a "final list."

46. Beginning on or about May 2021, there had been approximately five "final lists" that were produced by management.

47. Every task on those final lists were completed.

48. Despite all tasks being timely completed, the project was never "done."

49. Communication from management was extremely poor during portions of the project development.

50. There were times during the project where I would hear nothing from NDR's management for a week.

51. I had seen extreme conflict between the Concannons and David Delorge.

52. On or about July 2021 through my termination, David Delorge expressed dissatisfaction with the Concannons.

53. During a Microsoft Teams meeting with David Delorge in August 2021 he told me that he should "take the code and run."

54. David Delorge and I spoke many times about the conflicts between him and Chris Concannon.

55. Delorge disclosed to me his belief that Chris Concannon was intentionally sabotaging the parent company Network Financial Printing.
56. Delorge informed me that the Concannons would withhold months of payments owed to Delorge.
57. Due to the conflicts, David Delorge would stop working on the NDR's projects for weeks at a time.
58. Prior to my termination on January 18, 2022, there had been many issues with NDR management.
59. Starting in about June 2021, Thomas Concannon replaced Jack Concannon as the CEO of NDR.
60. Thomas Concannon would expect me to starting work with very irregular and unpredictable hours.
61. Sometimes Thomas Concannon would log in at 11PM, 3AM, or 4AM.
62. He would always expect an immediate response.
63. If I did not answer him immediately on Microsoft Teams, he would get very angry.
64. For several months, I slept with the speakers next to my bed to make sure I never missed an alert.
65. On or about January 12, 2022, I told Thomas Concannon that I would no longer work these irregular hours, and he needed to provide me with a real final list.
66. I also informed him that I would no longer work on the side project that he requested.
67. The morning of January 18, 2022, Thomas Concannon sent over the requested final list at about 3 A.M.
68. I believe the list was about ten pages long.
69. This new "final list" had entirely new items that were not discussed previously.
70. We had a meeting scheduled for that morning for 10 A.M.
71. When I woke up at 9A.M., I had several stern messages from Chris Concannon demanding that I "complete the software."
72. Since Chris Concannon and Thomas Concannon are not on the same page regarding completion of the software, I inquired "completed to what standard, and according to which list?"

73. After that Microsoft Teams discussion, I was blocked access from the secure network at about 10AM.
74. I was granted access again for approximately five minutes.
75. I spent the entirety of that five minutes reviewing the ten page "final list."
76. I was not even able to finish reviewing the "final list" when my access was removed.
77. At about 11AM, there was a Teams meeting with Chris Concannon, Thomas Concannon, and David Delorge.
78. To the best of my recollection, I barely was able to get a single word in the conversation.
79. The majority of the meeting was Chris Concannon screaming at both David Delorge and myself.
80. I did not apologize.
81. I said that I could finish the items on the list within two to three weeks.
82. However, I said that Thomas Concannon would need to communicate with me during normal business hours.
83. This simple request caused the screaming at me to intensify, and I was terminated.
84. If I were not terminated, I would have been able to complete software according to the "final list."
85. The issues were not "completion" of the software, it was the constant everchanging demands of the management.
86. I was willing and able to complete the project.
87. I did not sabotage the project and delete files.
88. I did not launch a small bat file deleting the DealTable website and marketing website, the DealTable Application, the DealTable database and database connection, the DealTable website certificate, or the current permissions and user data.
89. I did not attempt to create a "back door" into Network Security.
90. I did not embed "re-write code" in the database on January 18, 2022.

91. The Plaintiff had never followed standard operating procedure regarding administrative privileges.

92. Under standard operating procedures, there is only one administrator.

93. The fundamental issue with everyone being an administrator is that **anyone** can make changes under someone else's user account, and it will appear that the user made the change.

94. However, NDR management insisted that everyone including David Delorge, the Concannons, and myself had administrative access.

95. There have been instances during my consultant work with NDR, where Chris Concannon logged into David Delorge's account and made changes.

96. This had caused multiple conflicts between Chris Concannon and David Delorge throughout my time working with NDR.

97. The only time I ever deleted any code, or moved code from one server to another server was at Plaintiff's request.

98. I have no opposition to paragraphs (a) and (c) of the requested relief for the Plaintiff's Application by Order to Show Cause because I do not have in my possession, custody, or control any of Plaintiff's confidential, proprietary, and trade secret information.

99. I oppose paragraph (b) of the requested relief for the Plaintiff's Application by Order to Show Cause, because I do not have in my possession, custody, or control any of Plaintiff's confidential, proprietary, and trade secret information to turn over to the Plaintiff.

100. I request that the Court deem this Declaration as sufficient to meet the Plaintiff's requested relief for the Plaintiff's Application by Order to Show Cause.

101. I declare under the penalty of perjury that the foregoing is true and correct.

Dated:  April 11, 2022

_____
Ryan Saul