```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   NETWORK DATA ROOMS, LLC,

 4                   Plaintiff,

 5            v.                            22 CV 2299 (LGS)

 6   SAULREALISM LLC and RYAN SAUL,
     in her individual and
 7   professional capacities,

 8                   Defendants.           Hearing
                                           (via Zoom)
 9   ------------------------------x
                                           New York, N.Y.
10                                         April 20, 2022
                                           3:30 p.m.
11
     Before:
12
                        HON. LORNA G. SCHOFIELD,
13
                                           District Judge
14

15                             APPEARANCES

16   ALLYN & FORTUNA LLP
          Attorneys for Plaintiff
17   BY:  NICHOLAS FORTUNA
          PAULA LOPEZ
18
     RENEE M. WONG
19        Attorney for Defendants

20

21

22

23

24

25
```

```
 1                  (Case called)
 2             THE COURT:  Hello, everyone.  We are here for an
 3   evidentiary hearing on a motion for preliminary injunction
 4   following the issuance of a TRO.  I understand that the movant
 5   has witnesses, so you may proceed.
 6             MR. FORTUNA:  Yes, your Honor.  Good afternoon.  My
 7   name is Nicholas Fortuna with Allyn & Fortuna, and we call
 8   David DeLorge.
 9   DAVID DeLORGE,
10        called as a witness by the Plaintiff,
11        having been duly sworn, testified as follows:
12   DIRECT EXAMINATION
13   BY MR. FORTUNA:
14   Q.  Good afternoon, Mr. DeLorge.  Would you tell the Court what
15   your relationship is to the plaintiff, Network Data Rooms LLC?
16   A.  I am currently a contractor for NDR, or Network Data Rooms,
17   with their Deal Table application.  I'm the chief cloud
18   architect and their security architect for all of the
19   application IT infrastructure and security.
20             THE COURT:  Let me just interrupt for one second.  I
21   did want to reassure you that I've read all the declarations,
22   Mr. DeLorge's initial declaration as well as his reply
23   declaration.  I'll confess I looked at but did not study the
24   exhibits.  I'm happy to have you go over whatever you like,
25   including things that are in the declaration, but I just wanted
```

1   to reassure you that I have read them.

2              MR. FORTUNA:  Thank you, your Honor.  I anticipate not

3   going over most of the declarations.  Thank you.

4              THE COURT:  Sure.

5   Q.  Mr. DeLorge, would you tell us about your educational

6   background.

7   A.  Yes, sir.  I've been in the IT industry about 30 years.  I

8   have a bachelor's degree, a master's degree, I also I have an

9   MBA for IOT in technology from MIT.  I have 14 certificates

10  issued by Microsoft.  I have four certificates issued by AWS.

11  I am a Microsoft certified professional.  I'm also a Microsoft

12  certified security architect.

13  Q.  The 14 certificates issued by Microsoft, how do you get

14  those certificates?

15  A.  You work a lot, you study.  You go online.  You have to

16  actually pay for the certificates or pay to take the test.  If

17  you pass the test, they grant you a certificate, and then they

18  send it over to you.

19  Q.  Is that the same for Amazon certificates you give out?

20  A.  That's correct.

21  Q.  Thank you.

22  A.  Um-hum.

23  Q.  How long have you been working with NDR?

24  A.  About a year and a half.  They first hired me as a

25  contractor through their original contracting company, which

1    was called XOps.  I was a Microsoft Azure cloud security

2    engineer for them to make sure that their application and

3    infrastructure was up to par for different aspects, and then

4    they kept me on after they actually released XOps, and I became

5    their contractual chief architect and their security engineer.

6    Q.  You signed two declarations in this matter that were

7    submitted to the Court, one on March 22 and the other on April

8    18.  Did you review those declarations before you signed them?

9    A.  Yes, sir.  Read them over thoroughly.

10   Q.  And they are accurate and it's information that you

11   provided, is that correct?

12   A.  That's correct.

13   Q.  And you adopt that as your statement here today, is that

14   correct?

15   A.  That is correct.

16   Q.  And the exhibits that are attached to your reply

17   declaration you also submitted to be part of your declaration,

18   is that correct?

19   A.  That's correct.

20   Q.  Let me draw your attention to Ryan Saul.  What was his role

21   with respect to NDR?

22   A.  Ryan was a hired engineer.  I actually interviewed Ryan.

23   She was hired to do the front-end development work and back-end

24   development work or what we call full staff within the

25   applications code base.

 1   Q.  Mr. DeLorge, I know it's a little confusing.  You referred

 2   to Ryan as she.  My understanding from Mr. Saul's attorney,

 3   it's a man.  I know you know Ryan Saul as a woman.  But to the

 4   extent possible, try to refer to him as a man.

 5   A.  My apologies.  It was a year and a half of --

 6   Q.  Yes, I understand.

 7            MR. FORTUNA:  I am going to refer to the plaintiff as

 8   NDR, your Honor.

 9   Q.  NDR's Azure-developed DevOps source code repository, would

10   you describe what that is?

11   A.  So a source op repository is literally just a saved

12   location for all of the code base to be saved and retained

13   within the cloud infrastructure.  For an example, if you were

14   to save a file to your desktop, you would save it in a folder.

15   You do the same thing in a repository.  You would save that

16   code file to a separate folder or what we call branch in that

17   repository, and it keeps it and it is located in the Microsoft

18   Cloud space.

19   Q.  Azure is owned by --

20   A.  Microsoft.

21   Q.  Maintained by Microsoft.

22            What's the benefits of Azure with respect to its high

23   security or something else?

24   A.  All of it, actually.  So the benefits are, you have

25   disaster recovery, you have full retention, you have complete

1   security based on identity use, which means your user name,

2   your password, your secondary authentication, such as MFA

3   through your phone and as well as a seven-year or up to 30-year

4   retention period for all of your documentation and all of your

5   files.

6   Q.  Was Ryan Saul required to always use NDR's Azure-developed

7   DevOps source code repository?

8   A.  Yes, sir.  That was one of the job requirements.  All

9   developers, and we had a few added onto Ryan Saul, were to use

10  the Azure DevOps repository.  All code was to be saved there,

11  deployed from there, and changed and committed from there at

12  all times.

13  Q.  Just as an aside, would you explain to the Court what you

14  mean by deployed.  You have used that several times in your

15  verification.

16  A.  I'm sorry.  A deployment is kind of like making a pie, so

17  you take all your code, all your pieces, your eggs, your

18  butter, and everything else, you put them in a bucket, you put

19  them in the oven, and then the pie comes out.

20          So when you deploy a code, you actually deploy it to

21  the Internet and it combines all the code together and then

22  produces what we would like to call a website or an

23  application.  If you went to Netflix or Facebook, or anything

24  like that, that's actually deployed code.  The code behind that

25  has a lot of different ingredients involved in it.

1    Q.  Now, during the time that Ryan Saul worked as a developer

2    for NDR, were there any other developers working there?

3    A.  Yes, sir.  For a short period of time, we had two different

4    developers.  One was hired to do just front-end work, which

5    means kind of make the website look prettier.  The other one

6    was a full stack developer that was assisting with code during

7    the time of the first or actually the second iteration or build

8    process of the application.  Both of those developers were let

9    go prior to September.

10   Q.  Prior to September 2021?

11   A.  Yes, sir.

12   Q.  What was the reason they were let go?

13   A.  Well, the first reason, Ryan Saul did not like the way that

14   the one full stack developer was working.  The second reason

15   for the front-end developer, we were convinced -- myself, Jack

16   Concannon, Chris Concannon and Thomas Concannon -- that the

17   front end development could be done just with Ryan Saul doing

18   not only the back end but the front end.  Against my wishes, it

19   was agreed upon, and we went with using three developers down

20   to one.  Of course, that does save on cost and connectivity and

21   so on and so forth.  That was the process.

22   Q.  Who was the person who suggested that Ryan Saul could do

23   the work of both of those developers first?  Who was the

24   person?

25   A.  Ryan Saul.

 1   Q.  Was it Ryan Saul that asked to have them terminated?

 2   A.  Not so much in those words, but they were no longer needed.

 3   So you can take that as you'd like it, but I am not going to

 4   put words in somebody's mouth.

 5   Q.  When you say no longer needed, was Ryan Saul -- that's

 6   what --

 7   A.  Her recommendation was that she could do the front end and

 8   the back end and wouldn't have an issue with it, so we no

 9   longer needed those developers.

10   Q.  And then they were gone as of September 26, 2021?

11   A.  That's correct.

12   Q.  Prior to the developers leaving, was all the code that Ryan

13   Saul worked on saved on the Azure repository?

14   A.  Yes, sir.  All the code was in the Azure DevOps repository

15   under the individual folders for those developers and the

16   actual, what we call the main or the top-level folder, yes,

17   sir.  Everything was saved there.

18   Q.  Now, in your declaration you talk about compiled code and

19   decompiled code.

20   A.  Um-hum.

21   Q.  Would you explain to the Court what decompiled code is.

22   A.  Sure.  I'll make it easy.  I actually looked this up to

23   make it easier for people who don't understand development.

24   It's kind of like taking all your ingredients out for a pie.

25   You have all these different ingredients.  That's decompiled

1    code.  You have your eggs, your butter, your milk, your bread.

2    You are going to grease your pan.  Compiled code is the pie,

3    all the ingredients put together and then cooked.

4            Decompiled code is all the bits and pieces of the

5    application that are not put together.  A compiled code is

6    something that you actually -- it compiles it when you do what

7    we call a build of the code and then allows it to be seen,

8    viewed, and used by the World Wide Web.

9    Q.  So the compiled code is kind of like the final product?

10   A.  That's correct, sir.

11   Q.  Why is it important to have decompiled code?

12   A.  Well, without the decompiled code, the final product is

13   great.  It actually works.  It does everything you want to.

14   But you can't edit it.  You can't change it.  You can't add

15   anything to it.  You can't take away anything from it.  Without

16   the decompiled code we can make absolutely no changes to the

17   code base.

18   Q.  In order to finish this project did you need the decompiled

19   code?

20   A.  Yes, sir.

21   Q.  And how long would it have been to finalize the project and

22   go to market at the point of January 18, 2022, when Ryan Saul

23   left?

24   A.  We were looking at anywhere between 30 and 60 days.  We had

25   actually already booked a few venues with Microsoft and the

1    Vegas ITIS and a few others that we were actually going to show

2    the application to the public.  I would say anywhere between 30

3    to 60 days the application would have been, I hate to say this,

4    but polished and brought up to where the different lists and

5    components needed to be just corrected, and we would have been

6    ready for the public.

7    Q.  Is it fair to say without the decompiled code you cannot

8    finish the project?

9    A.  We cannot, no, sir.

10   Q.  Do you currently have the decompiled code?

11   A.  No, sir, we do not.

12   Q.  Why not?

13          THE COURT:  Can I just ask a question.  You don't have

14   any of it?

15          THE WITNESS:  I was about ready to say that.  I

16   apologize.  We have the code up to September 26, 2021.  After

17   that date the code was no longer checked into our Azure DevOps

18   repository, so the only code we actually have is the compiled

19   code.  We do not have the decompiled code.  So we can no longer

20   make any changes to it.

21          THE COURT:  Again, so I understand, you have the

22   decompiled code through September 6, 2021 and you have the

23   compiled code as of when?

24          THE WITNESS:  So we have the compiled code.  The

25   compiled code is on the World Wide Web.  We can actually

1    download the compiled code.  We do not have any code after

2    September 2021 of the decompiled code, which means all of the

3    changes from September to January we no longer have.  If we had

4    to, we would have to revert back seven months, which is a lot

5    of changes, to even see what is actually published on the World

6    Wide Web.  So there is no way for us to edit it, there is no

7    way for us to change it.  It's literally just sitting out there

8    in a compiled state.

9    Q.  To reengineer the compiled code and start again, how long

10   would --

11   A.  About a year.  Take about a year to redo it all because

12   reengineering code from where it is from now is literally just

13   like building it over again.

14   Q.  You mentioned to the Court the idea that code had not been

15   checked in since September 26.  Would you explain what it means

16   to check in code to the Court.

17   A.  Sure.  That means if you opened up a Word document, and you

18   edited that Word document, you went up to the left-hand corner

19   and clicked the word saved, it would save it to your folder, so

20   you have what you are actually working on.  The saved

21   uncompiled code we do not have a copy of.  So the code was

22   actually worked on, it was changed, but it was not saved into

23   our repository.  It was saved somewhere else.

24   Q.  Do you know where it was saved?

25   A.  Do I know a hundred percent, no, I do not.  I can estimate,

1    or guesstimate, based on investigation, discovery, talking to

2    different clients, that it is somewhere in a GitHub repository,

3    which is kind like a saved space that you can just set up on

4    your own.  So that code is somewhere either on Ryan Saul's

5    devices or it is in a GitHub repository that we do not have

6    access to.

7              THE COURT:  How do you know it's not just gone?

8              THE WITNESS:  How do I know it's not just gone?  I do

9    not.

10             Being truthful, the person who saved the code, Ryan

11   Saul, if they had saved it to a specific spot and deleted it,

12   that is outside of NDR's control.  It is not in our repository.

13   We are hoping that they have a backup copy of it, as GitHub

14   saves everything for seven years, or if they have it on the

15   device that they have a backup at a recovery process for that,

16   and we can get it back.  But it is no longer in the NDR or Deal

17   Table repository at all.

18   Q.  We will show some exhibits later.

19             It appears that Ryan Saul used GitHub repository to

20   deploy NDR's code while she was working -- excuse me -- he was

21   working at NDR, is that correct?

22   A.  That is correct.

23             I'm also a certified ethical white hat hacker.  So the

24   GitHub repository ID that when you save something from one

25   space to another leaves an ID number, kind of like your

 1  driver's license number.  That ID number is actually marked

 2  back to GitHub.  So according to what I found, I believe that

 3  the NDR Deal Table code is somewhere in a GitHub repository.

 4  Q.  We can show that in the exhibits that we have attached to

 5  your reply affidavit, is that correct?

 6  A.  That's correct.

 7  Q.  Before we get to that, GitHub, if Ryan Saul deleted the

 8  code from her GitHub repository, his GitHub repository, GitHub

 9  would still have a copy of that, and we can retrieve that with

10  Ryan Saul's user name and e-mail that's used to establish --

11  A.  That's correct.  I believe that we've also reached out to

12  GitHub, and they have confirmed that information.

13  Q.  Thank you.

14        So I draw your attention to January 18, 2022.  I

15  understand Ryan Saul was fired on that day?

16  A.  That's correct.

17  Q.  After Ryan Saul was fired, what, if anything, did Ryan Saul

18  do with respect to NDR's site?

19  A.  Between the four minutes that it takes me to lock an

20  account out of the Microsoft Azure platform, Ryan Saul went in

21  and deleted the website, which deleted the database

22  connectivity, the website certification through Azure, and also

23  went in and ran a batch script that deleted all of the data out

24  of the Deal Table NDR database.

25  Q.  And you have records of that activity attached to your

1  reply declaration in the form of exhibits, is that correct?

2  A.  That's correct.  They are screenshots with dates and times

3  which you can match up to the time that she was terminated.

4  Again, the screenshots are my time.  I live in Colorado, Denver

5  Colorado.  So they are two hours ahead of Eastern Standard

6  Time.  But all the dates and times are there.

7  Q.  And you can trace the machines that were being used to Ryan

8  Saul, is that correct?

9  A.  That's correct.  We can also look at where she logged in

10  from, when she logged in, how she logged in, what the IP

11  addresses are of the machines she tried to log in or did log in

12  with, and where those machines are located.  According to our

13  records, one is in Minneapolis, I believe, and the other one is

14  in Chicago.  Two different machines, two different times or

15  four, five different times, all logged into our system, and we

16  have the log reports, which, again, it is Microsoft Cloud.  It

17  logs everything.

18  Q.  As far as the documents that were deleted on January 18 by

19  Ryan Saul, were you able to recover those documents through

20  work that you did?

21  A.  So there weren't documents.  I'm not trying to correct you.

22  Q.  That's fine.  Please do.

23  A.  She deleted the website.  She deleted the certificate.  She

24  deleted the database.  She deleted the connectivity.  Yes.  It

25  took me about six or seven hours to restore.  Again, Microsoft

1   Cloud has this Azure recovery, backup and recovery.

2          We restored everything back to what we call deployed

3   code.  Again, it is not the uncompiled code.  It's the actual

4   website.  So we were able to log back in, test everything out,

5   make sure everything worked.  But, yes, we were able to recover

6   everything.  Not the code because it wasn't there, but the

7   actual application that was deployed, yes.  Everything has been

8   recovered.

9   Q.  What about the code?  When did you discover that the

10  decompiled code was missing?

11  A.  About two days later I actually started working with the

12  code base, which is in the Azure DevOp center, and I started to

13  notice that the last save, or what we call in development

14  commit date, was back in September, and there was nothing past

15  that date.

16         At that time I logged into the virtual machine that

17  was assigned to Ryan Saul and started looking through the

18  virtual machine for the code itself and could not find it there

19  either.

20         MR. FORTUNA:  Your Honor, at this point I am going to

21  share some of the exhibits that were attached to Mr. DeLorge's

22  declaration.

23         THE COURT:  OK.

24         MR. FORTUNA:  Thank you.

25         THE COURT:  While you're doing that, I am going to ask

1    Mr. DeLorge, had you ever checked to ensure that she was doing

2    her work in the Azure, whatever it's called?

3              THE WITNESS:  DevOp.

4              THE COURT:  Azure DevOp.

5              Had you ever checked that before or did you check it

6    for the first time after she was fired?

7              THE WITNESS:  So when a developer is assigned a task,

8    so say for an example they are going to turn a logo from blue

9    to green, what we usually do is we assign them a task.  They

10   complete the task, and then we go out to the actual application

11   where it's deployed, and we check to see if the logo has turned

12   from blue to green.  99.9 percent of the time myself and Thomas

13   Concannon did all of the manual testing, and we checked that

14   and, yes.

15             The other aspect is, the code would actually say it

16   had been updated, but there was nothing in the repository that

17   was updated.  So, yes, ma'am, I did check it, but I wasn't --

18   I'm not -- I'm a contractor --

19             THE COURT:  It sounds like what you did is, you

20   checked the work product, but you didn't check that she was

21   doing the work on the Azure DevOp.

22             THE WITNESS:  That's correct.  Because we gave her a

23   virtual machine that she was supposed to use.

24             THE COURT:  I understand.

25             THE WITNESS:  It's kind of like babysitting.  If you

1   tell somebody, you have to take your shoes off at the door, you

2   kind of --

3          THE COURT:  You don't always check that they are doing

4   that.

5          THE WITNESS:  Right.  Especially up to September, I

6   was actually in the code a lot.  And then I just assumed, and

7   again you know what that does, but I assumed they were using

8   the correct process.

9          MR. FORTUNA:  Can everybody see the screen that I

10  shared?

11         THE COURT:  Yes.

12         MR. FORTUNA:  Thank you.

13  Q.  Mr. DeLorge, Ryan Saul says in his declaration that --

14         THE COURT:  Could you identify this exhibit.  It's

15  DeLorge Exhibit A, is that right?

16         MR. FORTUNA:  Yes.  Sorry.  This is DeLorge Exhibit A

17  to his reply declaration.

18         THE COURT:  OK.

19  Q.  Ryan Saul said in his declaration that the work of prior

20  developers was deleted, suggesting that it is a regular

21  occurrence to delete code.  Is that true?

22  A.  No, sir, never, never.

23  Q.  If you look at Exhibit A, would you explain to the Court

24  the importance of this and what this exhibit depicts.

25  A.  Yes, sir.  Again, I'll explain a repository.  A repository

1   is literally just a bunch of folders and files that are saved

2   in a secure place.

3          So if you look to the arrow that I had pointing to the

4   two folders, XOp Demo and XOps Pasindu, those are actually the

5   original code base for all of the code.  If you look to the

6   right you will notice that none of these code bases -- this is

7   the original code that she claims was deleted -- has ever been

8   deleted.  It's still in Azure DevOps.  It still has the last

9   change date.  There is nothing that has been deleted in any

10  way, shape, or form.

11  Q.  This is something that Ryan Saul would have known was

12  there?

13  A.  Yes, sir.  She actually accessed this many times.

14          MR. FORTUNA:  This is Exhibit B to the DeLorge reply

15  declaration.  Can everybody see that?

16          THE COURT:  Yes.

17          Is there any way to make it a little bigger on your

18  screen?  Just because I'm looking at it on a smaller screen.

19          That's much better.  Thank you.

20  A.  You can leave it here, and I can explain, if you'd like,

21  Nick.

22  Q.  Would you describe the importance of this exhibit, and what

23  does it show?

24  A.  So this is the virtual machine that was assigned to Ryan

25  Saul to do all of her work on.  On a virtual machine, when you

1   are assigned to it and you work in the Azure DevOp center you

2   usually create a source in a repo folder.  As you can notice,

3   this source and repo folder, if you look at the top URL it

4   says:  This PC, Windows C, users, NDR admin, source, repos.

5   You will notice that the repo folder is empty.  That means that

6   there was no code saved to this machine at any given time.

7   Q.  Does that mean that Saul Ryan is always using a different

8   machine between September 26 and January 18 to do the work that

9   you were checking the final product on?

10  A.  That's correct.

11          THE COURT:  How do you know it wasn't there and then

12  deleted?

13          THE WITNESS:  Because I actually rolled the machine

14  back.  What we can do is, we can actually restore the machine

15  back to any certain date we want to.  So I restored the machine

16  back about six months, and each one of those restores, the PC

17  folder that you are looking at now comes up as empty.

18          THE COURT:  OK.  Thanks.

19          THE WITNESS:  We do have all of these snapshots, your

20  Honor.  So at any given time we can give you September,

21  October, November, December, January, February, a screenshot of

22  each month.  It doesn't matter.  They all look actually the

23  same, which is why it's just one screenshot.  It makes things

24  easier.

25          MR. FORTUNA:  Can you see that, your Honor.  Is it

1    large enough?

2           THE COURT:  Yes, I can.

3    Q.  Mr. DeLorge, this is Exhibit C from your reply declaration.

4    Would you explain what this is depicting and the importance of

5    it.

6    A.  Yes.  I'm doing the before and after.  So this is an XML

7    file.  I don't want to go too technical.  If you look down on

8    number 4, it says who deployed the actual deployment.  Number 5

9    tells you where it was deployed from.  So VSTS stands for

10   Visual Studio Team Services, which is actually Azure DevOps.

11   And line number 6 tells you the author's e-mail.  And number 7

12   tells you what they actually did.

13          Every time a deployment was made within Azure DevOps,

14   you would receive a status-completed XML file on every

15   deployment.  We have deployments that match this all the way up

16   to September.  After that, we do not.  This is an Azure DevOps

17   deployment log script, which we have no logs from Visual Studio

18   or Azure DevOps after September.

19   Q.  In other words, if Ryan Saul went into the Azure

20   repository, did some work, every time she went in, there would

21   be a record of her -- him going in and this record would

22   consist of something like this, a file, is that right?

23   A.  That's correct.  This is a deployment time, so it even

24   gives you the start time, end time.  Did it actually succeed,

25   which is line 16.  Was it read only.  Everything is in this

1    file.  It would tell you exactly what happened for that code,

2    yes.

3    Q.  So every time Ryan Saul or anyone else, for that matter,

4    went into the repository, you would get one of these files

5    created and saved, is that right?

6    A.  That's correct.  Everything is logged in Microsoft again.

7    So any time any user makes any edits, updates, deployment,

8    saves, it's all saved within the Microsoft ecosystem.

9    Q.  If the decompiled code was in the Azure system and then

10   deleted by Ryan Saul, you would still have these files showing

11   the work that was done during that period that the code was

12   deleted, is that correct?

13   A.  Again, the code cannot be deleted, so there is no way for

14   them to delete it.  But if she had -- if a person goes in and

15   changes anything with the code based, we have a log for it,

16   yes.

17   Q.  Thank you for the correction.

18         That was going to be my next point.  Any code that

19   would be in Azure cannot be deleted by the developer and that's

20   one of the benefits of having it in there, the security

21   provision, is that correct?

22   A.  That's correct.  It's covered under the Windows Defender

23   retention period, so everything that's in the Microsoft Azure

24   Windows cloud base is actually recovered by a retention period,

25   which means you can set your retention period for as many years

1  as you want.  NDR's retention period was set back in 2020 for

2  seven years, which means there is nothing in the system that

3  has been deleted at all.

4  Q.  Now, just referring back to a point that you made earlier

5  about GitHub, GitHub retains everything that's in its

6  repository for a period of time, and that's why you are

7  thinking or hoping that you can, once you get the information

8  about GitHub, you can go back to them and get whatever code was

9  in there at the time Ryan Saul was doing deployment?

10  A.  That's correct.  Because Microsoft, AWS, GitHub all follow

11  the same --

12          THE COURT:  Can we go back to C?

13          MR. FORTUNA:  Sure.  I'll make it larger.

14          THE COURT:  May I interrupt your question with my

15  question.

16          My question is, I understand what you said describing

17  the document and all the information it captures.  What does it

18  show us about this case and what happened in this case, if

19  anything?

20          THE WITNESS:  What it is showing is Ryan Saul used to,

21  before September 26, use the proper method using the Visual

22  Studio deployment, which is where we would get this log from.

23          After September, Nicolas Fortuna and his staff will

24  show you that they were not using this process anymore.  We are

25  going to show you the before and the after.  This is the

1  before.  And there is hundreds of these files because, again,

2  you change code and you deploy it hundreds of times, so we were

3  just grabbing one at a time to show you the before and the

4  after.

5  A.  You were asking about the retention, Nick.  According to

6  NIST and ISO 1809, all cloud-based structures have to have at

7  least a minimum of seven years' retention period.  It doesn't

8  matter where you go.  If you look up NIST, which is the network

9  information and security, it's the protocol that is used by

10  all-cloud platforms.  You have to have retention.

11  Q.  So that's why you are thinking, even if Ryan Saul tried to

12  delete the code after it was worked on, a different repository

13  will be able to get it once we get that information?

14  A.  That's correct.  Because GitHub is NIST, GDPR, FISMA,

15  FITREP, SOC, SOC 2, all certified.  So they have to keep that

16  retention period.

17       THE WITNESS:  As you were requesting, Judge, the

18  difference between what you were seeing before and the

19  difference what you are seeing now is extremely evident.

20  Number 1, it's a different type of log file.  The reason it's

21  different is because it's not being deployed from the Azure

22  DevOp center.

23  Q.  Let me just interrupt you for a second for the record.

24       MR. FORTUNA:  What we put on the screen, is Exhibit D

25  to the DeLorge reply declaration.  Mr. DeLorge is just about to

1    explain the importance of this exhibit.

2             THE COURT:  I understand.  He already explained this

3    is the after document.  It's basically showing nothing

4    happened.

5             THE WITNESS:  It's actually showing something.  If you

6    look at the time stamp, it's written in a different way, but

7    it's still a log file.  It's a JSON file because we don't get

8    the XML file because she was no longer, or they were no longer

9    using our DevOps environment.

10            So it tells you the time stamp.  The time stamp is

11   1:13:20:22, which means the code was deployed and pushed out to

12   the World Wide Web.  The site name is DEV Deal Table.  The

13   request ID is what I want to point out.  The request ID is no

14   longer a Microsoft Visual Studio request ID.  It is now a

15   straight GitHub request ID, which is why we are saying that the

16   code is somewhere.  We just can't access it.  But it was not

17   coming from the NDR Deal Table Microsoft environment.

18   Q.  Now, this displays a deployment that Ryan Saul did on some

19   work that he was asked to do by NDR, is that correct?

20   A.  That's correct.

21   Q.  So this work that prior to being fired was deployed, and

22   you were able to see the final product of this work, which you

23   saw, but at the time you didn't see that it was being deployed

24   from someplace else other than the Azure site?

25   A.  That's correct.  It took me hours to find this file.  So,

1    again, we asked the employee to use Visual Studio and DevOps.

2    They decided not to.  So when we found out they decided not to,

3    we started going digging and then to come to find out they were

4    using a different repository from somewhere else, which, again,

5    we do not have the code base for.

6              All the changes that were made during this deployment

7    we do not have the code base for.

8              THE COURT:  Can I just ask, what, if anything, that

9    you're aware of happened in September at or around the time

10   that things started to be done differently?

11             THE WITNESS:  Ryan Saul took over both the front-end

12   development and the back-end development on their own, and I

13   believe that they downloaded the code from our repository and

14   started using their own source.  It's just -- I believe it was

15   just for convenience.

16             As I stated, we worked together for almost a year and

17   a half, and Ryan Saul constantly complained that her Internet

18   was bad.  She didn't have connectivity.  The virtual machine

19   that we handed to kind of black out once in a while.  She

20   couldn't get to it.  Which was not because of Microsoft.  It

21   was because of her Internet connectivity, and I think this made

22   her job easier to download the code to where she wanted to and

23   deploy it from where she wanted to, instead of following the

24   rules and regulations that were set aside that she agreed to of

25   using the NDR Azure DevOps environment.

1    Q.  In September, as you said, in September of 2021, the other

2    developers were no longer working on it, so there was no way to

3    discover that it wasn't on Azure?

4    A.  That's correct.  If there was more than one developer

5    working on the branch code, then if the code itself was no

6    longer being updated by one developer and updated by another,

7    then you would see a massive difference, because they are not

8    working on the same document.

9          Think of it this way.  If you're working on a document

10   in collaboration mode with somebody and they decide to download

11   it to their desktop and work on it on their own, you wouldn't

12   see their changes anymore.

13         When we made the decision or -- not we.  But when Deal

14   Table and Network Data Rooms made the decision just to give

15   everything over to her, she no longer had to share the code

16   base with any other developer.  They could literally do

17   whatever they wanted to with the code base.  So Ryan Saul

18   downloaded the code base and developed it on their own wherever

19   they wanted to.

20   Q.  Mr. DeLorge, just to clarify, was Ryan Saul ever authorized

21   to do this work on or download it on any other system other

22   than Azure system?

23   A.  No, sir.  That's an entire breach of our NDA, our security

24   posture, our recommended rules, regulations and even the walk

25   through that we had up until September.  Every other developer

1    used the Azure code base.  So, no.  This was a total breach of

2    the NDA.

3    Q.  I am going to try to move a little bit more quickly through

4    the exhibits because we are under time limits.

5    A.  I apologize.

6    Q.  Question here.  This GitHub ID number that you identified,

7    you know that's a GitHub ID number because why?

8    A.  We reached out to GitHub and they identified it as a GitHub

9    number.  They said they cannot go in and look at the code or

10   see who did it, because of course that's a breach of privacy,

11   but they can identify that that is a request ID to GitHub to

12   pull code from a repository.

13   Q.  Also, based on your experience, you recognize that as a

14   GitHub ID prior to the confirmation?

15   A.  Yes, sir.  I am Azure DevOp's engineer and I started

16   developing when I was 13, so we totally understand where that

17   number came from.

18   Q.  Showing you what's Exhibit E to your reply declaration,

19   would you explain to the Court what that is.

20              MR. FORTUNA:  Your Honor, is that large enough?

21              THE COURT:  Yup.

22   A.  This is simple.  This is just backing up what I was

23   pointing out in the other screenshot.  This is the GitHub

24   applications that you can download from the Web, which means

25   you can actually click either the one that says Git Bash or

1  CMB, or whatever else, and actually log into GitHub, get your

2  code and change it from there.  This was actually deployed on

3  the VDI that was assigned to Ryan Saul.  So when you read the

4  statement that I never used GitHub, it's right here.

5  Q.  So that statement in Ryan Saul's declaration is clearly

6  false.  Based on this exhibit, you could see the GitHub

7  repository deploying code in the system because it's referenced

8  here, is that right?

9  A.  That's correct.  And when I open those up or try to log

10 into them, of course it's going to ask for a user name and

11 password, which I don't have for the code base we are looking

12 for.

13 Q.  Because Ryan Saul has the password?

14 A.  That's correct.

15          MR. FORTUNA:  This is Exhibit F.  It's hard to read.

16 I'm sorry, your Honor.  I can make it larger so you can see

17 parts of it.  Exhibit F to the DeLorge reply declaration.

18 Q.  What's the relevance of this exhibit, Mr. DeLorge?

19 A.  So Ryan Saul made a statement that she -- that a folder, or

20 branch is what we call it, in the code development process was

21 created and that everything was deployed and saved to there.

22          If you look to the right-hand side and if you scroll

23 in or just zoom in and then look over there, you will see that

24 September 26, 2021 is the latest date for any of the check-ins

25 for any of the branches or any of the saves.

1            If you scroll to the right there, Nick, real quick,

2     just go to the bottom and scroll to the right.  If you look,

3     the latest date is September 26, 2021.  Nothing else has been

4     checked in since then.

5     Q.  Now, next to that date it says nobody.  It doesn't say Ryan

6     Saul.  Why does it say nobody?

7     A.  So it says nobody because we put a legal hold and a

8     security restriction on Ryan Saul's account.  When you do that,

9     Ryan Saul's account is no longer accessible through Azure

10    DevOps, so it replaces it with anybody I want to.  So instead

11    of typing her name, I left it as the Microsoft default, which

12    is nobody.

13            It didn't leave her picture.  It left all her

14    information.  But it actually locks the account out so it

15    contact no longer make changes, edits, updates, reviews.

16            THE WITNESS:  So it's a security lock and a legal

17    hold, your Honor, kind of like doing a legal hold for e-mail,

18    discovery, or anything like that in Microsoft.

19    Q.  You did that after Ryan Saul was fired, is that right?

20    A.  Yes, sir.  At 1:47 on my time, January 18.

21    Q.  This is actually a picture of Ryan Saul next to nobody,

22    correct?

23    A.  I believe so, yes.  Again, I have never met the person in

24    person, so if you upload a picture yourself -- if you upload a

25    picture yourself, hopefully it's you.

1  Q.  I'll ask it a different way.  That's a photo that Ryan Saul

2  uploaded saying --

3  A.  That's correct.  That's an upload of Ryan Saul uploaded

4  saying this is me, yes.

5  Q.  Mr. DeLorge, what's the importance of this document?

6  A.  According to Ryan Saul's response, they created a saved

7  folder, or what we call an Azure DevOps branch, called Ryan

8  development.  All the code was actually deployed to that

9  branch.

10          As you notice, the last commit or another word for

11  everyone else, save, is actually July -- June 24.  So nothing

12  has been saved to that branch in any way, shape, or form.

13          This is what I would call a fake branch, which means

14  that nothing was really ever put there, nothing was ever done

15  there.  It was just uploaded for sake of saying, yes, I'm

16  uploading code because after June 24 nothing was actually

17  there.

18          THE COURT:  I am going to interrupt for just a second.

19  I understand that there is someone on the line but maybe I'm

20  wrong.  They may have called into the phone and it's

21  plaintiff's counsel in another matter where we had a default

22  hearing scheduled.

23          I just received a message from my courtroom deputy

24  that we will need to reschedule the hearing.  I don't know all

25  the details.  I had just assumed that the defendants would not

1    appear and that we could just proceed on the papers, but I

2    gather that's not true and we will have to reschedule the

3    hearing.  I just wanted to excuse plaintiff's counsel in that

4    matter so you don't hang around unnecessarily.  I'll issue an

5    order rescheduling it.  I apologize for any inconvenience.  But

6    hopefully you haven't been waiting too long.

7              Sorry, Mr. DeLorge.  You can proceed.

8              THE WITNESS:  No worries, your Honor.

9    A.  Again, this just shows -- so in Ryan Saul's response, we

10   were told that a branch or folder was created for her -- for

11   them to save everything to called Ryan Development.  This is a

12   screenshot of that branch and folder that absolutely shows that

13   nothing has been uploaded to that branch since June 24, 2021 at

14   1:32 a.m.  It's like I call the red herring.  I hate to say it.

15   Q.  This is addressing the point that Ryan Saul said in her

16   declaration to the Court, this is where the code was saved and

17   we are showing the Court it was never saved here.

18   A.  It was never saved there, correct.

19             THE COURT:  I got the point, and I don't need to hear

20   argument.  It just takes time.

21             MR. FORTUNA:  Sorry, your Honor.

22             THE COURT:  That's all right.

23   A.  I think that's good, Nick.

24   Q.  Would you explain to the Court what this is.

25   A.  So this is a screenshot.  You notice the two different

1   arrows.  You'll notice at the end of those arrows there is two

2   different locations.  One is De Soto, Missouri.  The other one

3   is Chicago Illinois.  If you look all the way to the right, you

4   will notice the time stamps.  The time stamps are 1:18, 1:05 --

5   I'm sorry.  To the left, Nick.  You will notice that Ryan Saul

6   continuously tried to access our environment and accessed our

7   environment during this time from two different locations.

8           The reason we are showing you this is because Ryan

9   Saul was only supposed to use her Azure DevOps VDR machine at

10  any given time.  This actually shows that Ryan Saul was

11  actually accessing our Microsoft Cloud space from two different

12  virtual machines, two different IP addresses, and two different

13  locations constantly, even on the day of the 18th, which is the

14  day she was fired.  If you'll notice the last time stamp up at

15  the top, it's actually 1:44 -- 1:44:25 p.m., which is actually

16  3:44, which is a minute after they were fired or terminated,

17  and they continued to access our environment from two different

18  locations.

19  Q.  Just to point out, Ryan Saul's name is listed here as well

20  as the person accessing the system from another machine, is

21  that correct?

22  A.  That's correct.  Another machine, different location,

23  different IP, two different states, pretty much at the same

24  time, which is actually against the NIST rules.  You cannot

25  access the same system from two different locations at the same

1   time.  That is actually called hacking or malicious intent.  So

2   this is actually -- if you want to pull this out and Google it,

3   it's malicious intent.

4   Q.  For some reason, my computer is a little bit show.

5   A.  Can you just center and move to the right a little bit,

6   Nick.

7              THE WITNESS:  Your Honor, this is actually a

8   screenshot of the deleted website that we spoke about earlier,

9   the time stamp of when it was deleted, and who deleted it.

10  Again, anything that happens in the cloud or anything that

11  happens within Microsoft's organization and cloud sphere is

12  logged and cataloged.  You can actually see the time entry,

13  what they actually did, which says delete website, and who

14  deleted it.

15  A.  If you want to zoom into that right-hand corner, Nick, it

16  will pretty much give the judge exactly what happened.  It's in

17  English.  Delete website, the time stamp, and who did it.

18  Q.  And the delete website notation, where does that come from?

19  A.  That comes from the Microsoft portal.  It literally tells

20  you what you did.  It's kind of like if you went into a Word

21  document and you deleted it, believe it or not, Word and your

22  computer actually keeps a log of that.  It would say you

23  deleted this document on this date.  That's exactly what it is

24  doing here.

25  Q.  What's the date that this was deleted, the website?

1        THE COURT:  Just so I understand, when it says who

2   deleted it, what do you mean who?  Somebody who has an e-mail

3   account with that name?

4        THE WITNESS:  That's correct.  The person's user

5   identification, which in Microsoft, the user identification is

6   the user name and e-mail address.  So this would be

7   rsaul@dealtable.com, and it tells you the event was requested

8   by and initiated by this user, which means literally that's the

9   person who logged in and did this.

10       THE COURT:  That's the e-mail account that logged in

11  and did that?

12       THE WITNESS:  That's correct.  That's their user ID.

13       THE COURT:  Got it.

14       THE WITNESS:  Ryan Saul, her user ID, according to

15  Microsoft, is rsaul@dealtable.com.

16       THE COURT:  Got it.

17  A.  You don't have to zoom in here, Nick.

18       This is actually the Deal Table application database.

19  You will notice that there is no information on the right-hand

20  side.  That is because the database was deleted using a batch

21  file on rsaul's virtual machine that she ran the day she was

22  terminated.  So she ran a file that went in and deleted all the

23  information out of the database.  We know this by looking at

24  the activity details sign-in.

25       You can stay here, Nick.  I think the judge

1   understands what I'm pointing out.

2          The activity details sign-in shows you exactly what

3   you did, when you did it, how you did it, and where you did it

4   from, and who did it.  So if you'll notice the middle of the

5   screen, Ryan Saul went into the Azure portal.  She has a

6   failure because she kept trying to log into our system.

7   Beforehand, she had successes and she went in and deleted our

8   information.  This is actually an extra screenshot of me

9   blocking the user trying to continuously log into our system,

10  even after they were terminated.

11  Q.  Would you describe for the Court what this is.

12  A.  Yes.  Ryan Saul's response said that anybody could log in

13  with their user credentials.  That is not true.  In the

14  Microsoft security platform, the reason we use Microsoft is

15  because you have to use secondary authentication of what we

16  call multifactor authentication, which means when you log in,

17  you use your user name, a password that you set up, not the IT

18  administrators, even not me as the chief architect.  Nobody

19  knows your password but you.

20          The third thing you have to do is kind of like your

21  bank.  It sends you a text message to your phone to verify you

22  are who you are.  There is absolutely no way anybody in the NDR

23  Deal Table organization can log in as someone else.  That is a

24  Microsoft security NIST ISO 1809 rule that you cannot log in as

25  somebody else.  That's what the screenshot is for --

 1          THE COURT:  It's not even a rule.  You are saying,

 2   unless you have somebody's phone and know their password,

 3   you're unable to do it.

 4          THE WITNESS:  That's correct, your Honor.  You

 5   understand exactly what I'm saying.  Yes.  It's used across the

 6   board everywhere.  So the statement that myself, anybody from

 7   NDR could log in as that person and make all this stuff up is

 8   impossible.  Number 1, the time stamp; number 2, the user's

 9   name.  The time period.  We don't have MFA.  We don't have her

10   cell number.  We don't have her cell phone.  It's all in here.

11   There is no way for them to fake that user.

12   Q.  Now, Ryan Saul worked remotely the entire time, isn't that

13   correct?

14   A.  That's correct.

15   Q.  So there was never a situation where his cell phone was in

16   your presence or anyone else's presence, is that correct?

17   A.  That's correct.

18   Q.  So no one had Ryan Saul's cell phone in order to get on the

19   system with the final authentication, is that correct?

20   A.  That's correct.

21          THE COURT:  You know where Ryan Saul physically worked

22   from?  You're in Colorado.

23          THE WITNESS:  I'm in Colorado.  You can back-check me

24   to Colorado and everything else.  Network Data Rooms is in New

25   York.  We were told Missouri.  But according to the IP

1  addresses, I have two different locations.  One is in Chicago,

2  one is in Missouri.  So I'm not a hundred percent sure.  I

3  couldn't tell you that.

4          THE COURT:  OK.

5          THE WITNESS:  Again, it was a contractor with a remote

6  contract.  We worked for a year.  Never had any issues.  So

7  that's how IT works, so to speak.

8          THE COURT:  OK.

9          MR. FORTUNA:  Your Honor, I don't have any further

10  questions for this witness.

11          THE COURT:  We will have cross.

12          Mr. Street, while we are getting organized to do that,

13  can you tell us how much time was used for the direct?  Looks

14  like about 30 minutes, roughly.

15          He's our official timekeeper.

16          If we are ready for cross, we can go ahead with that.

17          MS. WONG:  Yes, your Honor.

18          THE DEPUTY CLERK:  57 minutes, Judge.

19          THE COURT:  57 minutes.  OK.

20          MS. WONG:  Your Honor, I'm ready with cross.

21          THE COURT:  All right.

22  CROSS-EXAMINATION

23  BY MS. WONG:

24  Q.  Good afternoon, Mr. DeLorge.  My name is Renee Wong.  I am

25  the attorney for Saulrealism LLC and Ryan Saul.  Good

1    afternoon.

2    A.  Ma'am.

3    Q.  Mr. DeLorge, is it correct you testified that your role at

4    Deal Table with NDR was Deal Table as your chief cloud

5    architect and chief cloud security engineer?

6    A.  That's correct.

7    Q.  As such, was it your responsibility to ensure that all of

8    the services and codes are backed up in compliance with NDR

9    security protocols?

10   A.  Yes.

11   Q.  And it's alleged by NDR and you that Ryan Saul failed to

12   deposit code to NDRs as your DevOps repository from September

13   26, 2021 through January 18, 2022, correct?

14   A.  Yes, ma'am.

15   Q.  And it is your responsibility to ensure that all the code

16   was backed up pursuant to the protocol, correct?

17   A.  As long as the code is saved, it is my responsibility to

18   make sure that the Azure backup and recovery and disaster

19   recovery services within the cloud infrastructure is solid and

20   sound, and it is.

21   Q.  You testified today that you became aware that the code was

22   not being deposited approximately two days after Ryan Saul's

23   termination, is that correct?

24   A.  That's correct.

25   Q.  Is it correct that you have filed declarations in support

1   of plaintiff's application and have adopted those statements

2   today, those being in March and then a reply declaration that

3   was submitted?

4   A.   Not sure what you are asking.

5         THE COURT:   I already know and he already did, so you

6   can proceed.

7         MS. WONG:   Great.

8   Q.   In these declarations was it your statement that you had

9   learned that Ryan Saul last checked in code and discovered that

10  on February 17, 2022?

11  A.   Somewhere around there.   I mean, it took a long time to

12  discover if it wasn't there, if I could get it back, if I could

13  not.   Again, I'm a contractor.   So they weren't in a rush as

14  long as the Web app was corrected after it was deleted.   So,

15  yes, I worked on it, but I did know that something was missing

16  a few days later.   I spent a lot of time on this.

17  Q.   My question, was it two days after Mr. Saul was

18  terminated --

19  A.   It was about two days after that I noticed that the last

20  check-in date was September 26.   I was hoping that maybe it was

21  on the machine, maybe it was somewhere else, it just hadn't

22  been committed.   That was my hope.

23  Q.   Isn't it true that you contacted Mr. Saul regarding the

24  status of where the code was being deposited in about October

25  of 2021?

1   A.  That's correct.  I pleaded with Ryan Saul to just let me

2   know where the code is.  I can put it back in and that the

3   Concannons and NDR would let everything go.  We were trying to

4   do this without bringing in the Court.

5   Q.  I have here an exhibit that was appended, I believe it was

6   DeLorge Exhibit A to the declaration --

7           THE COURT:  The way this works for the court reporter,

8   is, you have to wait for her to finish speaking and then you

9   respond, but two people can't talk at a time.

10          Ms. Wong, go ahead.

11          You are showing us DeLorge Exhibit A.

12          THE WITNESS:  I can't hear you.  My mic died.

13          MS. WONG:  We need to make sure that the witness is

14  able to hear the questions.

15          Mr. DeLorge, are you able to hear what I'm saying?

16          THE WITNESS:  Can you hear me now?

17          THE COURT:  Yes.

18          THE WITNESS:  Sorry about that.  My headset died.

19          THE COURT:  Go ahead, Ms. Wong.

20  Q.  I'm presenting to you DeLorge Exhibit A, which was produced

21  with your original declaration here.  Can you please explain to

22  me what this exhibit is.

23  A.  Yes.  I asked where she was submitting the code to.  We

24  couldn't find it.

25  Q.  OK.  What date was this sent?

1   A.  October 19, 2021.

2   Q.  What day of the week?

3   A.  It looks like Saturday.  It says sent Saturday, October 19,

4   2021.

5   Q.  What's the subject of the e-mail?

6   A.  Quick question on source control.

7   Q.  Did you receive a response?

8   A.  No.

9   Q.  Is there a response on top of your original e-mail that was

10  sent on Saturday, October 19, 2021 at 5:44 p.m.?

11  A.  Yes.  She said she checked the name under Ryan Development,

12  which is one of the screenshots we just showed you that has no

13  check-in.  She said:  I just checked in the code and it is up

14  to date, which means I was actually asking, is everything up to

15  date, everything is in the system?  She said yes, this is where

16  it is.  It wasn't.

17  Q.  When was that sent from Ryan Saul?

18  A.  October 20, I'm guessing.

19  Q.  This states that it was sent on Saturday, October 20, 2021.

20  A.  OK.

21          MS. WONG:  Your Honor, I am going to ask to take

22  judicial notice that October 19, 2021 is a Tuesday.

23          THE COURT:  In any event, the two e-mails both say

24  that October 19 and October 20 are Saturdays, which probably is

25  not the case.

 1              THE WITNESS:  I would agree.

 2   Q.  At the top of the subject line it appears it is from David

 3   DeLorge to David DeLorge on March 1, 2022, is that correct?

 4   A.  Yes.

 5   Q.  Is it also correct that the subject line forward, quick

 6   question with a spelling error on source control does not match

 7   the subject line that was sent from Ryan Saul?

 8   A.  So it's a forwarded e-mail.

 9              THE COURT:  Just answer the questions.

10   A.  OK, yes.

11   Q.  When you sent this e-mail in October 19 of 2021, you had

12   taken some notice on whether the code was checked in to the

13   Azure DevOps repository, is that correct?

14   A.  I don't remember.

15   Q.  Did you check --

16   A.  I'm sure I asked the question for a reason.  It was

17   probably just a reason to check the code at that time.  I was

18   probably asked to check the code.  And according to what I saw

19   on the dashboard of the repository, it looked up to date, so I

20   left it alone.  Again, I'm not a front-end full stack

21   developer.  I'm a cloud architect and a security architect.  It

22   was not my job to check the code day in and day out.  It was

23   the job of the developer to check their code in day in and day

24   out.  I don't understand the question nor the relevance.

25              THE COURT:  We don't need your commentary.  Only your

 1   answers.

 2           THE WITNESS:  No worries.  Sorry.

 3           THE COURT:  Try to avoid that.

 4   Q.  As you earlier testified, it was your responsibility to

 5   make sure that all code was being backed up?

 6           THE COURT:  We don't even need to get into argument

 7   here.  Just ask questions that go to the facts.

 8   Q.  In your declaration you state that Ryan Saul went to great

 9   lengths to conceal unlawful conduct, is that correct?

10   A.  Yes.

11   Q.  You stated that Ryan Saul would upload old code to the

12   repository so that you and NDR would believe that Ryan Saul was

13   uploading new code, is that correct?

14   A.  That's correct.

15   Q.  What I'm showing here has been previously marked as DeLorge

16   Exhibit F.

17           THE COURT:  From the reply.

18           MS. WONG:  From the reply that has been previously

19   displayed by plaintiff's counsel.

20           THE COURT:  OK.

21   Q.  On here you had testified, is it correct, that the last

22   update to the code, decompiled code, is September 26, 2021?

23   A.  That's correct.

24   Q.  So if Ryan Saul had gone and uploaded old code appearing to

25   be new code after September 26, 2021, it would have been

 1  reflected on these branches.

 2  A.   No.   So the image you're looking at is the all of the

 3  branches.   The image I was referring to was actually Exhibit --

 4  give me two seconds -- G, where, if you look, code was deployed

 5  over and over and over again on the same day or actually

 6  between May and June 24.   If you look in that code -- and,

 7  again, you have to look at a lot.   So I don't have a screenshot

 8  of everything because not everyone on this call is IT savvy or

 9  a developer.   The same code was deployed over and over again

10  with barely any changes up until September 26.

11  Q.   So it's your testimony that there was no new code prior to

12  September 26?

13  A.   There was a period between June and I'd say September,

14  there was very little new code.   The changes that we are

15  missing are from September to January, and we are literally

16  just requesting that code back.

17  Q.   You testified in your declaration that Ryan Saul had

18  threatened to delete the code, is that correct?

19  A.   That's correct.

20  Q.   And did you look after this threat was made to see if the

21  code was deleted?

22  A.   She did not actually threaten to delete the code.   She

23  threatened to delete the Web app.   And, yes, three minutes

24  after she was terminated she deleted the Web app.

25           THE COURT:   I think the question is, right after she

1   threatened to delete the Web app, did you look to see whether

2   that was the case?

3           THE WITNESS:  Yes, I did.  Because that was about

4   three hours before the termination period between the process

5   of, they froze her account, or froze Ryan Saul's account,

6   talked to her.  The individual was then allowed back into the

7   account.  And then they had the conversation where that

8   individual was terminated and then the code was deleted.  So in

9   the space of four hours of access, access denied, terminated,

10  deleted code.  Again, there are screenshots, multiple times, to

11  show that's exactly what happened.

12  Q.  What was deleted was ultimately the majority that was

13  recovered nearly immediately, is that correct?

14  A.  No.  It took me like six hours, so that's not immediate.

15  Again, we do not have the decompiled code.  We have the

16  compiled code and the Web app, the database, the certificates,

17  and the Web services, which are all, again, under the Azure

18  infrastructure, under my job, to make sure that disaster

19  recovery, backup recovery, and everything else actually works,

20  so it did work.  Everything that we had is there.

21          The one thing we don't have is the code because the

22  code was not checked in or saved.  According to our NDA, the

23  developer is always supposed to check in their code to Azure

24  DevOps.

25  Q.  Is it true you assisted in the filing of criminal complaint

 1  with law enforcement the day after Ryan Saul was terminated?

 2  A.  I don't know if it was the day after, but I did send over

 3  screenshots to show that the Web app and the database and the

 4  certificate and the breach after her termination was being

 5  attempted, yes.  I sent those screenshots over.

 6  Q.  Prior to doing that, you didn't check to see if the code

 7  was in the repository?

 8  A.  Did I check to see if the code was -- no, I did not.  I was

 9  in the midst of trying to bring everything back online, which

10  takes a few days.

11  Q.  At some point in time does the plaintiff NDR hire a new

12  full stack developer to complete the Deal Table platform?

13           MR. FORTUNA:  After what point?

14           MS. WONG:  That's my question.

15  A.  No.

16  Q.  A full stack developer was never hired to complete the Deal

17  Table platform?

18  A.  No.  We had a contractor come on to look at the code to

19  give us an estimate on what the reengineering would be.  That

20  contractor was actually around for maybe a couple of weeks, but

21  they were not hired full time.  And they were being used as a

22  consultant to just look at the actual code.

23  Q.  When was that contractor hired?

24  A.  You would have to speak to Chris Concannon and Jack

25  Concannon on that.  Again, I just look over the infrastructure.

```
 1   I don't hire or fire anyone.

 2   Q.  You're not a full stack code developer, correct?

 3   A.  I am currently not a full stack code developer.  I know how

 4   to do it.  I'm an architect.

 5   Q.  So you cannot give us your opinion on how long or --

 6   A.  Yes, I can.

 7              THE COURT:  Just wait.  Wait.  You have to talk one at

 8   a time.

 9              So, Mr. DeLorge, if you could just let her finish her

10   question.

11              Go ahead, Ms. Wong.

12              MS. WONG:  I'll strike the prior question.

13              THE COURT:  OK.

14   Q.  Approximately how many years of development went into the

15   Deal Table platform prior to September 26, 2021?

16   A.  About a year.

17   Q.  Does your approximation include any of the contractors that

18   were hired prior to Ryan Saul?

19   A.  No.  My estimate is based on my activity with NDR and Deal

20   Table and who worked on the code prior to Ryan.  So I have only

21   been with the company that long.  So before that I couldn't

22   tell you.  You would have to talk to Jack or Thomas or Chris.

23              THE COURT:  Could I just ask a question.  The

24   screenshots that we saw that were your exhibits, Mr. DeLorge,

25   were those screenshots that you actually took so that you
```

1    created them in that sense; it wasn't somebody else who did

2    that?

3            THE WITNESS:  No.  Those are actual screenshots of the

4    system as it is now.

5            THE COURT:  When did you take the screenshots?

6            THE WITNESS:  January 18 up until probably the end of

7    February.

8            THE COURT:  Thank you.

9    Q.  I have brought up to the screen what has been previously

10   identified as DeLorge Exhibit A to the reply declaration.  Are

11   you able to see that, Mr. DeLorge?

12   A.  Oh, yes.

13   Q.  You had taken this screenshot, is that correct?

14   A.  Yes, I took this screenshot.

15   Q.  Approximately when did you take this screenshot?

16   A.  I don't know.  I don't remember.  I'd have to go through my

17   files and find the screenshot.  I can take it now and share it

18   with you all now, full screen, live in their environment.  It

19   hasn't changed.

20   Q.  Is it your testimony that there has been no changes to any

21   of these files since November 15, 2020?

22   A.  Yes.  This is the back-end repository for all of the old

23   code.  This is not the branch.  If you look at the path, if you

24   look up at the top, it says the Azure DevOps in blue.  If you

25   look to the right, it says Deal Table, and then a whack,

1    forward whack, NDR Dev, forward whack, repose, forward whack,

2    files, forward whack, the branch.  Let me back up.  It says NDR

3    Dev.  The NDR DEV folder is the old code.  The new code is NDR

4    Dev 2021, total different folder.  All of these repositories

5    here have not been touched since the original code.

6    Q.  Is it your testimony that you can go back in time and then

7    take screenshots --

8    A.  I am not taking any back in time.  It's literally just the

9    column options on a folder.  It's just like if you opened up a

10   file explorer, it tells you when the last time a folder was

11   changed.  This does the exact same thing.  I'm not going back

12   in time, ma'am.

13   Q.  You testified earlier that there were other developers

14   involved on the project prior to September of 2021.

15   A.  Um-hum.

16   Q.  That's correct?

17   A.  That's correct.  There were two other developers.  One was

18   Justin Rivera.  The other one was Ms. Guntupsli.

19            THE COURT:  Do you remember how to spell it?

20            THE WITNESS:  Let me look at a screenshot real quick

21   because it's actually in one of the check-in codes that we

22   actually deposited and showed.  G-u-n-t-u-p-s-l-i.  We called

23   her Alekia.

24   Q.  You had testified earlier that these developers were

25   terminated against your wishes, is that correct?

1    A.  It was not against my wishes.  That's not what I said.  I

2    said I didn't agree with the decided-upon action.  I believe we

3    could have kept at least one of them and alleviated some of the

4    issues or the roadblocks we were having at the time.  But I'm

5    not the one who hires and fires.  My recommendation was not

6    taken.

7    Q.  As an administrator on Azure, do you have the ability to

8    change authentication contact information?

9    A.  No, ma'am.  That would be Chris Concannon, who is not IT

10   savvy.  He is the owner of the Microsoft subscription and

11   tenant ID for the NDR and Deal Table application.  He is the

12   only person who can do that.  I can administer users.  I can

13   reset their password.  I cannot change their MFA.  That is part

14   of the NIST and ISO security model.  Microsoft just won the

15   quadrant as of last month.  That is not possible.

16           Again, there is a screenshot that shows the same phone

17   number that's been in there this entire time.  If you'd like,

18   again, I can log right in and show everybody that nothing has

19   changed.  That user account is under legal hold and security

20   block.

21           MS. WONG:  I'm pulling up what has previously been

22   marked, I believe, as Exhibit C as well as Exhibit D of the

23   DeLorge exhibits.

24   Q.  Here on Exhibit C we were looking at a deployment log for

25   Ryan Saul that appears to have issued --

1    A.   In March.

2    Q.   March 1, 2021, is that correct?

3    A.   Um-hum.

4    Q.   And Exhibit D is deploy --

5    A.   January 13, 2021.

6             THE COURT:  January 13, 2022.  2022, right?

7             THE WITNESS:  2022.  Sorry.  My apologies.

8    Q.   Are there other deployment logs between --

9    A.   There are hundreds.

10   Q.   There are hundreds of deployment logs?

11   A.   No.  Wait a minute.  There are hundreds of deployment logs

12   that look like the top part that say VSTS up until September

13   26.  After that, I have to dig through all of the deployment

14   logs within the API on the Azure Web app to find the latest

15   JSON file that has the configuration where it was deployed.

16   That is the difference.

17   Q.   And all of the deployment logs subsequent to September 26

18   have this GUID that is, to your best estimation, linked to

19   GitHub?

20   A.   No.  The top part is actually linked to Visual Studio Team

21   Services, which is Azure DevOps.  They all look the same.

22   Q.   I'm referring to Exhibit D, where you are -- you testified

23   that, to your best estimation, this request ID emanates from

24   GitHub, is that correct?

25   A.   That's correct.  We have actually verified that with

1    GitHub, so it's not just my guess or I'm making something up.

2    We actually have documentation from GitHub.  But, yes, there is

3    probably a lot of them.  I found two.  Because there is a lot

4    of files to go through to get to that.  This is not something

5    you just pull off out of a folder and say, here it is.  After

6    you get outside of the Visual Studio deployment process, you

7    have to figure out where things are deployed from.

8    Q.  So are there other logs that show that it was deployed from

9    this specific --

10   A.  The request ID?

11   Q.  Yes.

12   A.  I would guess yes.

13   Q.  You would guess, but you don't know and you have --

14   A.  I've seen multiple logs, but I have not -- I've seen the

15   request ID that is not a Microsoft ID.  But did I sit there and

16   verify them all?  No, I did not.  I know what happened.  I know

17   where the code is.  I'm just asking for it back.

18          THE COURT:  That wasn't really responsive.  Please

19   just answer the question.

20          THE WITNESS:  Yes.  If they would like more logs with

21   the same ID, I'll go get them.

22          THE COURT:  But that's not what we are here for.  She

23   is just here to ask you questions.  You give answers.  Then she

24   asks another question.

25   A.  Yes.  I have seen the same type of ID multiple times.

1   Q.  What is it about this ID that identifies it from a GitHub

2   repository?

3   A.  Because the ID sequence is completely different than the

4   Microsoft sequence, which is actually listed in the top one

5   where it says ID.  You will see how that GUID, or generator

6   user ID, identification number is totally different than the

7   one that's based at the bottom.  There are no dashes.  There is

8   no anything.  It's a total number which actually goes back to

9   the user ID information, which is the author e-mail.  The one

10  on the bottom is literally using request ID, which is from an

11  API, which means the API has to be registered with the

12  environment it's being deployed from.

13  Q.  Have you issued any subpoenas to GitHub?

14  A.  No, ma'am, I have not.  I'm not a lawyer.

15  Q.  When was it that you contacted GitHub to confirm that this

16  is --

17          THE COURT:  Let's just stop here.  My understanding is

18  that he is not the person who contacted GitHub.  So if that's

19  the case, you can just say that you are not the person who

20  contacted GitHub.

21          THE WITNESS:  I'm not the person who contacted GitHub.

22  That would be NDR's attorneys.  I am not in the position to do

23  that, nor was asked to.

24          MS. WONG:  I don't have any further questions.  Thank

25  you.

```
 1              THE COURT:  Thank you, Ms. Wong.

 2              Let me ask plaintiff's counsel, you have limited time.

 3   Did you want to call another witness, or how do you want to

 4   proceed?

 5              MR. FORTUNA:  Your Honor, I do have a question.  We

 6   have declarations submitted by Thomas Concannon and Christopher

 7   Concannon.  They are both available, if required --

 8              THE COURT:  The declarations are in the record and

 9   I've read them.  You don't need to call them to say anything

10   that's in the declarations.

11              MR. FORTUNA:  The declarations will be considered if I

12   don't call them?

13              THE COURT:  Absolutely.

14              I was just going to say, everybody's declarations are

15   in the record in support of the motion and in opposition to the

16   motion, so I'll consider all of them.

17              MR. FORTUNA:  I know I have a limited amount of time

18   left.  I'll call Thomas Concannon.  I just have a few questions

19   for him.

20              THE COURT:  OK.

21              Mr. Street, can you tell Ms. Wong how much time she

22   has used?

23              THE DEPUTY CLERK:  Ms. Wong, you have used 28 minutes.

24              MS. WONG:  Thank you.

25              THE DEPUTY CLERK:  You're welcome.
```

1          MR. FORTUNA:  Just for my information, how much time

2     does the defendant have to cross-examine the plaintiffs?

3          THE COURT:  Sixty minutes total.  So she has about a

4     half an hour left, and you have about a half an hour left.

5     THOMAS CONCANNON,

6          called as a witness by the Plaintiff,

7          having been duly sworn, testified as follows:

8     DIRECT EXAMINATION

9     BY MR. FORTUNA:

10    Q.  Mr. Concannon, thank you for taking the time today.  Would

11    you explain to the Court what your position is currently at

12    NDR.

13    A.  Sure.  Currently the acting CEO of the company.

14    Q.  I just have a few questions.  We used up a lot of our time,

15    so I am just going to ask you a few questions.

16          Would you describe for the Court as far as the plans

17    for going to market and the Deal Table software prior -- in or

18    around January 18, 2022?

19    A.  Sure.  We were hoping to get the platform completed to a

20    beta version by probably another 30 days, maybe 60 days at

21    most.  And at that point we were looking to go to a venture

22    summit trying to raise capital to get more funding for the

23    company.  The entire project had been self-funded up until that

24    point, so we were looking to go outside.  But we needed a

25    completed platform in order to do so.

1   Q.  Did you have any companies that were going to test the

2   software for you within that 30 to 60-day period?

3   A.  We did.  We actually had a financial printing company

4   before this which had clients that were in the same realm as

5   the industry of virtual data rooms.  So we had a private equity

6   company that was going to take a look at the platform, go

7   through it, make sure that it was looking good, had all the

8   bells and whistles and then had the things that they asked for

9   on top of that.  They wanted to help us out to get a platform

10  that we could sell, and they wanted to test it out for us to

11  make sure that when we did go to market we didn't embarrass

12  ourselves or miss anything that was necessary in order to

13  compete with the other companies involved in the industry.

14  Q.  The features that were designed and worked on by Ryan Saul,

15  how do they compare to the features that the competitors

16  currently have?

17  A.  We had all the bells and whistles that they had as well,

18  but to name a couple, we had an activity log which was

19  specifically asked by one of our clients that demonstrated

20  every move that was made within the platform, at what time, who

21  did it, and what was done.

22          On top of that, something that really differentiated

23  our platform from everybody else's was that you could edit a

24  document within Deal Table.  As it stands with most virtual

25  data rooms, you have to download the document, get it onto your

1   personal computer, edit on any -- whether it be Word or PDF,

2   and then re-upload the document to the platform.  We wanted to

3   kill that process and just have it all done on our platform.

4   And we had completed that up until everything went down on

5   January 18.  Those were the two differentiating factors, I

6   would say.

7           Another one would be, we were able to download all the

8   files at once, so that made us stand out a little bit and gave

9   us a competitive advantage, I would say.

10  Q.  Do you have an understanding of, if you don't get back the

11  code, how long it will take to reengineer the software and get

12  back to where you were on January 18?

13  A.  It would take forever.  If I had to guess, maybe up to a

14  year.  It would take a very long time and it would take a lot

15  of money as well.

16  Q.  How much money --

17          THE COURT:  Wait.  How do you know how long it would

18  take?  Is this your area of expertise, or are you relying on

19  something else?

20          THE WITNESS:  Well, I've been involved in the project

21  since we started in 2019.  I ended up becoming the acting CEO

22  in July of 2021.  And from July up until January, we worked on

23  the code with Ryan and David as our cloud architect as well.

24  That's six, seven months right there.  On top of that, we hired

25  Ryan in December.

1          It's my personal opinion, and I do believe this

2    wholeheartedly, most of the work that we did and completed with

3    Ryan Saul was finished between September 26 and January 18.

4    The majority of it before, that was kind of the easy part, if

5    you ask me.  It was the front-end work.  It was making it look

6    good.  But the actual nitty gritty of it, whether it be the

7    redaction tools, being able to edit documents, kind of the

8    stuff that's very hard to accomplish as a developer and the

9    hard stuff that would be important for our platform to succeed,

10   that was done between September and January.  But it would take

11   another two months.  And, with everything else, I would say it

12   would take maybe up to nine months to a year, if I had to

13   guess.

14   Q.  You had a developer come in after Ryan left to look at the

15   engineering software, is that correct?

16   A.  We did.  We had one full stack developer to come in, look

17   at the code, and then hopefully finish the project.  But the

18   issue was, we didn't have what we needed, which was the

19   decompiled source code.  That was really the issue.  So he

20   couldn't work on anything after September 26 of 2021, because

21   at that point all we had was old code.  All the slides were

22   different.  The platform looked different entirely at that

23   point.  So he said, do you want me to start here?  All the work

24   that we had done was just completely gone.  It would have been

25   a waste of time and money.

1      So eventually we let him go, I would say, two or three

2  weeks after we hired him.  We hired him on February 9 of 2022

3  and -- I can find the date.  One second.  We let him go -- he

4  kept asking, is there anything you want me to do?  Is there

5  anything -- where is the code?  Do you guys have the code?

6  That started around February 23, 2022.

7      Eventually, after trying everything we could to figure

8  if the code was there, we realized it's not going to happen.

9  So we let him go on March 7 of 2022 and just told him it wasn't

10  necessary for him to be part of the job anymore, or part of the

11  team rather.

12  Q.  You said it was your personal opinion that it would take a

13  year or nine months to a year.  But prior to stating that, did

14  you talk to David DeLorge about how long it would take to

15  reengineer?

16  A.  Yeah, absolutely.  He said it would take a very long time.

17  This is probably the biggest part about it for me after going

18  through the entire process with the entire team.

19      What he told me is that it may not even be, if he

20  reverse-engineered the code, it may not even be the exact code

21  that we had on January 18 and it may look different.  It may

22  function differently.  That's what really made us realize that

23  this is going to be such an endeavor that we are going to have

24  to take on again.  We are going to have to spend hundreds of

25  thousands of dollars.  I believe we spent up over a million

 1    dollars on this project.

 2             THE COURT:  Could I understand something.  You have

 3    the product on the web, but it just doesn't have all the bells

 4    and whistles that you intended for it to have.

 5             THE WITNESS:  That's exactly correct, your Honor.  We

 6    have a product that -- it's viable.  It's something that is a

 7    basic virtual data room.  But when you are competing with

 8    companies like Intralinks and data site -- which Intralinks,

 9    just for reference, is a billion dollar company.  They have so

10    much more, and we would just be blown out of the water if we

11    went to public like this.  Not only that, not all the features

12    work.  Being able to edit the documents, being able to redact

13    the document, none of those features work.  They are on the

14    platform --

15             THE COURT:  So the real issue, if I understand it

16    then, is that you are not able to go public.  Is that right?

17    Maybe I misheard you.  The product is functional.  It's not

18    what you want it to be.  What it's keeping you from doing is

19    what?

20             THE WITNESS:  From having a virtual data room that's

21    functional.

22             THE COURT:  This one is functional.  It's just not

23    fancy and it can't compete with the best ones.

24             THE WITNESS:  Not only that, it's also not functional.

25    At times, if you were to upload a document, the document may

1   not be there.  If you were to go redact a document, the

2   functionality of redacting, the UI UX is there, so the user

3   interface the way it looks is there.  But if I were to type in

4   a word and try and redact it from said document, it wouldn't

5   work.  So the functionality is not even there.  It just kind of

6   looks like it is, if that makes sense, your Honor.

7              THE COURT:  Yes.  I understand.

8              So what were you planning to do then when it was

9   totally functional?

10             THE WITNESS:  We were planning to go to the private

11   equity firm that I had mentioned previously and say, hey, what

12   are we missing?  Do you guys find any glitches?  What do you

13   see here?  Is this something we could sell.

14             THE COURT:  And then get investors.

15             THE WITNESS:  Not necessarily from them, but go to a

16   venture capital summit and obtain investors potentially, yes.

17             THE COURT:  Are you still at the moment entirely

18   self-funded, or has that changed since January?

19             THE WITNESS:  That's right, your Honor.  We are

20   entirely self-funded since we started this project.

21             THE COURT:  And you continue to be.

22             THE WITNESS:  Continue to be, yes.  That's correct.

23             THE COURT:  Thank you.

24   Q.  Just to follow up on the judge's question, the plan was to

25   actually start a business where financial institutions would

1    pay you to use your virtual data room, isn't that correct?

2    A.   That's correct.

3    Q.   So when you said going public, you meant going out in the

4    market and getting clients to come in and use it?

5    A.   Yeah.  I'm sorry.  That was a poor choice of words on my

6    behalf.  I didn't mean in terms of us doing an IPO or anything

7    like that.  Going public into releasing this version of our

8    platform and saying, hey, we are here, we are ready to sell

9    this thing.  Go to market would be the correct wording.

10   Q.   If you had to wait a year to go to market again at this

11   point, would the opportunities be the same to develop the

12   client base that you are looking to develop?

13   A.   Definitely not.  To expand on that, the most important

14   thing would be our reputation is completely -- it has been

15   damaged, to say the least.  We have been saying that this is

16   going to be ready since late 2021, early 2022, with the hopes

17   that we finally get it there.  Ryan Saul kept on telling us

18   that we were close, this is a viable product, you can sell

19   this, but in reality it wasn't.  Furthermore, there was much

20   left work to be done.

21   Q.   And you already had, for the physical printing, a roster of

22   clients that were investment banks and large law firms that

23   were using your services that would have just been transitioned

24   to the virtual data room?

25   A.   That's correct.  Over 25 years the company had amassed a

1  list of over 19 investment banks and a bunch of private equity

2  firms that we would print confidential documents for.  Our hope

3  was to pivot into this new industry with the virtual data room

4  and offer them a new product that we could sell.

5  Q.  If you don't get the code back at this point, what will

6  happen to NDR?

7  A.  It will cease to exist.

8          MR. FORTUNA:  I have no further questions, your Honor.

9          THE COURT:  OK.

10          Is there any cross?

11          MS. WONG:  Yes, your Honor.

12  CROSS-EXAMINATION

13  BY MS. WONG:

14  Q.  Good afternoon, Mr. Concannon.  My name is Renee Wong.  I'm

15  the attorney for Saulrealism LLC and Ryan Saul.

16  A.  Good afternoon.

17          THE COURT:  Can someone adjust the screen, please, so

18  I can see both the attorney and the witness.

19  Q.  Is it your testimony, Mr. Concannon, that the plaintiff,

20  NDR, does not have any current clients?

21  A.  As Network Data Rooms, NDR, no.  But our previous company,

22  Network Financial Printing, does.  What we were hoping to do

23  was leverage the clientele that we had into this new company.

24  Q.  You had testified that the current Deal Table VDR platform

25  is not functional, is that correct?

1    A.   I think it depends on how you define functional.   But for

2    me I would say no.   It's not sellable and it's not something

3    that anyone would pay to use.   I'll put it that way.

4    Q.   And you had previously stated in your declaration that it

5    would have been ready to use within 30 to 60 days, is that

6    correct?

7    A.   That was my hope.   Ryan always told us a couple more weeks,

8    few more weeks.   Eventually, it got old and I would just guess

9    another three weeks from what they said to me.   They told me it

10   would take another month, most likely, with the final list.   So

11   for me I added on another month to that.

12   Q.   When we say final list, are you referring to a final list

13   that was produced on January 18 of 2022?

14   A.   That's correct.

15   Q.   And, to your best approximation, how long was that final

16   list?

17   A.   It was very long.   It was probably about 10 pages.

18   Q.   Did you have any outside input beyond Ryan Saul as to how

19   long it would take to finalize the items on the final list?

20   A.   No, did not.

21   Q.   The items that were prepared on the final list, had they

22   been provided to Ryan Saul prior to the 18th of January?

23   A.   I would say about 75 percent of that list were features

24   that Ryan knew about.   The other 25 percent I had stayed up and

25   just thought, OK, we need to move this button here.   This

1   button, it's a little bit off.  It needs to look a little bit

2   better, smaller changes that I ended up adding to the list,

3   which, just to point this out, Ryan obviously did not like, and

4   she was frustrated by that because these were changes that she,

5   in her eyes -- they, in their eyes, believed to be completed,

6   and there was no need to work on that and that it was a waste

7   of time.  They were looking for further, more arduous

8   functionality that could be completed first.

9   Q.  Were there other final lists that had been distributed

10  prior to January 18?

11  A.  There were no final lists.  There were many lists that I

12  did send their way to say, that's just how this business works.

13  I would send a list.  Ryan would complete the changes.  I would

14  say about 75 percent of those changes were completed, and I

15  would say, Ryan, we still need to finish this 25 percent.  I'd

16  add a new list, add them, and say OK, we are going to keep

17  going.  We are going to keep going.  And those lists continued

18  on.  But they were never final lists, I would say.

19  Q.  I apologize.  You've answered.  You said that the final

20  list was very long.  Did you give an approximation in terms of

21  number of pages of what this final list was?

22  A.  I sent it in an e-mail, and then I put it into a Word

23  document just to see how long it was.  It was about 10 pages

24  long.

25  Q.  Prior to the events that happened on January 18, did Ryan

1  Saul express any dissatisfaction of the working hours and

2  communication between the two of you?

3  A.  Yes.  They wrote a very lengthy paragraph to me on Teams

4  that was very demanding.  In fact, she called me an idiot twice

5  and said that I was incompetent, an idiot.  I let it go.  But

6  the best part about it for me was that they said that they

7  wanted to work from 9 to 5 moving forward.  My exact response

8  was, that's fine with me.  If you would prefer to work 9 to 5,

9  we can have that happen.  I'm totally OK with that.  They did

10  express dissatisfaction.

11       But I must say, just so the Court is aware, Ryan's

12  sleep schedule is the most erratic thing I have ever seen.  It

13  was from the beginning that they told me that they would prefer

14  to sleep every three hours for 45 minutes.  It reminded me of a

15  Seinfeld episode with Kramer, but that's neither here nor

16  there.

17  Q.  Prior to retaining Ryan Saul as a consultant, were you

18  working with a company called XOps?

19  A.  We were, that's correct.

20  Q.  Is it accurate to say that you had paid XOps approximately

21  $700,000 to develop code for the Deal Table platform?

22  A.  I would have to look at the exact amount.  I don't know

23  because that was paid through Chris Concannon's business

24  account, which I did have access to, I guess, but we'd have to

25  find the records.  I can't give you that exact number off the

1   top of my head.

2   Q.  To the best of your knowledge, were there any legal

3   disputes with Larry Gordon of XOps in 2020?

4   A.  No, there was not.

5   Q.  So at this time your statement that there was no dispute

6   settled with Larry Gordon out of court?

7   A.  Out of court, I believe they tried to charge us -- it

8   wasn't a legal dispute.  That's the thing.  We just said:  This

9   is a lot of money that you are charging us.  And it's obscene

10  because you guys did no work, so we are going to pay half of

11  it.  And then Larry Gordon said, fine, because he realize that

12  they didn't do any work and that they were scam artists, but I

13  don't need to go into all that.

14  Q.  So is it the position of NDR that XOps did no work towards

15  the Deal Table platform?

16  A.  If they did any work, I would say it was very, very

17  minimal.  It was bare.  What we had was very bare.

18  Q.  Did XOps work on this project for approximately two years?

19  A.  No, certainly not.  Maybe -- I'd have to find the exact

20  amount, but my guess would be five, six months, maybe longer.

21  I could find out for you.

22  Q.  To your knowledge, was Ryan Saul ever requested to record a

23  video regarding the quality of coding provided by XOps?

24  A.  To my knowledge, no.  But I must just state, I was not the

25  CEO at that point.  I was just a mere owner during her hiring

1   process and for the first six months of their employment.

2   Excuse me.

3   Q.  Approximately when was it that you had discovered that the

4   code had been not deposited on the Azure DevOps repository?

5   A.  Are you talking about after the termination?

6   Q.  Yes.

7   A.  Well, if I had to guess, it would probably be about 10 days

8   after is when things started to go south.  We were under the

9   impression that we had everything and it was going to be

10  totally fine.  We just get a new developer and everything moves

11  on.  But I'd say it was about 10 days later that we kind of

12  realized, this is bad.  Ryan still has the code.

13  Q.  And was this after you had recovered anything that was

14  allegedly deleted on January 18?

15  A.  I wouldn't use the word allegedly, but, yes, that's

16  correct.

17  Q.  After that, did you file a complaint with law enforcement,

18  either state or federal?

19  A.  We did, yes.

20  Q.  This was prior to discovering that you did not have a copy

21  of the decompiled code?

22  A.  No, no.  That was after.  We would never do that if we

23  thought we had the code.

24  Q.  So it's your testimony that you had filed with law

25  enforcement after finding that you did not have a copy of the

1   decompiled code?

2   A.   Yes.   But I did not file the complaint.   Thomas Concannon

3   did not.

4   Q.   You had testified earlier that a new developer, full stack

5   developer, had been brought on to look at the project after

6   Ryan Saul was terminated, is that correct?

7   A.   That's correct.

8   Q.   Was this before or after you had discovered that you did

9   not have a copy of the decompiled code?

10   A.   That's a good question.   I would say we hired him on 2/9.

11   I think we were still under the impression that we could

12   somehow still find it because David DeLorge told us, let me

13   keep looking, let me keep looking.   So we said fine.

14          So we hired him, the new developer, and at that point,

15   I'd say about two weeks into his hiring, we realized that we

16   didn't have the decompiled source code for good.   We had an

17   impression that we didn't have it, but things got finalized

18   after that.

19   Q.   This developer, was this an individual or a company?

20   A.   It was an individual contractor, similar -- same way that

21   we hired Ryan Saul.

22   Q.   Was this person provided with an NDA agreement prior to

23   receiving any --

24   A.   Yes, ma'am.   Every single employee that has worked for NDR

25   has had a consulting agreement and NDA in place.

1  Q.  What was the time in between when an NDA was issued and

2  executed and then the consultant was able to actually take a

3  look at the materials that NDR had?

4  A.  As soon as I got it back, I was fine with them going in.

5  We just had to get David to give them access.

6  Q.  This consultant, was this consultant working full time or

7  part time?

8  A.  Part time.  They didn't even do anything.  They allotted

9  hours, but it was generally just looking at the code.  But

10  there was nothing they really did.  It was certainly less than

11  40 hours a week, I'll tell you that much.

12  Q.  What is your best estimation for how much time this new

13  consultant had put into working for NDR?

14  A.  My best estimation, I really don't know.  I could find you

15  the exact amount of hours because we did have an invoice from

16  them.  I don't want to lie.  I raised my right hand.

17  Q.  That's fine.

18           Do you believe that it would be more or less than 10

19  hours?

20  A.  More.

21  Q.  Did this developer provide you with an estimation of how

22  much time it would take to reengineer the code strictly from

23  September 26 to the present?

24  A.  They did not.  Mostly because they didn't want to do it, I

25  would say.  It's a very big undertaking.

1   Q.  Have you since looked to retaining a full stack developer

2   haver who has the capabilities of developing this code for this

3   three-month span?

4   A.  No, ma'am.  Unfortunately, that is a very expensive

5   endeavor and our company is running out of money.

6            MS. WONG:  Nothing further.  Thank you.

7            THE COURT:  What's next?

8            MR. FORTUNA:  I don't have any other witnesses to call

9   at this time, your Honor.

10           THE COURT:  Why don't we adjourn.  We are convening

11  again, I think, at 11:30 tomorrow to hear from Ryan Saul.

12           Everyone, have a great evening.  Thank you.

13           (Adjourned to Thursday, April 21, 2022 at 11:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX OF EXAMINATION

2      Examination of:                                   Page

3      DAVID DeLORGE

4      Direct By Mr. Fortuna  . . . . . . . . . . . . 2
       Cross By Ms. Wong  . . . . . . . . . . . . . .37
5      THOMAS CONCANNON

6      Direct By Mr. Fortuna  . . . . . . . . . . . .55
       Cross By Ms. Wong  . . . . . . . . . . . . . .63

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25