M4LTNETH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

NETWORK DATA ROOMS, LLC,

                    Plaintiff,

          v.                        22 CV 2299 (LGS)

SAULREALISM LLC and RYAN SAUL,
in her individual and
professional capacities,

                    Defendants.        Hearing
                                       (via Zoom)
------------------------------x
                                       New York, N.Y.
                                       April 21, 2022
                                       11:30 a.m.

Before:

                    HON. LORNA G. SCHOFIELD,

                                       District Judge

                         APPEARANCES

ALLYN & FORTUNA LLP
     Attorneys for Plaintiff
BY:  NICHOLAS FORTUNA
     PAULA LOPEZ

RENEE M. WONG
     Attorney for Defendants

1        (Via Zoom videoconference platform, case called)

2        DEPUTY CLERK:  Before we begin today, I want to remind

3   everyone listening that recording or rebroadcasting of this

4   proceeding is prohibited.  Violation of this prohibition may

5   result in sanctions.

6        We're here before the Honorable Lorna G. Schofield.

7        THE COURT:  All right.  As you know, we're here for

8   day two of an evidentiary hearing in support of the plaintiff's

9   motion for preliminary injunction.  And the witnesses for

10  plaintiff, who has the burden of proof, were presented

11  yesterday, and today we have allotted one hour for the

12  presentation of defense witnesses, and I understand there is

13  one such witness.

14        MS. WONG:  Yes, your Honor.  Today we are prepared to

15  have defendant Ryan Saul testify in opposition to plaintiff's

16  motion.

17        THE COURT:  Okay.  Mr. Street, will you swear the

18  witness.

19   RYAN SAUL,

20        called as a witness by the Defendant,

21        having been duly sworn, testified as follows:

22  DIRECT EXAMINATION

23  BY MS. WONG:

24  Q.  Mr. Saul, please state your name for the record.

25  A.  Ryan Saul, S-A-U-L.

M4LTNETH                        Saul - Direct

1    Q.  In advance of the hearing today, did you review a document

2    dated April 11, 2022 titled Declaration of Ryan Saul in

3    Opposition to Plaintiff Network Data Rooms LLC's Motion for

4    Preliminary Injunction?

5    A.  Yes.

6    Q.  Did you sign this document after reviewing it?

7    A.  Yes.

8    Q.  Are you adopting it as your statement for today's hearing?

9    A.  Yes.

10   Q.  Mr. Saul, as we begin, the caption in this matter refers to

11   you as female.  At any time have you held yourself out to be a

12   woman to the plaintiff?

13   A.  No.

14   Q.  Have you provided any documents or anything else?

15   A.  When I started there was a background check and I provided

16   my driver's license and I checked the box for male and they

17   started calling me female.

18   Q.  Does your driver's license indicate that you are male?

19   A.  Yes.

20   Q.  What is your relationship with the plaintiff, Network Data

21   Rooms, which I will hereinafter refer to as NDR?

22   A.  I was hired on as a consultant for back end development in

23   the start of 2021.

24   Q.  And prior to starting that relationship, were there any

25   documents that you had signed in advance of your employment?

M4LTNETH                           Saul - Direct

A.  That would be the NDA.

Q.  Did you sign any other agreements with the plaintiff?

A.  No.

Q.  Was there a consulting agreement that you entered into?

A.  Oh, yeah, basic stuff.

Q.  When you were hired as a developer, was there existing progress that had been made on a project?

A.  Yes, they told me they worked with two companies previously, the first one was company called XOps.  The other company is unknown, the name, or the time that they were in business with them, but they do have copies of that code on Azure.

Q.  And did you have an opportunity to review the code that was provided to you prior to your -- that was developed prior to your employment?

A.  I was only given access to the XOps code, and to me it looked very, very incomplete.  It looked -- they claimed to be working with them for six, seven, eight months, and to me it looked like it was the result of work of maybe a week.

Q.  I'm going to show to you an exhibit that has been previously marked in this hearing as the Delorge Exhibit A to his reply in support.

        Are you familiar with this file that's shown on the screen?

A.  I am not.

M4LTNETH                          Saul - Direct

1    Q.  At the beginning of your employment, were you given certain

2    codes that were completed prior to when you were employed?

3    A.  I was, but the folder was just called XOps.

4    Q.  Have you seen --

5    A.  I'm not that familiar with that.

6              THE COURT:  Did you have access to this path and this

7    location in your access to the plaintiff's records on Azure?

8              THE WITNESS:  No.

9              THE COURT:  So you never have visited this location

10   and you did not have access to these files unless they were

11   provided in another way.

12             THE WITNESS:  That is correct.

13             THE COURT:  Okay, thank you.

14   BY MS. WONG:

15   Q.  So out of those two files, they're titled XOps, did you, as

16   far as what you could tell from what you're seeing, have access

17   to those files?

18   A.  So the guess is that I was given XOps demo, because what I

19   was given felt like a demo.  I would not be able to confirm or

20   deny that unless I had -- unless the screen shot -- unless they

21   clicked on XOps demo in the screen shot.

22   Q.  During the course of your employment, were you able to make

23   edits to the existing code as was written by XOps?

24   A.  Yes, or what was provided to me.

25   Q.  And did you in fact make edits to the code that was

M4LTNETH                           Saul - Direct

1   provided to you by XOps?

2   A.  Yes.

3   Q.  How were you able to access the code that was provided to

4   you by the plaintiffs?

5   A.  That would be only through the Azure VPM as provided by the

6   plaintiff.

7   Q.  Can you please explain the process and the steps that you

8   would go through.

9   A.  Sure.  First off, you have to log in to Azure through the

10  website, or referred to as the portal.  Once you get into the

11  portal you are then able to get into the VPN and work.

12  Q.  And were you, throughout your employment, creating code

13  towards this?

14  A.  Yes.

15  Q.  Where would you have this code saved or deposited?

16  A.  That would be on Azure DevOps.

17  Q.  What does it mean to deposit code?

18  A.  When you deposit code, that means that the work you've done

19  has been submitted to the company so that they own it.

20  Q.  At certain points throughout NDR, were there times that you

21  had or other developers used branches?

22  A.  Yes.

23  Q.  What are the functions of branches?

24  A.  So there's two main functions of branches.  The first one

25  is you're working with multiple developers and you don't want

1    to be stepping on each other.  You then merge the branches.

2            The other purpose of branches is when you're requested

3    to make a huge change but it's uncertain as to whether the

4    change will be official, so if you want to, say, spend a couple

5    of months on something and be able to instantly go back, and

6    that is the purpose of having multiple branches.

7    Q.  Was this used --

8            THE COURT:  So could I ask a question?

9            So are you saying that branches are essentially a

10   place where different -- I'm used to Word documents, so are you

11   saying that basically it's a place where you have different

12   versions and you're saving different versions and then you can

13   merge the versions?

14           THE WITNESS:  That is correct.

15           THE COURT:  Or you can just disregard the version and

16   go back to some prior version?

17           THE WITNESS:  All of those are correct, and that is

18   the purpose and power of having branches, so that gives you the

19   ability to do that if you wanted.

20           THE COURT:  So is the branch the version or the place

21   where you put it?

22           THE WITNESS:  Both.

23           THE COURT:  Okay.

24   BY MS. WONG:

25   Q.  So I'm going to show you an exhibit that has previously

1  been shared from the Delorge declaration.  I believe this to be

2  Exhibit F.  Can you see the exhibit?

3  A.  Yes, yes.

4  Q.  Was this particular screen something that you would be able

5  to have access to while you were employed at NDR?

6  A.  Yes.

7  Q.  And if there were to be certain branches that were created,

8  would they be visible here on this screen?

9  A.  Yes.

10  Q.  And after September 26, 2021, what was the branch that you

11  were using to commit code?

12  A.  It was a branch called Net Roadshow.

13  Q.  Was this branch -- is this branch, as far as you can tell,

14  visible on this exhibit?

15  A.  It is not.

16  Q.  What was the purpose of creating -- strike that.

17          Did you create this branch Net Roadshow?

18  A.  Yes.

19  Q.  What was the purpose of creating this branch?

20  A.  The purpose is because I received a request from Thomas

21  Concannon that we would be very much focusing on essentially

22  copying features of a competitor product called Net Roadshow,

23  which he said was very important.

24  Q.  And why was this on a different branch?

25  A.  The reason why is because I received conflicting requests

M4LTNETH                         Saul - Direct

1    from Chris Concannon and Thomas Concannon to go back and forth

2    between those branches or those versions, so there's no way out

3    of that except to have branches.

4              THE COURT:  I don't understand what the conflicting

5    instructions were.  I heard that you were primarily working on

6    copying features from some other product and so you had a

7    branch to do that.

8              THE WITNESS:  Yes.

9              THE COURT:  But I don't understand what the

10   conflicting issues were.

11             THE WITNESS:  Good question.  And that's because the

12   answer is Chris Concannon did not really want the Net Roadshow

13   work to happen but Thomas did.

14             THE COURT:  Okay.

15   BY MS. WONG:

16   Q.  And if you were able to create this work in a separate

17   branch and you wanted to go back in time, can you please

18   testify why this is a completely separate branch?

19   A.  Exactly for that reason.  If you wanted to just say, hey,

20   guess what, we don't want to do the Net Roadshow stuff anymore,

21   then that's how you could back, very easy.

22   Q.  And was there a point in time where it was decided that NDR

23   no longer wanted to do the Net Roadshow?

24   A.  Yes, that would be middle of November.

25   Q.  And where was the remaining code that wasn't applicable to

M4LTNETH                          Saul - Direct

1   Net Roadshow, where was that code committed to?

2   A.   It was still committed to the Net Roadshow branch, because

3   as part of doing the work for Net Roadshow we did other things

4   that we needed to keep.  So the logic there is Net Roadshow is

5   okay, it doesn't hurt the program, so it can just sit there and

6   we don't have to use it.  So I continued to use the Net

7   Roadshow branch.

8   Q.   Despite it being in a separate branch, did you have the

9   abilities and were you able to merge it into any other

10  branches?

11  A.   I had the ability, yes.

12  Q.   Was this merged at any point in time?

13  A.   No.

14  Q.   Did there come a time where --

15          THE COURT:  Could I ask a question about that?

16          THE WITNESS:  Sure.

17          THE COURT:  So I understand that in the Net Roadshow

18  branch there was the work you were doing to essentially copy

19  features of the Net Roadshow product.

20          THE WITNESS:  Yes.

21          THE COURT:  There was also other coding you were

22  doing, and you said that you were able to basically separate

23  the two, but how were you able to separate the two if it was

24  all in one branch?

25          THE WITNESS:  Good question.  So basically if I had

M4LTNETH                        Saul – Direct

1      received a directive to delete Net Roadshow, that's where the

2      branches would have come in handy.  Net Roadshow is an

3      additional thing to have that's nice, but it can just sit

4      there.  So if you decide you don't want it, we don't have to

5      switch branches.  I made that -- again, I was receiving

6      conflicting -- one day I would see don't work on Net Roadshow,

7      I would see from Chris Concannon don't work on Net Roadshow,

8      the next day I would see from Thomas Concannon work on Net

9      Roadshow.  So it's basically for my protection to go back in

10     time.

11              THE COURT:  I don't understand how you could go back

12     in time since all of the Net Roadshow work and all of the other

13     work is basically the same branch.

14              THE WITNESS:  It's going to require a lot of technical

15     stuff, but basically the easiest way out of that situation is

16     to have branches.  And they didn't tell me to delete the Net

17     Roadshow.  If they told me to delete, then that's where the

18     branches would have come into play.  So it was protecting

19     against something that might have happened.

20              THE COURT:  Maybe I won't try to understand that.  All

21     the work was in one branch, and it was in the branch called Net

22     Roadshow.

23              THE WITNESS:  That's correct.

24              THE COURT:  Okay.

25     BY MS. WONG:

M4LTNETH                          Saul - Direct

1    Q.  Mr. Saul, I would like to talk about deployments of code

2    and where the code was deployed from.

3    A.  Okay.

4    Q.  Did you deploy code?

5    A.  Yes.

6    Q.  And when did you start deploying code?

7    A.  That would be end of January 2021.

8    Q.  And how frequently would you deploy code?

9    A.  Every two to three days.

10   Q.  And to the best of your knowledge, every two to three days

11   a new log would be created from where the code was deployed?

12   A.  Yes.

13   Q.  And what was the location from which you deployed the code?

14   A.  It would be from Azure DevOps within the Azure VN.

15   Q.  VN being --

16   A.  Sorry, VPN.  There's a million ways to say VPN, VN.

17   Q.  Did you ever deploy code from a personal device?

18   A.  No.

19   Q.  Did you ever deploy code from a GitHub repository?

20   A.  No.

21   Q.  You had a virtual personal network which was like a

22   computer that you were able to work remotely from.  Is that a

23   correct description?

24   A.  That's correct.

25   Q.  And on this computer, was there a version of GUID that was

M4LTNETH                          Saul - Direct

1   downloaded?

2   A.   Yes.

3   Q.   Can you explain why?

4   A.   Azure DevOps, which is what I was required to use, is a

5   version or implementation of GUID.  So to put code anywhere you

6   need your GUID client for Windows or whatever you're using.  So

7   you can download that for free, and as part of submitting to

8   Azure it installs a bunch of other things on your desktop, but

9   you basically just use one to commit to Azure.

10  Q.   Did you ever use GitHub as a repository for any of the

11  plaintiff's code?

12  A.   No.

13  Q.   Mr. Saul, I would like to discuss final lists that you had

14  received.

15          THE COURT:  Sorry, could we go back?

16          THE WITNESS:  Sure.

17          THE COURT:  So you were talking about GUID.  Can

18  you -- I think, I'm not sure, were you here during there

19  Delorge's testimony yesterday?

20          THE WITNESS:  Yes.

21          THE COURT:  And he talked about GUID and finding -- I

22  don't know if it was an ID or location, but basically something

23  that was associated with GUID showing that there had been some

24  transfer of data from GUID.

25          THE WITNESS:  Yes.

M4LTNETH                        Saul - Direct

1           THE COURT:  And does that relate to what you just said

2      in any way, and if so, can you explain it?

3           THE WITNESS:  Yeah, kind of.

4           THE COURT:  Okay.

5           THE WITNESS:  The ID that you're referring to, it's

6      called a local generation ID, and it's from -- I don't remember

7      the exhibit, but it's the one with the JSON file.  And that is

8      generated every time you use GUID, and it has to.  And the

9      reason is because there are situations where in big

10     corporations with thousands of employees there happen to be

11     more than one employee with the exact same name, and if you

12     forget to account for that, by which I mean if there were five

13     Ryan Sauls, it wouldn't know the difference between each one.

14     So it always generates a local ID before you commit to solve

15     that problem in the case if there's multiple Ryan Sauls.

16           Does that make sense?

17           THE COURT:  Yes, I understand what you just said, and

18     I think I understand what you said before, but I don't know how

19     the two relate to each other, if they do.

20           THE WITNESS:  And that's because it's required to

21     install GUID.  There's no way to put the code on Azure unless

22     you have a GUID client.  You need it.  And that's true for any

23     software job, you need to be able to send the code up, and the

24     way you do that is through GUID, and it makes an ID.

25           THE COURT:  Okay.  Could that explain the ID that we

M4LTNETH                        Saul - Direct

1   saw in the exhibit yesterday?

2         THE WITNESS:  Yes.  And you would be able to download

3   GUID and make a commit yourself and you would see it would

4   generate a similar type of file.

5         THE COURT:  Okay.

6   BY MS. WONG:

7   Q.  Mr. Saul, do you have a GUID repository associated with any

8   ID that was provided by David Delorge?

9   A.  No.  And just remember that the ID is generated locally and

10  is just a way to get around if you forgot to rename people with

11  the same name.

12        THE COURT:  So it's generated locally every time by

13  the system?

14        THE WITNESS:  That's correct, by your own computer,

15  and that's to get over if there are multiple Ryan Sauls.

16  Q.  Do you possess any user names with GitHub that was

17  associated with your VPM?

18  A.  No, I only use Azure DevOps.

19        THE COURT:  Okay, I interrupted you.  Thank you for

20  indulging me.

21        MS. WONG:  No problem, your Honor.  Of course we want

22  to clear up any questions that you have.

23  Q.  I would like to go back to final lists.  At any point did

24  you receive from NDR Management final lists to complete the

25  project?

M4LTNETH                              Saul - Direct

1   A.  Yes.  The final list started in May.

2   Q.  And when was this final list -- the tasks on the final

3   list, were they completed?

4   A.  They were completed every month.  We averaged one final

5   list per month.

6   Q.  As far as -- what is the difference between back end and

7   front end development?

8   A.  Back end is referring to when you make the request to the

9   website, like the URL at the top of your browser, it gets the

10  data that it's going to display on the screen.  So the data

11  could be people's names, something like that, just phone

12  numbers, something.  The front end refers to making that data

13  look nice.

14  Q.  And by looking nice, do you mean --

15  A.  Graphical design, layouts, pop ups, flashy things.

16  Q.  At some point in time would you have considered the back

17  end development completed for the plaintiff?

18  A.  Yes, the back end of DealTable did not change I would say

19  since April of 2021, and it may have changed like five percent,

20  so 95 percent complete in April.

21  Q.  What would be the percentage of back end development work

22  that was completed after September 26?

23  A.  That would certainly be a hundred percent.

24  Q.  So if you had an approximation of the amount of time it

25  would take to complete the code between September 26 through

1    your termination, what would be your estimate?

2    A.  Let me just say I will give you the estimate but then I

3    will tell you the reason why.  The estimate I would say is

4    about less than a month, three or four weeks, and the reason

5    why is because the time from September 26 up until termination

6    was mostly I'm going to say not very well used time because it

7    was throwing things out, copying things from competitor

8    products, copying pop ups, things like that, then the next day

9    they would say forget about it and do something else.  So that

10   was the way it worked.  So four or five or six months of work,

11   only about a month of that was used.

12              THE COURT:  I'm going to interrupt for just a second.

13              Mr. Street said you have seven minutes left.  Since I

14   interrupted you frequently, I'm happy to give you another five,

15   so if you could wrap it up in twelve minutes that could we

16   great.

17              MS. WONG:  Your Honor, I could probably get it done

18   within the next seven minutes.

19              THE COURT:  Okay.

20   BY MS. WONG:

21   Q.  To the best of your approximation, how much would it cost

22   to complete the work of the coding after --

23   A.  So if you go through Indeed and try to hire a front end

24   developer, you're looking at less than $10,000 for about a

25   month to get those front end changes.  So now they have decided

M4LTNETH                        Saul - Direct

1    what they want it to look like, so there's no more spending

2    time going back and forth, so that would be a one-month effort

3    from a front end developer.

4    Q.  Were there any complexities or certain characteristics that

5    you entered into the code that would make it an obstacle for

6    any experienced front end developer to come in and do this?

7    A.  No.  The best example is Alikia (ph).  She was able to pick

8    up the code in about a day with little guidance.

9    Q.  Could you briefly describe the sort of difficulties you had

10   working with NDR prior to the termination in January?

11   A.  Yeah, the difficulty was Thomas Concannon was new CEO after

12   June, and he started logging in at completely random times, 3,

13   4, 5 in the morning.  He would basically dump a wall of text of

14   random things that he wanted incorporated.  This got to the

15   point where I set up my speaker to blast the sound that the

16   chat makes, and I would wake up and the first thing I would

17   chat him to say please give me five minutes to read what you

18   just wrote.

19        And you could very easily see that there was an icon

20   next to what I wrote that says that he read it, so he was still

21   there.  And then he would decide to log off and I would have no

22   communication with him again for 24 hours.  Which means 3, 4, 5

23   in the morning, because it was inconsistent, I couldn't set a

24   timer, like I couldn't set a timer for 3 in the morning,

25   sometimes it was 1 in the morning, 2 in the morning, 3 in the

M4LTNETH                        Saul - Direct

morning, et cetera.  There's no consistency.  So the best I
could do was try to go to sleep but blast the speakers.  And if
you're able to access the Teams, you'll see that very quickly.

            THE COURT:  I have a question.  Why did you have to
communicate with him in real-time?

            THE WITNESS:  That's a great question.  That's because
outside of that 3, 4, 5 in the morning communication, he
refused to communicate with me any other way, and I tried.

            THE COURT:  Okay.  So in other words, he was refusing
to communicate in real-time?

            THE WITNESS:  He won't say the words "I'm not
communicating with you," but any attempt to do anything went
nowhere.

            THE COURT:  What if you just made whatever changes and
said I couldn't make the other ones and sent him an email or
however you communicate in Azure?

            THE WITNESS:  That's what we would have to do, but the
problem is if anything he said was vague or if it required a
back and forth, that is a three, four-day process just to ask
that question because the 3 a.m. business.

            THE COURT:  Got it.

BY MS. WONG:

Q.  And what documents do you currently possess from your time
at NDR that permitted you to be able to prepare for hearing?

A.  So because everything was in Teams, I no longer have access

1    to that, obviously.  The only documents I have whatsoever are

2    invoices sent to my personal email, and that was something that

3    only Jack would do.  Thomas, as I said earlier, refused to

4    communicate in any way, so after June there was no

5    communication.

6    Q.  And you did not possess any of the documents from Teams or

7    from Azure, is that correct?

8    A.  No, I cannot have that because I'm locked out.

9            THE COURT:  So it sounds like you had difficulties in

10   your relationship with Thomas Concannon.  Were there other

11   relationships that were difficult at NDR between you and anyone

12   else?

13           THE WITNESS:  That's a good question.  Basically,

14   Chris and Jack, they were very -- they were very easy to work

15   with and they were fun to work with.  The problem is that Chris

16   distanced himself from the project, so it was -- we had

17   altercations, but I understand those altercations because he

18   relied on Thomas to communicate with him.  So I don't blame him

19   for that, but to answer your question, yes, I did have

20   altercations with Chris.

21           THE COURT:  How about Mr. Delorge?  I gather you

22   reported directly to him, although it seems like you took your

23   marching orders from one of the Concannons.

24           THE WITNESS:  That's a good question.  Officially when

25   the project started I did report to David Delorge.  He was the

M4LTNETH                        Saul – Cross

1   project manager.  That was also his title.  You could see that

2   inside of Teams.  Over time, David told me that they stopped

3   paying his invoices and he would not log in to Teams for

4   months, and I kept asking:  Is he terminated?  Who do I report

5   to?  And they said:  Keep reporting to David, but he's not

6   here.

7                THE COURT:  Okay.  How was your relationship with him

8   when you were in contact?

9                THE WITNESS:  Very positive.

10               THE COURT:  Okay.  Are there things that he testified

11  to that you think are false?

12               THE WITNESS:  Yes.

13               THE COURT:  Ms. Wong, go ahead.

14               MS. WONG:  Your Honor, I really don't have any further

15  questions.  If you have further questions for Mr. Saul --

16               THE COURT:  Okay.  I don't at the moment.

17               Cross, Mr. Fortuna?

18               MR. FORTUNA:  Yes, thank you, your Honor.

19  CROSS-EXAMINATION

20  BY MR. FORTUNA:

21  Q.  Good morning, Mr. Saul.

22  A.  Good morning.

23  Q.  Just so I understand how you were being paid for your work,

24  you got paid for every hour you were working, so if you got a

25  ten-page list, as annoying as it was, you were paid for the

M4LTNETH                          Saul - Cross

1    work you would do on the ten-page list, is that correct?

2    A.   Yes.

3    Q.   And if you received a message at 3 in the morning from

4    Thomas Concannon, it wasn't that he expected you to respond, he

5    was just sending you information.  You felt like you had to

6    respond because you were worried you wouldn't be able to reach

7    him later on in the day, is that correct?

8    A.   That is partially correct.  He did not communicate in any

9    fashion, whether Teams, email, any fashion whatsoever except

10   for the 3 a.m. business.  So I made multiple attempts to ask:

11   Are you available?  What general timeframe?  What general time

12   of the day?  The only way he communicated was that very late at

13   night business.

14   Q.   But he wasn't looking to wake you up and shake you awake

15   and say here, I have this information for you, he was sending

16   it for you at the time because that was the time he was

17   working, is that correct?

18   A.   That is correct, but I could tell you 4 or 5 --

19   Q.   Just answer the question.

20   A.   That's correct.

21   Q.   Now when you were testifying on direct, it sounds like what

22   you're saying to me is if the code is missing from September 26

23   on, no big deal, because there was nothing much done from

24   September 26 on, no big harm.  That's what it sounds like

25   you're saying, is that correct?

M4LTNETH                    Saul – Cross

1   A.  That's correct.

2   Q.  In your judgment, the fact that the code is missing or

3   stolen, no big deal, because it would only cost 10,000 to

4   replace.  That's your argument?

5   A.  I can't -- I mean it's effective -- yes.

6   Q.  Okay.  Now I want to draw your attention to paragraph 11,

7   you state --

8                THE COURT:  Paragraph 11?

9                MR. FORTUNA:  I'm sorry, paragraph 11 of your

10  declaration.

11  A.  Sure.

12  Q.  You state that you were asked to create a side project?

13  A.  Mm-hmm.

14  Q.  What side project are you talking about?

15  A.  That would be Net Roadshow.

16  Q.  Now you say in your declaration that you were told to keep

17  that secret from Chris Concannon, is that right?

18  A.  Yeah, in so many words.

19  Q.  Okay.  But in fact, it was Chris Concannon's idea to do the

20  Net Roadshow, isn't that correct?

21  A.  No, that was Thomas Concannon's idea for Net Roadshow.

22  Q.  So you weren't aware that it was Chris Concannon who asked

23  that that be done?

24  A.  No.

25  Q.  Okay.  Now you were saying that you created a Net Roadshow

M4LTNETH                        Saul - Cross

1    branch on direct examination so you would have some place

2    separate to work on that Net Roadshow product that was being

3    done, is that right?

4    A.   No, only inside Azure DevOps.

5    Q.   What does that mean?  Did you create a separate branch for

6    Net Roadshow?

7    A.   Yes.

8    Q.   And you created a separate branch for Net Roadshow, you

9    said, so you could work on this Net Roadshow project separately

10   from everything else?

11   A.   That's correct.

12   Q.   But then later on you said you didn't work on it separately

13   from everything else, you worked on everything else on Net

14   Roadshow?

15   A.   Yep.

16   Q.   That's what I'm asking.

17   A.   Okay, sure.

18   Q.   So then everything that you were working on was in the same

19   branch?

20   A.   Correct.

21   Q.   And it wasn't in the Ryan development branch, as you had

22   previously said you were working, it was in the Net Roadshow

23   branch, is that right?

24   A.   Yes.

25   Q.   Okay.  In paragraph 17 of your declaration you said the

code written by other developers was deleted.  And I can go

into the exhibits, but that's not true in fact, right, because

you testified on direct that there was other code that you

worked on from the prior developers, is that right?

A.  That's correct.

Q.  In paragraph 18 you say there was prior litigation over

missing code with other developers.  Do you recall saying that?

A.  Yes.

Q.  What litigation was that?

A.  So I used the term "litigation" because I was told by the

Concannons that they tried to.  So I didn't know at the time

that they settled it out of court, they just told me that there

was litigation.

Q.  Regarding missing code?

A.  From XOps, yes.

Q.  But there was no missing code.  You knew that and you

testified to that on your declaration, isn't that correct?

A.  No.  So I was only given the demo folder.  I don't know a

hundred percent for sure, but based on the screen shot, I was

given the demo folder, not the other one.

Q.  So on direct you said you were using the XOps code, and you

told your attorney on direct that you were making edits from

that, and then I asked you if it was incorrect that it was

missing and you said it is incorrect, it wasn't missing, you

were working with it.  So now are you saying it was missing or

M4LTNETH                      Saul - Cross

1    are you saying part of it was missing?

2    A.  The answer to that question, if you look at the screen shot

3    they provided, there are two XOps folders, so I was only given

4    the demo one.

5    Q.  You said there's missing code in your declaration.

6    A.  Yes.

7    Q.  What code is missing?  If you're making a sworn statement

8    that something is missing, I'm trying to find out what you're

9    declaring is missing.

10   A.  I have an answer.

11          THE COURT:  To interrupt for a second, could someone

12   fix the screen so I could see Mr. Fortuna?

13          Thank you, go ahead.

14   A.  So the question is why did I say the code was missing and

15   deleted.  And the reason why I said that is because they

16   claimed that they worked with them for six months, but what I

17   was given was something that would represent a time of one or

18   two weeks of development.

19   Q.  That's an opinion you're making, but you're just -- that's

20   your opinion, but you're not -- so in other words, you weren't

21   aware of any missing code when you said that?

22   A.  That is correct.

23   Q.  Okay.  In paragraph 20 of your declaration, you say there

24   were two other developers working on the code?

25   A.  Yes.

1  Q.  And by implication, you're indicating they could have taken

2  the code?

3  A.  That is possible.

4  Q.  However, from September 2021, those developers were no

5  longer on the project, is that right?

6  A.  That's correct.

7  Q.  And the missing code is only from September 2021 forward,

8  is that correct?

9  A.  That's correct.

10  Q.  So they weren't there to take the code in September 2021,

11  is that correct?

12  A.  That's correct.

13  Q.  And those developers were terminated at your either request

14  or recommendation, is that correct?

15  A.  Recommendation.

16  Q.  So at that point, you were the only developer with access

17  to the code, is that correct?

18  A.  Yes, as well as David Delorge.

19  Q.  Yes.  Now are you saying that you only used -- you said

20  this on your direct, you said this in your declaration, you

21  only used the Azure system and NDR's Azure VDR platform to

22  perform the work?

23  A.  Correct.

24  Q.  I'm going to show you an exhibit that was attached to David

25  Delorge's -- can you see that or I didn't show that properly?

M4LTNETH                      Saul – Cross

A.  I cannot see, but I do have a copy that you could refer to

a page.

Q.  No, I have to share it with everyone.  Hold on one second.

        Can you see it now?

A.  Yes.

        THE COURT:  Yes.  Please identify the exhibit for the

record.

        MR. FORTUNA:  I'm sharing Exhibit H to David Delorge's

reply declaration.

Q.  Now do you see that this is a screen shot of your access to

NDR's system?

A.  Yes.

Q.  And I want to point out, you see where the red arrows are

on this screen shot?

A.  Yes.

Q.  It's been testified to and it indicates here that you

have -- you tried to access -- you accessed the system from two

different locations, one in Missouri and one in Chicago, is

that right?

A.  It's not -- it's due to the way the internet routing works.

If you have been on websites, it could say you're in a

different location.

Q.  So you're from Missouri, you live in Missouri?

A.  That's correct.

Q.  So you're denying that you were using a machine in Missouri

M4LTNETH                        Saul - Cross

1    to access the code?

2    A.  No, I was using a machine in Missouri to get on Azure to

3    then get on the VN or the VDR platform.

4    Q.  But you weren't using -- as a result, you were using your

5    own machine, not the virtual machine that you were told to use?

6    A.  No, that's only to log on to Azure.  This was when I was

7    terminated and I had to get back on to Azure, they said log

8    back on, and I tried to do so to get back on to Azure.

9    Q.  So you're saying the only time that you used other machines

10   was on the date that you were terminated?

11          THE COURT:  He's not saying that he used another

12   machine.

13   A.  There's a two-step process.  This is -- I'm not saying it's

14   complicated.  You have to get into the Azure portal, and then

15   after that you to get into the VDR platform that you're

16   referring to.  So if you are terminated, you get kicked out of

17   both and you have to log back in to Azure portal.

18   Q.  So what you're saying is you logged into a different

19   machine as opposed to the VDR platform that was provided to you

20   by NDR, is that correct?

21   A.  No, I would only use the same machine to try to log in to

22   Azure to then get access to the VPN again.  It's a two-step

23   process.

24          THE COURT:  Let's ask in a different way.  Do you have

25   any idea why some of these show up as Missouri and why some of

them show up as Chicago?  Are you saying it has something to do

with the way the internet routes things so it will show a

different location?

THE WITNESS:  That is correct.  Sometimes if you go on

websites and they try to sell you something, they get a

location that's close, and that's because they do it based off

the first two, three octets of the IP address which is

separated by dots.  So all they do is they check the first part

and say oh, you must be from -- if you live right on the

border, it's virtually impossible for them to -- St. Louis,

Missouri is right on the border, so 90 percent of the time you

might show up as being in Illinois.

Q.  And that's the reason you're saying it's coming up that

you're showing up in two different locations, is that right?

A.  That's correct.  And the entire time I was trying to log

back into the same Azure that they are requesting that I go

back to because I no longer had access to it because I was

kicked out because I was terminated.

Q.  We'll get back to that.

I want to show you what was marked as Delorge's

Exhibit K to his reply declaration.  Would you take a look at

this, Mr. Saul.

Now it's been testified to --

A.  I cannot yet see the exhibit.

THE COURT:  I can see it.

M4LTNETH                          Saul - Cross

1   Q.  Can you see it now?

2              THE COURT:  Actually, no, I can't see it.  All I see

3   is the list of exhibits.  If you click on it, we'll be able to

4   see it.

5              MR. FORTUNA:  Okay.  Do you see it now?

6              THE COURT:  Okay, we have it.

7              MR. FORTUNA:  Thank you.

8   Q.  Do you see the log in highlighted for you?

9   A.  Yes.

10  Q.  And that's a log in that shows when you log in using the

11  Azure portal, it has Azure there, it has your name.

12  A.  Yes.

13  Q.  And it showed that you tried to do that and it shows

14  failure, right?

15  A.  That's correct.

16  Q.  So it's been testified if you are using their system and

17  not your own system, this is the way that all log ins would

18  look like, but you are saying that's not true?

19  A.  So the problem here is I was terminated and there was no

20  communication for over an hour as to when I could get back in

21  or not, so I had no choice but to sit there and try and log in

22  again every 30 minutes, 15 minutes.  So the first time --

23  Q.  That wasn't my question.  My question is if you use the

24  system that you are required to use, it's been testified that

25  the log-in information would look like the one here highlighted

M4LTNETH                    Saul - Cross

1  in Exhibit K where it states that it's the Azure portal, it has

2  your name, it has the time and date.  Are you saying it's not

3  correct that you are supposed to get this?

4  A.  No, I'm definitely supposed to get a failure to log in.

5  Q.  Again, I didn't ask you about the failure, I asked you

6  about the indication --

7          THE COURT:  Sorry, I'm going to interrupt to say I

8  don't understand the question either.

9          THE WITNESS:  I can explain the failure.

10          THE COURT:  I don't think that's his question.

11  Q.  Mr. Saul, on the earlier exhibit, Exhibit H, we saw that

12  you entered the system and it said that you were entering it

13  from Missouri and Chicago, and you explained that that's

14  because of the internet routing, and not withstanding the prior

15  testimony is that is proof that you were using another machine.

16  So then we went to Exhibit K here, and I said Exhibit K it's

17  been testified to when you use the NDR's equipment assigned to

18  you, this is the way it's supposed to come up as a log in.  It

19  says Azure portal, it says your name, it says the date and

20  time, notwithstanding whether it's success or failure.

21          So are you saying that that's not correct, this isn't

22  the type in every circumstance that you are supposed to get

23  when you use their system?

24          THE COURT:  Are those the same two kinds of documents,

25  Exhibit K and the last one that we looked at, are they both

M4LTNETH                          Saul – Cross

1  activity detail sign ins?

2          MR. FORTUNA:  These are activity sign-in logs.

3          THE COURT:  Is the last one that I looked at the same

4  thing?  I don't remember.

5          MR. FORTUNA:  I will bring it up again, your Honor.

6          THE COURT:  Sorry.

7          MR. FORTUNA:  This is the same activity log, it tells

8  you the name, the success, the same thing.  It's just a

9  different place, different screen shot.

10          MS. WONG:  Your Honor, I object to that

11  characterization.  These are completely different screens and

12  logs.

13          THE COURT:  The problem is without seeing them like

14  next to each other, I can't even tell if the fields are all the

15  same, I don't see, for example, the column that has -- there's

16  a column here that has locations, and so in the other document

17  we have a date and then we have something and then we have a

18  name and then we have Microsoft Teams and then we have success

19  and then we have something else and then a location and then --

20          MR. FORTUNA:  Well, it says multifactor

21  authentication.  It's okay if I go back to the other one?

22          THE COURT:  Yeah, sure.

23          So you're representing these two documents are

24  basically the same document but from different times and

25  therefore they should be showing similar things, and they're

M4LTNETH                          Saul - Cross

1    not, because they're showing Chicago and Missouri as opposed to

2    whatever it is on the most recent document.

3            MR. FORTUNA:  So your Honor, the only thing I want to

4    say, I don't want -- that's my understanding of what that is.

5    I don't want to like make the representation because that's my

6    understanding of what that is.

7            THE COURT:  Okay, I understand.

8            MR. FORTUNA:  Okay.  I'll move on.

9    Q.  I'm going to show you another exhibit, Mr. Saul.

10           Can you see that exhibit?

11   A.  No.

12           THE COURT:  No.

13           MR. FORTUNA:  Just a minute, your Honor.

14           THE COURT:  That's okay.

15   Q.  Can you see the exhibit now, Mr. Saul?

16   A.  Yes.

17   Q.  You looked at this with your attorney earlier, and you were

18   looking at the different branches here?

19   A.  Yes.

20   Q.  And on here, do you see the latest commit date from you is

21   September 26, 2021.  Do you see that?

22   A.  That's correct, on that branch.

23   Q.  And of the list here, there's no other branch that shows a

24   later commit date, so the last time, if you just looked at this

25   document, it looks like that you checked in and saved the code

M4LTNETH                         Saul - Cross

1  was September 26, 2021, isn't that correct?

2  A.  Yes.

3  Q.  But what you testified to is that you started saving it to

4  a different branch called Net Roadshow which is not depicted

5  here, is that right?

6  A.  That's correct.

7          THE COURT:  Mr. Fortuna, do you know if anybody has

8  looked to see if there's a folder called Net Roadshow and if

9  there's anything in it?

10         MR. FORTUNA:  There isn't any file or branch Net

11 Roadshow with any code in there or anything.  Not only did

12 David Delorge spend a considerable amount of time looking to

13 see if he could recover the code after it was taken, they hired

14 a different developer and that developer couldn't find it

15 either and he ended up not doing anything.

16         THE COURT:  Is there a folder called Net Roadshow?

17         MR. FORTUNA:  There isn't a separate branch called Net

18 Roadshow.

19         THE COURT:  There is no separate branch called --

20         MR. FORTUNA:  There is no separate branch called Net

21 Roadshow, that's my understanding.  What I understand from all

22 the participants on the plaintiff's side is that there was an

23 idea to create features called Net Roadshow that they were

24 going to do but they actually did not do any work on that

25 project.

1     THE COURT:  But in any event, there is no folder or

2 branch called Net Roadshow, at least according to your clients?

3     MR. FORTUNA:  Right, according to my client and

4 according to the research, there's no branch.  Those are all

5 the branches that exist.

6     THE COURT:  Okay.

7     MR. FORTUNA:  And that was very clear, that I can

8 represent that they searched for, and that's what they said,

9 those are all the branches.

10     THE COURT:  They said that was all the branches, but

11 it doesn't look from that screen shot that we can see all the

12 branches.  And as I understand it, you can't really delete

13 anything in Azure.

14     MR. FORTUNA:  That's right, it would be there in any

15 event.

16     I need to go through document training again.

17     THE COURT:  That's okay, I will ask a question.

18     Mr. Saul, the day that you were terminated --

19     THE WITNESS:  Yes.

20     THE COURT:  -- can you walk through in narrative form

21 what happened?

22     THE WITNESS:  Sure.  So I usually start my day at

23 9 a.m. CST, and I woke up to see that Thomas had sent the last

24 final list that he mentioned, which was 10 pages.  He also said

25 that most of it we never talked about before.  I had about 10

M4LTNETH                         Saul - Cross

1  to 15 minutes to read it over that before Chris got on Teams

2  and he basically said he was very angry that nothing had been

3  done for several months, and he said that he was going to

4  terminate me.  He did, and --

5           THE COURT:  Wait.  So what did you say?  I understand

6  people get angry, so just tell me what happened.

7           THE WITNESS:  Sure.

8           THE COURT:  So he's mad that nothing was done for

9  several months.  What did you do?

10           THE WITNESS:  I said that a new final list that Thomas

11  sent out at 2:44 in the morning was a two to three-week effort.

12  He would not read the final list at all.  He terminated me.

13  And Thomas told me that he and Chris had a conversation and

14  then they got me back.  In order for me to get back --

15           THE COURT:  So what did you say to Chris during this

16  conversation when he was angry?

17           THE WITNESS:  I said that the existing final list was

18  a two to three-week effort.  And he would not hear a single

19  word, wouldn't look at the final list.

20           THE COURT:  Did you say anything in anger to him?

21           THE WITNESS:  No.

22           THE COURT:  So he terminated you, and what's the next

23  thing you heard from them?

24           Wait, he terminated you, and what did you do?  Did you

25  try to get in into Azure?  Did you do anything?  What did you

M4LTNETH                          Saul - Cross

1  do?

2          THE WITNESS:  So they called me back on my cellphone

3  an hour later and we had a conversation, and they said that

4  they would be willing to let me back in.

5          The issue is that they took two hours to let me back

6  in and I had no choice but to sit there and try again to log in

7  and keep doing that every 30 minutes.  No one ever sent me a

8  text or something that said your access is restored, they said

9  sometime today we'll let you back in.  So I had to keep sitting

10 there and try over and over and over again for a couple of

11 hours.

12         THE COURT:  Why did you need to get in immediately?

13         THE WITNESS:  Because I was trying to restore order

14 with them and try to fix the relationship if I could, or just

15 say:  Did you look at the final list?  Anything to try to work

16 with them again.

17         THE COURT:  So you couldn't communicate with them

18 without being on Azure?

19         THE WITNESS:  That's correct, unless they decided to

20 call or text, but there was 100 percent silence over any other

21 form of communication until they restored my access.  So I had

22 no choice but to sit there and try to log in again.

23         THE COURT:  And so then what happened?

24         THE WITNESS:  We had another meeting where essentially

25 Chris wanted to me to work for free to complete the final list.

M4LTNETH                    Saul - Cross

1    I told him that I would not do that and he terminated me again.

2              THE COURT:  Okay.

3              THE WITNESS:  And that's it.

4              THE COURT:  What did you do?  Did you at any point

5    threaten to delete anything?

6              THE WITNESS:  No.

7              THE COURT:  Did you delete anything?

8              THE WITNESS:  No.

9              THE COURT:  There are things they say were deleted

10   that they were able to restore, the website and certifications

11   and various other things.  Did you delete any of those?

12             THE WITNESS:  No.

13             THE COURT:  Okay.

14             Mr. Fortuna.

15             MR. FORTUNA:  Yes, sure, thank you.

16   BY MR. FORTUNA:

17   Q.  You watched the testimony of David Delorge, right?

18   A.  Yes.

19   Q.  And you saw that, after you were terminated the second

20   time, he identified attempts by you to log on to the Azure

21   system, isn't that correct?

22   A.  That's -- I did not do that.

23   Q.  And then did you see where he identified the batch file

24   that deleted the website?  Did you see that?

25   A.  I saw that, but I did not take that action.

M4LTNETH                        Saul – Cross

1   Q.  So you're saying someone else must have done that?

2          THE COURT:  If it happened.

3   Q.  If it happened.  But Mr. Saul, you saw that demonstrated

4   that it happened, isn't that correct, the screen shots that the

5   website was deleted?

6   A.  I saw it demonstrated.

7   Q.  I'm sorry?

8   A.  Yes, I saw it demonstrated, yes.

9   Q.  You saw it demonstrated that it was deleted?

10  A.  Yes.

11  Q.  So you agree that it was deleted, you just are saying

12  someone else must have done it?

13  A.  Yes.

14         THE COURT:  Let me ask that.  So you agree that it was

15  deleted, and the reason you agree is because you saw that

16  document, is that right?

17         THE WITNESS:  Yes, that's based on the documents.  So

18  I have no way of knowing if it was actually factually deleted.

19  After I was terminated the second time I considered the

20  relationship completely over and I took a nap.

21         MR. FORTUNA:  May I continue, your Honor?

22         THE COURT:  You may.

23         MR. FORTUNA:  Thank you.

24  BY MR. FORTUNA:

25  Q.  Now you said that GitHub ID would not be generated because

M4LTNETH                         Saul - Cross

 1   there was a GUID program in the Azure system, however, can you

 2   explain why there are no GitHub IDs prior to September 26 saved

 3   in the system?

 4   A.  I cannot explain.  So every time you do GUID it's going to

 5   generate a local ID every time.

 6   Q.  So the only GUID IDs that were found were after

 7   September 26, 2021.  Can you explain why that is the case?

 8   A.  No, and I do not support that.

 9           MR. FORTUNA:  Okay.  Just a couple of wrap-up

10   questions, your Honor.

11   Q.  So you saw the log-on information provided yesterday during

12   David Delorge's testimony showing that you were trying to log

13   on after you were terminated the second time, is that correct?

14   A.  That is not correct, only the first time.

15   Q.  Did you see the log-on information that was testified to

16   that was provided showing that you tried to log on after you

17   were terminated the second time?

18           I'm not asking if you did log on, I'm saying did you

19   see that information --

20   A.  Yep.

21   Q.  -- provided to the Court?

22           So you saw there were attempts showing that you were

23   trying to log on, is that correct?

24   A.  I saw -- I understand the question and I saw what was

25   testified and I recall it.

M4LTNETH                        Saul - Cross

1    Q.   Now you had a mobile phone that you were using as one of

2    the authentication places to get on the system, right?

3    A.   Yes.

4    Q.   Did you ever give that mobile phone to anyone at NDR?

5    A.   No.

6    Q.   Did you ever meet anyone from NDR in person?

7    A.   No.

8              THE COURT:  So let's go back.  You saw there was a

9    document showing attempts by you to log on after the second

10   time you were terminated, right?

11             THE WITNESS:  I saw that.

12             THE COURT:  And you deny that you tried to log on

13   after the second time you were terminated?

14             THE WITNESS:  That is correct, only the first time,

15   because I received notification they would let me back in, but

16   not the exact moment that I was to log back in.

17             THE COURT:  So if I were to accept your testimony,

18   because we have diametrically opposed testimony here, someone

19   is not right.  If I would accept your testimony, that would

20   leave two alternatives:  One, either the document is fake,

21   essentially, it is showing that something that didn't happen,

22   or it shows something that happened but it wasn't you who did

23   it.  Is that right?

24             THE WITNESS:  That is right.  And if I may, I would

25   just like to suggest if you have Outlook or if you have any

M4LTNETH

1  sort of password system, what it does when you're removed from

2  a system, it tries to log back in over and over again.

3          THE COURT:  What do you mean?

4          THE WITNESS:  If you have Outlook and you have an

5  email address associated with a company and they reset the

6  password, it tries to use the old password again and again; not

7  every minute, but let's say every hour it fails.  That's a

8  possibility.

9          THE COURT:  Okay.  Mr. Fortuna, could you wrap up in

10  the next couple of minutes?

11          MR. FORTUNA:  Yes, I can.

12  BY MR. FORTUNA:

13  Q.  So you're trying to suggest that your Outlook system was

14  trying to log in without you knowing about it?

15  A.  I mean, yeah.  I mean I wouldn't say without me knowing

16  about it.  I thought maybe there would be a third attempt for

17  them to say -- try to get me back in again, so I just said I

18  will just take a nap, see what happens.

19  Q.  I didn't ask you about your sleeping, I asked you:  You're

20  suggesting that your Outlook system was trying to log on

21  without you knowing about it.

22  A.  Yeah.

23          MR. FORTUNA:  Okay.  No further questions, your Honor.

24          THE COURT:  Okay.  Thank you.

25          I am going to reserve decision.  I want to think about

M4LTNETH

1  this.  I want to look at the transcript one last time.

2          Could we go back to gallery view?

3          MR. FORTUNA:  Your Honor, may I -- while you're

4  reserving decision, would you just continue the TRO in effect

5  until --

6          THE COURT:  Yes, yes.

7          MR. FORTUNA:  Thank you.

8          THE COURT:  And I gather there's no opposition from

9  Ms. Wong to my doing that, is that right?

10          MS. WONG:  No, your Honor, there's no opposition to

11  that.  In fact, there's no opposition to the majority of the

12  relief requested.

13          THE COURT:  I understand.  Just so it's clear, you

14  don't object to a preliminary injunction basically on the same

15  terms as the TRO, what you object to is any order that Mr. Saul

16  return software that Mr. Saul says he doesn't have and is

17  capable of returning under threat of some kind of contempt

18  penalty, is that right?

19          MS. WONG:  That is absolutely correct, your Honor.  We

20  certainly cannot produce items that my client has the position

21  that he does not possess or control.

22          THE COURT:  Okay.  So I know we have people on the

23  phone plus we have the people here.  I just want to say I find

24  this case very troubling, I think for obvious reasons.  In some

25  ways it's like what I think trials and lawsuits used to be

M4LTNETH

before the advent of email, which is clearly a long time,

because lawsuits these days, the facts generally are fairly

clear because there's usually some long documentary string,

usually emails, that show everything that happened.

My guess is that there are also documents here that

show everything that happened, but I don't have the ability to

look at them, and I think that ultimately only if someone

looks -- some independent person looks at what's going on in

Azure and the same independent person looks perhaps at

Mr. Saul's -- I'm not sure what, I don't think looking at the

computer is going to show much of anything since everything was

done over VN, but I think more discovery is going to be

necessary to really sort this out.

What's troubling to me is that it's hard to imagine an

explanation other than someone is being very untruthful, and I

will confess to you, perhaps previewing my ruling, that it's

not entirely clear who that is.  But there is what sounds to me

like perjury and fraud on the Court going on, and it strikes me

that maybe both lawyers would be well served to have serious

conversations with your clients, but also, in the case of

Mr. Fortuna, with your witnesses.

And it's also occurred to me that it's entirely

possible that the truth lies somewhere in the middle.  I don't

know.  It's not immediately obvious to me that -- I think it's

remiss in some ways to look at people's faces and see who is

M4LTNETH

1    lying.  I don't have that magical power.  I actually think

2    working digitally is useful because you can actually see

3    people's faces and stare into them in a way you cannot when

4    someone is sitting next to you on the witness stand, so I

5    appreciate we have been able to do that in this format.

6            I don't mean any disrespect to Mr. Delorge or to

7    Mr. Saul, but clearly what they are saying are diametrically

8    opposed, and at some point, perhaps, we'll sort it all out.

9            So I will reserve my official decision.  I wish you

10   good day and we'll see where it goes.

11           MR. FORTUNA:  Your Honor, may I be heard on a few

12   points on the issues you raised?

13           THE COURT:  Yes.

14           MR. FORTUNA:  So I do disagree with your Honor in the

15   sense that a couple of things.  I understand it was our burden

16   of proof, so we presented documents that in no way were

17   challenged as not being correct or original.  There was no

18   countervailing evidence.  There was no cross-examination.

19   There was nothing to suggest that those are fake documents.

20           In fact, the witness Ryan Saul agreed that the website

21   was deleted, he agreed that someone was trying to sign in as

22   him, and testified inconsistently on a number of points.  He

23   agreed that a GitHub system was being used to generate IDs, and

24   we presented information showing what the identification should

25   look like without the GitHub, that GitHub shouldn't have been

M4LTNETH

1    used, and we also showed that we're missing the code.

2              We have no incentive to have a whole lawsuit over code

3    that they have been working on for three years, spent over a

4    million dollars on.  And frankly, I think it's kind of

5    offensive to minimize like the value of that code by saying

6    it's no big deal.  Basically Mr. Saul is saying who cares that

7    it's stolen, it's only worth $10,000.  Well, that's not my

8    understanding from our clients, and basically they had to pay

9    more for this litigation than if they could have reestablished

10   the code.

11             So the circumstances suggest that what the clients are

12   saying is accurate.  The documents that we provided weren't

13   adequately challenged to allow the Court or to suggest the

14   Court should question them.  And the testimony of David Delorge

15   was consistent on all the technical issues.

16             And that clearly, if you look at the transcript of

17   Mr. Saul's testimony, he was going back and forth on issues

18   saying things that made no sense.  First, he says that the Net

19   Roadshow branch was created so he could work on it separately

20   so it could be later be deleted but nothing was ever deleted,

21   then he said he worked on everything in the Net Roadshow branch

22   yet there's no Net Roadshow branch.

23             So I do think we deserve -- given the circumstances

24   and the harm that's happening to our client, we deserve an

25   order that directs him to turn over the code and turn over

M4LTNETH

1   information from his password and things like that so we could

2   locate the code.

3        Whether or not you hold him in contempt later on if he

4   doesn't do it, if he wants to resist, that could be a separate

5   issue.  You could decide well, maybe more information is needed

6   to hold him in contempt, but I think we deserve an order

7   directing him to turn over the code, because I think we

8   provided adequate proof that he took the code.

9        THE COURT:  So here's the problem.  I will respond to

10  that.

11       Let me let Ms. Wong respond then I will tell you what

12  my own view is.

13       MS. WONG:  Thank you, your Honor.

14       I think it's a complete mischaracterization of what

15  the hearing I spent and we spent in the last two days here.

16  The first thing being exhibits provided by David Delorge are

17  completely cherry picked, they're cut off, they're hard to

18  read.  It was shown based upon an email platform that we are

19  all familiar with, an email dated October 19 and October 20

20  that is so completely unreliable that the best inference there

21  is that David Delorge is incapable of providing documents that

22  adequately reflect dates and times.  And on the other end of

23  the spectrum, that these are documents that are completely and

24  wholly fabricated.  Either way, the documents and screen shots

25  provided by David Delorge do not represent the entirety of the

M4LTNETH

1    discovery here.

2          Here, we have heard that the plaintiffs have spent

3    over a million dollars, yet every single person that they have

4    worked with is completely incompetent or a scam artist.  We had

5    testimony from Mr. Concannon indicating that XOps were scam

6    artists, so that's why we worked out a deal with them.  The

7    other two developers were no longer on the project because they

8    were unable to complete tasks.  Mr. Saul, the defendant in this

9    litigation, has is gone and scammed them out of code.  Then we

10   have David Delorge, who was in charge of security and in charge

11   of securing this code, testify that he has not gone and looked

12   to see that this code was secured at all.

13         The point here of Mr. Saul testifying that the code to

14   finish, now that the plaintiff knows what they want post

15   September 26, 2021, is not to say oh, the code is lost and who

16   cares, it is the plaintiffs are required to show irreparable

17   injury here, and irreparable injury is not three weeks worth of

18   work and development that costs between 10,000 to $15,000, your

19   Honor.  That would not qualify as irreparable.

20         We ask the Court not to impose any conditions on

21   Mr. Saul to produced things that the plaintiffs have not

22   demonstrated that Mr. Saul is in possession of.  I believe that

23   the most strong evidence that was provided by the plaintiffs

24   was David Delorge indicating that he has a strong estimation

25   based upon the local ID produced by GitHub that Mr. Saul

M4LTNETH

1   possesses the code.  Other than that, there is nothing that has

2   been provided to the Court demonstrating that Mr. Saul actually

3   has this code, and we will continue --

4           THE COURT:  Could I ask Mr. Saul, do you have a GitHub

5   account?  I assume you do because --

6           THE WITNESS:  No.

7           THE COURT:  Have you ever?

8           THE WITNESS:  No.  I cannot use GitHub because

9   potentially you can subpoena the code, you could pretend to be

10  a lawyer.  This is why nobody uses GitHub and why I have never

11  used it.  I always used an internal system such as Azure

12  Deadlocks.  All you need to do, if it's on GitHub, is try to

13  get someone who has been working there a week or two, say I'm a

14  lawyer and give me the code.  That's why nobody uses GitHub.

15          MR. FORTUNA:  Your Honor, that is not true, because I

16  contacted GitHub --

17          THE COURT:  Look, I understand.

18          THE WITNESS:  What I said was potentially.

19          THE COURT:  I'm going to stop this right here, in part

20  because I have to chair a meeting at 1:00, which is why we were

21  going to end at 12:30.

22          But in brief, here's the issue:  We're very early in

23  the case.  I understand that neither side probably has an

24  appetite to spend lots of time and money doing discovery, but

25  the problem is at this point we all have somewhat limited

M4LTNETH

1    information.  There is no expert who has gone in and looked at

2    anything and given an impartial view.  And if I were to order

3    Mr. Saul to produce code, the consequences of not doing so

4    would be contempt, and I don't feel that there is sufficient

5    evidence for me essentially and eventually to say to Mr. Saul

6    I'm going to fine you X amount a day or put you in jail because

7    you haven't done this, and that is essentially the consequence

8    of my ordering that.

9            And the burden of proof is on the plaintiff.  The

10   evidence is strong, but I don't know if it's reliable, and so

11   what I -- my plan I have solidified in my mind, but wait for my

12   order, but my plan is to deny the aspect of the relief that

13   asks for an order for Mr. Saul to return code that he has sworn

14   under penalty of perjury he does not have, without prejudice to

15   asking for that at a later point after there is some discovery.

16           But just based on what I have heard, I have seen

17   selected screen shots, I have been told there's lots of other

18   information on Azure, I have been told nothing can be deleted.

19   It seems like a pretty easy case in a sense to get some

20   agreed-on, perhaps, third party, whom you will both trust, to

21   go into Azure and look at it and see what the heck and tell me.

22   But until that happens, I'm not comfortable granting that

23   relief.  I'm likely to grant the preliminary injunction in

24   other respects.  Why shouldn't I?  It's not opposed.  But that

25   is where I stand.

M4LTNETH

1          So I am not going to hear further argument.

2          MR. FORTUNA:  No, no argument.  I request four

3     seconds.

4          Could you, rather than making a decision now, order

5     that an independent person go in and review the files and come

6     up with a report based on the information?

7          THE COURT:  Write me a letter with that proposal and

8     explaining how this independent person would be retained, talk

9     to Ms. Wong.  If you can agree to something, then I am more

10    inclined to grant it.  I will wait to rule on anything until

11    tomorrow.  Send me a letter.  I'm picking a jury all day

12    tomorrow, but send me a letter by 2 o'clock tomorrow and I will

13    consider it.  Okay?

14         MR. FORTUNA:  Thank you, your Honor.

15         THE COURT:  All right.  Thank you.

16         MS. WONG:  Thank you.

17         THE COURT:  We're adjourned.

18         (Adjourned)

19

20                          INDEX OF EXAMINATION

21    Examination of:                              Page

22     RYAN SAUL

23    Direct By Ms. Wong . . . . . . . . . . . . . . .74

24    Cross By Mr. Fortuna . . . . . . . . . . . . . .93

25